[No. S005233. July 29, 1996.]

THE PEOPLE, Plaintiff and Respondent, v.
LANCE IAN OSBAND, Defendant and Appellant.

634

COUNSEL

Tim Brosnan and Peter A. Leeming, under appointments by the Supreme Court, and Robin Packel for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, William G. Prahl and Ward A. Campbell, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**THE COURT.***—Defendant Lance Ian Osband has been sentenced to death under the 1978 death penalty statute for murder.

In an information, defendant was charged with the murder on October 5, 1985, of Lois Minnie Skuse. (Pen. Code, § 187; all unlabeled statutory references are to this code.) It was also alleged that he used a knife in the killing. (Former § 12022, subd. (b).) Three special circumstances were alleged: that the murder was in the first degree and he committed it during a burglary (former § 190.2, subd. (a)(17)(vii)), during a robbery (former § 190.2, subd. (a)(17)(i)), and after raping Skuse (former § 190.2, subd. (a)(17)(iii)).

Defendant was also charged with the burglary of the Skuse residence (§ 459), and with the robbery (§ 211) and forcible rape (§ 261, subd. (a)(2)) of Skuse. It was alleged that he used a knife to commit the robbery (former § 12022, subd. (b)) and rape (§ 12022.3, subd. (a)).

---

*Before George, C. J., Mosk, J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Lucas J.†

†Retired Chief Justice of the Supreme Court, assigned by the Acting Chief Justice pursuant to article VI, section 6 of the California Constitution.

Defendant was also charged with attempting to murder Norma C. 16 days after he killed Skuse. (§§ 187, subd. (a), 664.) He was further charged with the burglary of the classroom in which she was attacked (§ 459), with robbing her (§ 211), and with assaulting her with the intent to rape (§ 220). Each of these four charges also carried allegations of infliction of great bodily injury (§ 12022.7) and knife use (former § 12022, subd. (b)).

A jury found defendant guilty on all counts and all the allegations true, except for the knife-use allegations in the charges stemming from the attack on Norma C., following the trial court's decision to strike those allegations. It found that the murder of Skuse and the burglary of her apartment were offenses committed in the first degree. The burglary of Norma C.'s classroom was found to be in the second degree.

FACTS

I. *The Guilt Phase.*

 A. *The Prosecution's Case.*

 1. *The Killing of Lois Minnie Skuse.*

Just before noon on October 6, 1985, the son and daughter-in-law of 66-year-old Lois Minnie Skuse found her body on the floor of the bedroom of her Sacramento apartment. Her son first saw the body; he cried out "almost instantaneous[ly]" on entering the bedroom from a short hallway. As her daughter-in-law explained: "All of the drawers in her dresser had been dumped" on top of the body so that she and her husband could only "see her legs kind of halfway out from underneath the pile" formed by the drawers and clothing. She called to her husband not to touch anything because there might be fingerprints, and she summoned the police, who arrived while she was still on the phone. A coroner's deputy saw "one leg and part of another" protruding from underneath the pile.

The bedroom had been ransacked. In addition to the drawers and clothing atop Skuse's body, papers and boxes lay on the bed. Her purse's contents had also been emptied onto the bed, and her car keys and wallet were missing.

Skuse's television set was also missing. And the padlock to her garage was unlocked, which was unusual. A knife drawer in the kitchen was open, a position in which Skuse, a careful housekeeper, would not have left it. After Skuse died, her son and daughter-in-law moved a knife set of Skuse's

to their house along with other personal effects. A police officer showed her daughter-in-law a photograph of a knife, or the item itself, and it was similar to the type found in that set. However, she could not say that a knife was missing from the set.

When the police permitted Skuse's son and daughter-in-law to reenter the home, they recovered $14,000 in envelopes in various hidden locations. Empty envelopes were scattered "all over the place."

The United States Postal Service mailed Skuse's wallet to her son and daughter-in-law. Those individuals received it about two weeks after the killing.

The coroner's deputy examined the scene. Skuse had "some fragments" of clothing on. "There was what appeared to be a pair of panties that had been either cut or ripped, where the crotch was not in its normal position with respect to where it should be. [¶] The waistband was still around the waist . . . ." The deputy collected samples of fluid from Skuse's pubic area.

An impression of defendant's palm print was found on one of the dresser drawers lying on the body—a police officer testified that he believed it was the topmost drawer in the pile, located near Skuse's head—and impressions of his fingerprints or thumbprints were found on a small turquoise tissue box located atop the dresser, on the tissue paper itself, and on an envelope and a box lid that were found on the bed. Shoe print impressions apparently formed by blood and consistent with those made by the type of shoe defendant owned were found in the apartment.

The pathologist who performed an autopsy on Skuse testified that he found a one-and-three-quarter-inch-deep V-shaped stab wound on the right side of her neck. It could have been caused by a serrated knife found near Skuse's head. The wound was not "a simple slit-like stab wound[, as] if one stabbed a knife in an apple . . . ." Rather, it had "two arms to it, as if there were two separate stab wounds in the same area" or as if "movement had occurred while the knife went in one direction . . . [and] was twisted slightly, and removed, making two cuts rather than one." If the product of a single insertion, its shape could also have been caused by movement by Skuse rather than twisting of the knife. It had almost completely severed her carotid artery, and was the cause of death, which would likely have occurred very quickly but not instantaneously.

In addition, the pathologist testified that a rib and various facial bones, including the upper jawbone, were broken, consistent with Skuse's having

been beaten. Epidermal and other injuries also revealed that she had been severely beaten about the face. The pathologist found sperm in her urethra, vagina, and vaginal introitus. He also testified that Skuse suffered from osteoporosis or "soft bones" that in turn caused kyphosis, i.e., a stooped or hunchbacked condition.

### 2. *The Attack on Norma C.*

Early in the evening of October 21, 1985, Gloria Luevano was waiting outside the gymnasium at St. Patrick's Elementary School in Sacramento County when 51-year-old Norma C., covered with blood and with "one shoe on and one shoe off with one nylon," came up to her. She went for help and when it arrived she showed a police officer where the second grade classroom was located. The blinds to that classroom were closed, whereas those to the first, third, and fourth grade classrooms were open.

Norma C., the second grade teacher, testified that she was grading workbooks at 5:20 to 5:25 that afternoon. The classroom curtains were open. She was wearing boots that zipped up almost to the knee. Defendant entered the room, strode quickly toward her, threw her on the floor and, without a word, started beating and choking her, hitting her at least 15 times. Bleeding profusely, Norma C. told him that she had a daughter and that she hoped he would not kill her. He dragged her—by her arms, she was fairly certain, although a sheriff's deputy experienced in analyzing bloodstain patterns thought that she was dragged by her feet or legs—to the back of the room and asked her if she had any money. (She was uncertain whether she was dragged on her back or on her stomach.) Although her glasses had been knocked off and her eyesight was dimmed by blood, she could see him going through her purse, which had both paper money and coins in it. She was fully clothed at that time. Then she blacked out. She next recalled being lifted into an ambulance. By the time she arrived at the hospital, she had discovered that her undergarments and one boot were missing. She could not remember telling a police officer at the hospital, in effect, that she had been raped. She identified defendant in the courtroom as the man who had battered her, and also testified that she had identified him in a photographic lineup.

Norma C. testified that she was left with a broken jaw and teeth and fractured facial bones. She lost her sense of smell and parts of her face remained numb at the time of trial. She had been lacerated, and had also received "three large incisions, . . . [including] one . . . which was near my neck vein." She had been required "to go and have some tests to see whether or not my jugular vein had been severed." She did not keep a knife

in the classroom. There were, however, scissors that were evidently not in plain sight. She did not see a weapon in defendant's hand.

Norma C. also testified that she did not try to defend herself because the force of defendant's attack on her convinced her that he intended to kill her in any event and she did not want to increase her suffering.

A police officer testified that five to ten minutes after he arrived at 6:20 p.m. he went to the second grade classroom to try to apprehend the culprit. The curtains were drawn. He looked inside the classroom to see whether a suspect might still be there and, observing no one, guarded it for an hour until investigators could arrive and collect evidence.

Another police officer testified that the drapes were drawn when she arrived and that she found a stain that appeared to be caused by blood on the inside edge of one of them. Still another officer testified that there was blood at several locations on the classroom floor. And another officer testified that he gathered up the spilled contents of a purse and the purse itself from the floor, retrieving $1.68 entirely in coins. He saw no money inside the purse, although he did not conduct a thorough search of it. He also found and collected a "wad of clothing" consisting of "[l]ady's underpants, a pair of pantyhose that were turned inside out, and inside the leg of one pantyhose at the foot was a woman's shoe or boot." The underpants and pantyhose were torn.

An identification technician for the Sacramento Police Department who inventoried the purse's contents testified that she found $4.99 in coins but no paper money.

Defendant's fingerprints were found in the classroom. Shoe print impressions apparently formed by blood were also found. There was testimony that they were likely made by defendant's shoes.

A doctor who treated Norma C. on the evening of the attack testified that she had a laceration within about an inch from the carotid artery accompanied by swelling of that side of her neck. The swelling raised the possibility that "the carotid artery that supplies blood to the brain had been partially transected, such that the blood would leave the vascular channel . . . into the soft tissue." He also described various facial fractures. She had her jaw immobilized for six weeks and could only drink liquids.

A police officer acknowledged on cross-examination that Norma C. told him from her hospital bed that she was unable to see defendant during the attack because of the blood in her eyes.

### 3. *Postarrest Forensic Analysis.*

When defendant was arrested, he was wearing Nike tennis shoes. They were introduced into evidence.

There was testimony that 20 percent of the Black population, including defendant, have type B blood. Skuse had type O blood. Norma C. had type A blood. Defendant's shoes had been exposed to type O blood and also to blood that could have come from individuals with types A and B or an individual with type AB.

There was also testimony that fluid on swabs containing semen found in Skuse's vaginal area tested positive for type B and type O antigens. The former could have been contributed by defendant, and either he or Skuse could have contributed the latter. A purple robe that Skuse was wearing was semen stained; the semen reacted to a test for type B antigen, consistent with what defendant could produce.

### 4. *Postarrest Interrogation.*

On October 22, 1985, defendant, evidently having waived his rights under *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R3d 974] to silence and to counsel, told a homicide detective that he had never visited the Skuse apartment. When told that his fingerprints had been found there, he could offer no explanation for their possible presence. He also denied ever having been inside St. Patrick's Elementary School and could not understand why his fingerprints might be found in a second grade classroom there.

### B. *The Defense's Case.*

Defendant testified on his own behalf and, contrary to his pretrial statement to the police, acknowledged having been at both crime scenes. He also admitted wearing at both scenes the shoes that were seized on his arrest.

With regard to Skuse's killing, the defense was alibi—defendant testified, "I didn't do any murder." He described two Black males who were carrying a television set down the stairs leading from Skuse's apartment. He asked them if they were moving and they said that they were. He asked whether the apartment was for rent and they told him to talk to the manager. They loaded the television into a red truck. He tried to find the manager but could not. He saw the solid door to Skuse's apartment open and the screen door ajar, and, getting no response from inside, entered. He found the bedroom in disarray

but saw nobody, dead or alive. He did touch surfaces inside the house. He took nothing from the apartment; he was there for two to three minutes and then continued on his way. When he was arrested the day after he attacked Norma C., the police asked him about a homicide that had occurred at Skuse's apartment. That scared him and he denied being at the apartment or the elementary school.

On cross-examination, defendant admitted that he inspected a jewelry box in the apartment but found nothing valuable. He also admitted, as he had on direct examination, that he entered the apartment with the idea of stealing something. When he entered the bedroom, the light was dim, and although he saw no blood, he did not know whether he might have stepped in any.

Defendant admitted that he attacked Norma C. He testified that he did so out of upset: evidently his car had run out of gasoline and stalled nearby, he was having other car trouble, and he had needed to appear in traffic court earlier that day. He dragged her to the back of the room, tearing her pantyhose. When she volunteered to give him money he emptied the contents of her purse onto the floor but, finding only coins, took nothing. He had no weapon, did not rape or attempt to rape her, and did not intend to kill her. He left, went back to his car, and finally obtained gasoline by siphoning it from another car.

On cross-examination, defendant admitted that he entered the classroom with the intent to steal and that he attacked Norma C. "more or less" because, in the prosecutor's words, he was "having a bad day." He did not know why he did not drag her by the ankles rather than her pantyhose, why her torn underpants should have been found on the floor, or whether he turned out the light or pulled the drapes on leaving. He did not know how she could have been stabbed in the neck. He did nothing to try to get medical help for her. After he left and siphoned gasoline out of the car, he went with some friends to buy some beer, had a few drinks, and returned home.

Defendant testified that he was of average strength at the time of the crimes.

There was evidence for the defense beyond that presented by defendant's testimony. Defense counsel adduced evidence that a pair of yellow sunglasses found on Skuse's bed did not belong to her or to defendant. Fingerprint impressions belonging to unknown individuals were found on other property taken from the scene of the killing, and it was impossible to determine how long his fingerprint impressions might have been present on the property recovered from the premises.

Skuse's son conceded in testimony that when he found her, he could see only her ankles.

The criminalist acknowledged that Nike is a common brand of shoe and that he had not learned how many shoes with defendant's sole pattern had been sold in Northern California. It was conceivable that shoes of different size could have the same size and design of sole pattern.

The criminalist also stated that the type B activity found on Skuse's purple robe could have been caused by bacterial contamination, although such an event would be unusual. Bacteria present in fecal matter found on the robe could have altered the analysis of the stains also found on it, and could themselves generate type B activity, in which case the seminal stains could have been caused by anybody. Indeed, all the swabs that tested positive for semen could have been so contaminated, although there was no visual indication that they were. However, the criminologist did not see any unusual bacteria.

### C. The Prosecution's Rebuttal Case.

A police officer testified that there was blood only in the bedroom of the Skuse apartment and that he found it on the floor "[a]bout and under the victim and at her feet." The blood at her feet consisted of that left by shoe print impressions, and some shoe print impressions lay underneath her lower legs. The only pooled blood in the apartment lay directly under Skuse's torso.

## II. The Penalty Phase.

### A. The Prosecution's Case.

In aggravation, the prosecution introduced evidence of prior violent criminal activity.

Dorothy Cossman, who was approaching her 70th birthday at the time, was walking on a sidewalk on September 1, 1984, when she sensed that someone was fast approaching by bicycle and preparing to snatch her purse. She clutched it and wheeled around to ward off the perceived impending robbery. A person on a bicycle struck her in the buttocks but did not seize the purse. She was not injured or knocked to the ground. She could remember few details of the incident. A police officer testified, however, that defendant was detained and arrested and that Cossman identified him in a showup as the culprit.

On cross-examination defendant elicited the officer's belief that he pleaded guilty to misdemeanor battery. It was later stipulated that he did so.

Fourteen-year-old Angela M. was walking to school on March 26, 1984, when defendant offered her a ride. Instead he took her to a house where he forced her into a bedroom, kissed her repeatedly, fondled her over her brassiere, and told her she could not leave " 'until I get what I want, and I want to make love to you[]' . . . ." He was interrupted by the sound of the front door being unlocked and opened, and she was able to flee and ran to her aunt's house. At some point during the incident defendant apologized for his misconduct. Angela's mother called the police. Angela testified that defendant later warned her that "if anyone pressed charges against him, someone was going to get hurt."

On cross-examination, asked whether she recalled that defendant was convicted of battery, Angela M. testified that she thought he was convicted of statutory rape. After her testimony the parties stipulated that he pleaded no contest to a misdemeanor battery charge.

### B. *The Defense's Case.*

The principal at the elementary school defendant attended until the end of fourth grade testified that he presented no major discipline problems, was friendly with other students, and was a "nice kid." There was testimony from a pastor that he attended church until his early teens and still believed in Christianity. An older sister testified that he led an uneventful childhood until age 13. There was testimony that at about age 17 he took it on himself for 3 months to care for a sick woman who had nobody else for the task—he was at her house every night and would do chores for her, ignoring an opportunity to steal hundreds of dollars from her purse. And a teacher testified that defendant received a high school diploma in jail—he was the first person to graduate from the independent study program in which he was enrolled—that he wanted to continue formal study, and that he was a very motivated student.

Defendant was 19 years old when he killed Skuse and attempted to kill Norma C. There was testimony that he started drinking beer with friends in sixth grade and soon was dabbling in marijuana use. He began using other drugs such as methamphetamine, phencyclidine-laced "sherm" cigarettes, and cocaine, and his circle of friends changed. In the six months before he was arrested he was regularly intoxicated by drugs and alcohol, and when "loaded" he was susceptible to personality changes. His drug and alcohol abuse caused him to become more frenetic, and he began to neglect his once meticulously maintained automobile.

A psychologist opined that defendant would adjust well to life in a prison setting. On cross-examination, he admitted that defendant told him he was convicted because the jury was corrupt, that if he were released he would be on methamphetamine or crack cocaine, and that, in the prosecutor's words, "he's been a problem ever since he was born and just didn't fit into society."

There was other testimony describing defendant's background and character. His girlfriend of several years' standing expressed loyalty toward him and testified that she would like to marry him. The two had a son who was twenty months old when she testified.

At closing argument counsel for defendant stressed the unpleasantness of prison life and emphasized that life imprisonment without possibility of parole was a very severe punishment. He insisted that defendant was not so entirely devoid of humanity or the ability ever to contribute to society that he deserved execution, and he urged the jury to show mercy to him and compassion for his girlfriend, mother, and infant son.

CLAIMS OF ERROR

I. *Inadequate Record on Which to Bring Appeal.*

 Defendant contends that the judgment must be reversed because the superior court clerk's office destroyed many trial exhibits after the proceeding ended. He asserts that he has been left with an inadequate record to pursue his appeal, in violation of the federal and state Constitutions. Although he generally lists the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and their California constitutional equivalents as the legal basis for his contention, he focuses on claims of violations of his right to due process of law under the Fourteenth Amendment, to an asserted right to a reliable determination of his guilt and punishment under the Eighth and Fourteenth Amendments, and to the effective assistance of counsel on appeal under the Sixth and Fourteenth Amendments.

On this court's order, the trial court held a series of post-trial hearings to determine which exhibits had been lost, to try to reconstruct them, and to prepare and certify a settled statement regarding exhibits that could not be reconstructed. Defendant registered a continuing objection, under the United States and California Constitutions, to the reconstruction of any exhibit absent a finding that it was certain that the replacement matched the original.

The court found that misconduct by employees in the clerk's office resulted in the exhibits' loss. Although it could not conclusively decide the

nature of the misconduct, its findings suggest that the exhibits were improperly safeguarded and hence were inadvertently discarded.

Three of the missing exhibits were never admitted into evidence. Those remaining consist of color photographs or diagrams. Aided by the prosecution's retention of some 800 photographic negatives, the court found that 62 exhibits could be precisely reconstructed. Although another twelve original exhibits—all photographs—could not be traced to a single replacement photograph, it was possible in each case to identify between two and five such photographs that "may be the same as the original exhibit."

Six exhibits could not be reconstructed. These were the subject of a settled statement. The first, a manila folder that may once have contained lineup photographs, was among the three exhibits not admitted into evidence. The second and third, diagrams drawn by witnesses who were medical doctors, could not be reconstructed. One, however, "is described in the trial transcript." The fourth was "a color photograph of the victim Lois Skuse, sitting at a kitchen table . . . ." The fifth and sixth, diagrams previously drawn and then marked during testimony, survived only in unmarked form.

We review the court's findings regarding the reconstruction of the missing exhibits, which are essentially factual, on a deferential substantial evidence standard. (See *People* v. *Hardy* (1992) 2 Cal.4th 86, 183, fn. 30 [5 Cal.Rptr.2d 796, 825 P.2d 781].) We then independently determine whether the record, as reconstructed and settled by the trial court, is adequate to allow the appeal to proceed meaningfully.

Turning to the first prong, we see, with one exception to be discussed, no reason to question the court's findings regarding reconstruction of the lost exhibits. Preliminarily, we observe that defendant's somewhat conclusory argument that generally no substantial evidence supports the rulings fails to persuade. We turn to the heart of defendant's argument: that the findings that five particular exhibits (Nos. 14, 16, 34, 51, and 52, all photographs) were reconstructed are unsupported by substantial evidence. Having reviewed the record with regard to each exhibit's reconstruction, we agree with defendant in one case, but otherwise disagree.

In the case of exhibit No. 52, defendant is correct that substantial evidence does not support the ruling reconstructing the exhibit. There was trial testimony by a police officer that exhibit No. 52 showed, in the prosecutor's words, "the lower portion of the remains of Lois Skuse as she was [lying] on the floor." But there was also testimony that exhibit No. 52 showed a television stand—testimony buttressed by the court's description of the

exhibit when it and the parties were later reviewing them. The People speculate that the officer was describing exhibit No. 72. However, that surmise is questionable, because, without any indication that he was being shown the same exhibit again, the prosecutor later asked him whether exhibit No. 72 depicted the victim on the floor. Moreover, the prosecutor appeared generally to be proceeding in numerical order as he showed the officer the exhibits. We agree with defendant that the court's finding must be set aside to the extent it finds that exhibit No. 52 was reconstructed. In the case of the other four exhibits, we will not disturb it.

Defendant further contends that the superior court's ruling that exhibit No. 48—a photograph of the victim while alive—should be replaced with a new, similar photograph must be set aside because substantial evidence does not support it. But the court made no attempt to find that the new photograph replaced the lost original, only that it was similar. The prosecutor testified that the replacement photograph was "fairly similar in contents [to the original]. It is a photograph of her sitting at a kitchen table. The only thing really missing is the [Christmas] present sitting on the table in front of her, but that's it. That is the same likeness of her."

Turning to the next prong of our inquiry, we conclude on independent review that the record is adequate to allow the appeal to proceed.

The exhibits "admitted into evidence or refused" are part of the record on appeal. (Cal. Rules of Court, rule 4.5.) Defendant is entitled to a record "adequate to permit meaningful appellate review." (*People* v. *Howard* (1992) 1 Cal.4th 1132, 1165 [5 Cal.Rptr.2d 268, 824 P.2d 1315] [impliedly considering state and federal law]; see also *id.* at p. 1166 [explicitly addressing Eighth and Fourteenth Amendment requirements].) But the burden is his to show that the deficiencies in the record are prejudicial to him. (*Id.* at p. 1165.) The parties were able either to reconstruct or to issue a settled statement regarding virtually the entire record. The reconstruction restored most of the record; the settled statement provided a satisfactory substitute for other portions (*People* v. *Holloway* (1990) 50 Cal.3d 1098, 1116 [269 Cal.Rptr. 530, 790 P.2d 1327]). Although the record as reconstructed remains deficient, defendant has not met his burden of showing that the deficiencies—the loss of certain exhibits and the court's inability to assign an exact replacement photograph to each of 12 original photographic exhibits—have left him unable to proceed with his appeal on a record adequate to permit meaningful appellate review.

We turn to defendant's argument that proceeding with this appeal on a deficient record will preclude counsel from providing effective assistance on appeal.

A defendant claiming ineffective assistance of counsel under the federal or state Constitutions must show both deficient performance under an objective standard of professional reasonableness and prejudice under a test of reasonable probability of a different outcome. (*People* v. *Ledesma* (1987) 43 Cal.3d 171, 216-218 [233 Cal.Rptr. 404, 729 P.2d 839].) We apply that standard to representation on appeal. (*People* v. *Hamilton* (1988) 45 Cal.3d 351, 377 [247 Cal.Rptr. 31, 753 P.2d 1109]; *Alford* v. *Rolfs* (9th Cir. 1989) 867 F.2d 1216, 1220; see also *In re Harris* (1993) 5 Cal.4th 813, 833 [21 Cal.Rptr.2d 373, 855 P.2d 391]; cf. *Evitts* v. *Lucey* (1985) 469 U.S. 387, 392 [83 L.Ed.2d 821, 827, 105 S.Ct. 830] [declining to decide whether same standard to show ineffective assistance on review applies to appellate as well as trial counsel].)

There is no reasonable probability that the outcome of this appeal differs because of the deficiencies in the record before us. As we show below, we are able to review the judgment in a meaningful manner notwithstanding those deficiencies. Defendant has not been denied any right to an adequate appeal.

 Defendant also claims that the trial court erred by refusing to find beyond a reasonable doubt that the replacement exhibits matched the original. To the extent that the court used a lower standard of proof in reconstructing the record—e.g., finding by a preponderance of the evidence that an exhibit had been reconstructed—it did not err. (Evid. Code, § 115; see also *Curl* v. *Superior Court* (1990) 51 Cal.3d 1292, 1305-1306 [276 Cal.Rptr. 49, 801 P.2d 292].)

II. *Issues Regarding Pretrial Proceedings.*

A. *Claims Regarding Forensic Analysis of Tardily Discovered Hair.*

Before trial, defendant moved to have laboratory tests performed on physical evidence taken from the crime scenes, or to have samples provided to him so that he could perform his own tests. The motion was granted.

Near the conclusion of jury selection, counsel for both parties informed the court that an item of evidence retrieved from the Skuse murder scene had just been discovered to contain some hair. Before the presentation of evidence was to begin, defendant moved to continue the case pending analysis of the hair. The prosecutor, for his part, agreed not to call any witnesses to discuss the hair's significance for the rest of that week. Defendant agreed to proceed, and reserved his opening statement. The parties do not say whether evidence based on the tardily discovered hair was ever introduced, or whether tests were ever performed on it.

■ Defendant contends that the prosecution intentionally withheld evidence material to his culpability. In essence, he asserts that the failure to disclose the evidence disrupted his trial strategy, notably by forcing him to reserve his opening statement.

■ The prosecution has a due process duty under the Fourteenth Amendment to the United States Constitution to disclose evidence to a defendant. (See, e.g., *United States* v. *Bagley* (1985) 473 U.S. 667, 674-677 [87 L.Ed.2d 481, 488-491, 105 S.Ct. 3375].) But such evidence must be both "favorable" to the defendant and " 'material' " to either guilt or penalty. (*Id.* at p. 674 [87 L.Ed.2d at p. 489].) Favorable evidence is evidence that the defense could use either to impeach the state's witnesses or to exculpate the accused. (*Id.* at p. 676 [87 L.Ed.2d at p. 490].) "*Bagley* held that . . . favorable evidence is material, and constitutional error results from its suppression. . . , 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " (*Kyles* v. *Whitley* (1995) 514 U.S. 419 [131 L.Ed.2d 490, 505, 115 S.Ct. 1555].) A "reasonable probability" is one sufficient to "undermine[] confidence in the outcome." (*United States* v. *Bagley, supra,* 473 U.S. at p. 678 [87 L.Ed.2d at p. 491].)

■ Defendant candidly acknowledges that it is impossible on this record to know the significance of the additional samples, and that "full resolution of this issue must await the presentation of additional facts in [his] Petition for Writ of Habeas Corpus." We agree that the issue cannot be resolved on the record now before us. He points to no place in the record that might divulge the evidence to be material or favorable. Thus, on appeal, he has not established that any delay or purported misconduct in handling the tardily discovered hair prejudicially affected the outcome at trial.

He also contends that his counsel were ineffective under the Sixth and Fourteenth Amendments to the federal Constitution for failing to vigorously pursue enforcement of the court's discovery orders. This contention rests on a general assertion that counsel neglected discovery matters until jury selection was underway. But he refers only to the tardily discovered hair samples.

As stated, a defendant claiming ineffective assistance of counsel must show both deficient performance under an objective standard of professional reasonableness and prejudice under a test of reasonable probability of a different outcome. Defendant concedes that the significance of the hair samples is unknown. On this record, therefore, it is impossible to find prejudice, assuming for purposes of argument that counsel's performance may have been deficient in some respect. He also asserts that counsel's

neglect of discovery matters forced him to reserve his opening statement until the presentation of his case. But he does not contend that any need to do so resulted in prejudice to him. This contention we also reject.

### B. *Denying Motion to Sever Skuse- and Norma C.-related Counts.*

■ Defendant moved to sever the counts charging crimes in the Skuse killing from those in the attack on Norma C. The court denied the motion.

We review the court's ruling for an abuse of discretion. (See *People* v. *Cummings* (1993) 4 Cal.4th 1233, 1284 [18 Cal.Rptr.2d 796, 850 P.2d 1].) A court abuses its discretion when its ruling "falls outside the bounds of reason." (*People* v. *DeSantis* (1992) 2 Cal.4th 1198, 1226 [9 Cal.Rptr.2d 628, 831 P.2d 1210].) The ruling did not fall outside those bounds.

The governing statute is section 954, which provides in relevant part: "An accusatory pleading may charge . . . two or more different offenses of the same class of crimes or offenses, under separate counts . . . . provided, that the court in which a case is triable, in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately or divided into two or more groups and each of said groups tried separately. . . ."

■■ "The statutory requirements for joinder were met here because both incidents involved the same class of crimes—murder [and attempted murder, both involving batteries (see *People* v. *Miller* (1990) 50 Cal.3d 954, 987 [269 Cal.Rptr. 492, 790 P.2d 1289])]. Since the requirements for joinder were satisfied, defendant can predicate error only on a clear showing of potential prejudice. [Citation.] 'The burden is on the party seeking severance to clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried.' [Citation.]

" 'The determination of prejudice is necessarily dependent on the particular circumstances of each individual case, but certain criteria have emerged to provide guidance in ruling upon and reviewing a motion to sever trial.' [Citation.] Refusal to sever may be an abuse of discretion where: (1) evidence on the crimes to be jointly tried would not be cross-admissible in separate trials; (2) certain of the charges are unusually likely to inflame the jury against the defendant; (3) a 'weak' case has been joined with a 'strong' case, or with another 'weak' case, so that the 'spillover' effect of aggregate evidence on several charges might well alter the outcome of some or all of the charges; and (4) any one of the charges carries the death penalty or joinder of them turns the matter into a capital case." (*People* v. *Sandoval*

(1992) 4 Cal.4th 155, 172-173 [14 Cal.Rptr.2d 342, 841 P.2d 862], affd. *sub nom. Victor* v. *Nebraska* (1994) 511 U.S. 1 [127 L.Ed.2d 583, 114 S.Ct. 1239].)

The criteria listed in *Sandoval* should not be misunderstood as being equally significant, however. "[T]he first step in assessing whether a combined trial [would have been] prejudicial is to determine whether evidence on each of the joined charges would have been admissible, under Evidence Code section 1101, in separate trials on the others. If so, any inference of prejudice is dispelled." (*People* v. *Balderas* (1985) 41 Cal.3d 144, 171-172 [222 Cal.Rptr. 184, 711 P.2d 480]; see *People* v. *Mason* (1991) 52 Cal.3d 909, 934 [277 Cal.Rptr. 166, 802 P.2d 950].)

Cross-admissibility suffices to negate prejudice, but it is not needed for that purpose. Although " 'we have held that cross-admissibility ordinarily dispels any inference of prejudice, we have never held that the absence of cross-admissibility, by itself, sufficed to demonstrate prejudice.' " (*People* v. *Sandoval, supra,* 4 Cal.4th at p. 173; see also § 954.1, eff. June 6, 1990 [codifying rule].)

"[T]he propriety of a ruling on a motion to sever counts is judged by the information available to the court at the time the motion is heard." (*People* v. *Cummings, supra,* 4 Cal.4th at p. 1284.) Defendant conceded that his fingerprints were found at both crime scenes, along with shoe prints similar to those made by a pair of shoes he owned, but argued that those facts did not suffice to establish identity and that judicial economy did not require one trial. He also argued that the murder case was much weaker than the attempted murder case, in which Norma C. identified him as her assailant, but that a jury hearing Norma C. testify about the attack on her would be outraged and would therefore be unfairly inclined to convict him of Skuse's murder.

The prosecution introduced evidence relating to cross-admissibility. It offered evidence that defendant's shoes bore traces of blood, and argued that the blood evidence would be cross-admissible because the evidence showed that the traces could only have been left by (1) a single individual with type AB blood, or (2) two or more contributors. There was insufficient blood to be able to prove that it came from defendant or the two victims. Because Skuse was type O, Norma C. type A and defendant type B, the prosecution explained that it would need to introduce evidence of both sets of crimes to explain why the blood on the shoes did not come from a person with type AB blood.

The prosecution also argued that at trial it would present strong evidence that defendant committed both sets of crimes. It declared there would be

evidence that his palm print was found on a drawer lying atop Skuse's body and that Norma C. had identified him as her assailant. It contended that his shoes matched the pattern of bloody shoe prints found at both scenes. The prosecution also argued that his modus operandi was to rape both women, who were alone and vulnerable, to kill them with a knife following a savage beating, and then to opportunistically steal whatever valuable items might be in the vicinity.

The court denied the motion without comment. Implicitly, it found evidence of the offenses cross-admissible, for the hearing focused on the blood evidence taken from defendant's shoes.

The court did not abuse its discretion in implicitly finding no cross-admissibility consideration that might favor severance. For that reason alone, its ruling must be sustained. (See *Frank* v. *Superior Court* (1989) 48 Cal.3d 632, 639 [257 Cal.Rptr. 550, 770 P.2d 1119].) Defendant calls any such reasoning "spurious"; in his view, the evidence could have been tailored at each trial to exclude mention of the other blood. Nevertheless, as stated, the burden was his to " 'clearly establish that there is a substantial danger of prejudice' " arising from the joinder of charges (*People* v. *Sandoval, supra,* 4 Cal.4th at p. 172). The court did not abuse its discretion in ruling that he failed to meet that burden.

Finally, "[e]ven if the ruling was correct when made, we must reverse if defendant shows that joinder actually resulted in 'gross unfairness,' amounting to a denial of due process." (*People* v. *Arias* (1996) 13 Cal.4th 92, 127 [51 Cal.Rptr.2d 770, 913 P.2d 980].) For the reasons the prosecution presented to the court, no gross unfairness occurred when the motion was denied.

III. *Jury Selection Issues.*

A. *Denying Motion for Separate Juries for Guilt and Penalty Phases.*

Defendant maintains that the court violated the Fifth, Sixth, Eighth and Fourteenth Amendments to the federal Constitution by denying his motion to impanel separate juries to hear the guilt and penalty phases of his trial. The gravamen of the basis for the motion was that "the exclusion from the guilt phase of jurors categorically opposed to the death penalty deprived him of a jury composed of a representative cross-section of the community, in violation of his Sixth and Fourteenth Amendment rights. We have rejected such claims [citation], as has the United States Supreme Court [citation]." (*People* v. *Kaurish* (1990) 52 Cal.3d 648, 674 [276 Cal.Rptr. 788, 802 P.2d 278].)

■ Defendant withdrew a motion to bar voir dire on the death penalty after the court denied the motion to impanel separate juries. He perfunctorily asserts that counsel were ineffective, apparently in violation of the Sixth Amendment to the United States Constitution, for doing so on his behalf. To the contrary, it was certainly not professionally unreasonable to examine jurors who might decide whether his life should be spared or taken on their opinions regarding that subject.

B. *Other Jury Selection Issues.*

■ At defendant's behest and over the prosecutor's objection, the court agreed to use a "modified struck system" of jury selection. (See *People* v. *Johnson* (1992) 3 Cal.4th 1183, 1211 [14 Cal.Rptr.2d 702, 842 P.2d 1]; *People* v. *Pride* (1992) 3 Cal.4th 195, 226-227 [10 Cal.Rptr.2d 636, 833 P.2d 643]; *People* v. *Ashmus* (1991) 54 Cal.3d 932, 955-956 [2 Cal.Rptr.2d 112, 820 P.2d 214].) The record reveals that the court was concerned about subjecting many prospective jurors to what it believed to be the tedium of the "jury box" system, and that after observing similar selection proceedings in another courtroom, it decided to accede to defendant's request in an effort to save time and reduce tedium.

Under the version of the struck system used in this case, pools of prospective jurors were screened seriatim for hardship. Those prospective jurors who remained filled out questionnaires. Next, they were randomly selected to appear in groups of five in the morning and six in the afternoon and each was examined outside the presence of the others to determine whether he or she should be excused for cause. After this process, 12 of the remaining prospective jurors were randomly selected for seating in the jury box and the parties exercised their peremptory challenges. A prospective juror who was excused was replaced with another from the pool of qualified prospective jurors by name drawn at random.

The foregoing procedure occurred in three rounds. At the end of the first, defendant used 21 of his 26 peremptory challenges. At the end of the second, he consumed two of the five remaining. At the end of the third, he had one left. At that point, and after the jury was sworn, he moved for a mistrial based on the jury selection procedure. Specifically, he declared that the use of three rounds of peremptory challenges rather than one made it impossible to exercise them effectively. The court denied the motion.

Defendant contends that the jury selection procedure violated rights he locates in the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and their California equivalents, essentially because, in

his view, the first jury pool was prosecution-prone and he was therefore forced to consume many of his peremptory challenges early in the process without knowing whether members of succeeding pools would be more or less objectionable. Had the court used a pure struck system, he contends, he would have known the views of all prospective jurors when exercising peremptory challenges.

But defendant has not preserved his claim for review. He objected to the selection process after the jury was sworn, and therefore did so in an untimely manner. (Former § 1060, enacted 1872; see now Code Civ. Proc., § 225, subd. (a)(1); *People* v. *Flowers* (1974) 38 Cal.App.3d 813, 818 [113 Cal.Rptr. 701].)

Next, defendant contends that the court wrongly failed to excuse six jurors he challenged for cause. But because he did not exercise all of his peremptory challenges, that claim, too, is precluded on appeal. (*People* v. *Morris* (1991) 53 Cal.3d 152, 184 [279 Cal.Rptr. 720, 807 P.2d 949].) Defendant contends that because he can justify his refusal to use his last peremptory challenge, that rule does not apply to him. (But see *ibid.* [defendant must also show he was dissatisfied with the jury as selected].) He asserts that when the final group of prospective jurors had been qualified, he knew about each juror's views, but did not know the order in which they would be called, and therefore had to reserve a peremptory challenge. The implication is that someone worse for the defense might be called and he had to hedge against that possibility. But we have previously rejected the argument that the struck-jury system permits exceptions to the exhaustion rule (*People* v. *Johnson, supra,* 3 Cal.4th at p. 1211) and decline to reexamine our reasoning.

Defendant next contends that counsel were ineffective, apparently in violation of the Sixth Amendment to the United States Constitution, for failing to adequately question seven prospective jurors who, in his view, were hostile to him.

As stated, to show ineffective assistance of counsel, defendant must establish deficient performance and a prejudicial outcome. (*Ante,* at p. 663.) He has not met his burden.

Preliminarily, we note that only one of the seven prospective jurors was actually seated, and defendant did not exhaust his peremptory challenges. With regard to the other six, therefore, any contention that counsel were ineffective is, as the People respond, pure conjecture—no prejudice can arise from any deficiency involving the voir dire of them. (*People* v. *Cain* (1995) 10 Cal.4th 1, 62 [40 Cal.Rptr.2d 481, 892 P.2d 1224].)

The seventh juror, Edward Kluza, sat on the jury. He seemed to be taken aback by a question whether he would consider defendant's background in deciding penalty. Initially he stated that he would assign the factor no mitigating weight; then, in response to the next question, he said, "I can't see that it should weigh that heavily." Kluza was then asked, "if . . . we only introduce evidence in mitigation [that] consisted of . . . Mr. Osband's background, . . . would you totally say, 'Hey, that's the only evidence they got, automatic death penalty'?" He replied, "Oh, no. No. I don't—I don't think I'd close my mind." He continued in a similar vein.

Counsel's questioning of Kluza was not deficient. The questioning elicited his views and revealed that he was open-minded with regard to penalty. Moreover, Kluza's written questionnaire would already have assured counsel on that score: he answered that he had "no strong feelings one way or the other" about the death penalty, that the principle of *lex talionis*—" 'an eye for an eye' "—is "a little too broad," and that he would have no difficulty whatever ignoring it. Indeed, the prosecution had reason to be concerned about Kluza, because in his questionnaire he ventured that "[t]oo much is at stake to allow circumstantial evidence to dictate" the rendering of a guilty verdict. In general, the questionnaire suggests a juror who would be fair to both sides and would sit without invidious preconceptions or prejudices. Counsel were not deficient with regard to the voir dire of Kluza.

Finally, defendant contends that three seated jurors were wrongly told during voir dire that the penalty process was standardless and subjective—in effect, that they could impose the death penalty on a whim. Not so. What the jurors he lists were told was that if the trial reached a penalty phase it would be up to them to decide defendant's fate by assigning whatever weight they deemed proper to each factor in aggravation and mitigation. This was correct. "As we have emphasized, the sentencing function is inherently moral and normative [citation] and therefore the weight or importance to be assigned to any particular factor or item of evidence involves a moral judgment to be made by each juror individually." (*People* v. *Crandell* (1988) 46 Cal.3d 833, 882-883 [251 Cal.Rptr. 227, 760 P.2d 423] (lead opn. by Kaufman, J.).)

Defendant also implicitly complains that the prosecutor committed misconduct when he effectively told one of the three jurors, Sara Kint, that "[w]hatever moral misgivings [she might feel about the death penalty] would be secondary to the fact that . . . it is the law here in California[.]" Defendant did not object to this statement at the time, and may not do so now. In any event, the implication of his point is that the prospective juror was improperly told the decision would be purely mechanical without any

room to exercise discretion or mercy. (See *People* v. *Champion* (1995) 9 Cal.4th 879, 947-948 [39 Cal.Rptr.2d 547, 891 P.2d 93].) But the prosecutor immediately informed Kint that she personally and subjectively would have to decide the issue by weighing the aggravating and mitigating circumstances presented. We find no misconduct.

IV. *Guilt Phase Issues.*

Defendant raises various claims that prejudicial error occurred during the guilt phase. As will appear, none of them has merit.

A. *Order Compelling Defendant to Provide Blood and Hair Samples.*

■ The prosecution sought an order, after trial began but before the taking of evidence, to compel defendant to furnish samples of blood and hair for forensic analysis. It explained that it was seeking these specimens because it needed hair from additional locations on his body, and that previously drawn blood had deteriorated over time. Defendant argued that it was unreasonable under the Fourth Amendment to the United States Constitution to take the samples, in essence because no exception to the warrant requirement appeared and there was no probable cause to support the intrusion. Nonetheless, the court granted the motion.

Defendant renews his contention, declaring that taking the blood and hair samples violated the Fourth Amendment's bar against "unreasonable searches and seizures" because it was conducted without a warrant. He also asserts perfunctorily that it violated other constitutional rights.

Taking the *blood* sample constituted a search and seizure under the Fourth Amendment. (*Schmerber* v. *California* (1966) 384 U.S. 757, 767 [16 L.Ed.2d 908, 918, 86 S.Ct. 1826].) Although "the plucking of defendant's hairs by the police constituted a 'seizure' that might *conceivably* be subject to the constraints of the Fourth Amendment" (*State* v. *Sharpe* (1973) 284 N.C. 157, 162-163 [200 S.E.2d 44, 48]), nevertheless the question whether taking *hair* samples generally implicates the Fourth Amendment appears to be unsettled. (*United States* v. *De Parias* (11th Cir. 1986) 805 F.2d 1447, 1456 [matter undecided in federal courts]; see also *United States* v. *D'Amico* (2d Cir. 1969) 408 F.2d 331, 333 ["clipping" a "few strands of hair from appellant's head was so minor" an intrusion that the Fourth Amendment is not implicated].)

We need not decide under what circumstances taking hair samples might constitute a search or seizure that implicates the Fourth Amendment, however. There was no constitutional violation in this case.

It is hornbook law that " 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable' " under the Fourth Amendment's warrant requirement unless they fall within one of a few narrow exceptions thereto. (*Coolidge* v. *New Hampshire* (1971) 403 U.S. 443, 454-455 [29 L.Ed.2d 564, 576, 91 S.Ct. 2022] (plur. opn. by Stewart, J.).) But as long as the prosecution shows that probable cause exists for the intrusion, a court order compelling specimens to be taken from the body of a criminal defendant satisfies the Fourth Amendment's guaranty. (*Com.* v. *Trigones* (1986) 397 Mass. 633, 641 [492 N.E.2d 1146, 1151]; *Matter of Abe A.* (1982) 56 N.Y.2d 288, 290 [452 N.Y.S.2d 6, 7, 437 N.E.2d 265, 266 ] [criminal suspect]; see also *State* v. *Weigel* (1980) 228 Kan. 194, 198 [612 P.2d 636, 642] [hair sample]; *State* v. *Jones* (1977) 279 Or. 55, 59 [566 P.2d 867, 870]; but see *Mills* v. *State* (1975) 28 Md.App. 300, 302, 307 [345 A.2d 127, 129, 132].)

Probable cause was surely present here. There was strong evidence of defendant's presence at both crime scenes; indeed, "at the time of the motion for blood and [hair] samples, a preliminary hearing had already been held at which one of the victims, under oath, identified [him]. Because probable cause had been established at a hearing prior to this motion, we are persuaded that [defendant] was accorded as much constitutional protection under this court order as he would have had under a search warrant." (*State* v. *Brown* (1984) 118 Wis.2d 377, 388 [348 N.W.2d 593, 599]; see also *Com.* v. *Trigones, supra*, 397 Mass. at p. 641, fn. 4 [492 N.E.2d at p. 1151] [discussing blood evidence].) And the order was issued following a contested hearing—in sum, the procedures more than satisfied the policy against oppressive governmental intrusions that lies behind the Fourth Amendment's warrant requirement. (*Ibid.*; *Coolidge* v. *New Hampshire, supra*, 403 U.S. at pp. 454-455 [29 L.Ed.2d at pp. 575-576] (plur. opn.).) There was no Fourth Amendment violation in taking the blood or hair. Nor was any other provision of the federal or state Constitutions violated.

## B. *Issues Regarding Restraints on Defendant.*

Before the prospective jurors first saw him, defendant moved to have only one bailiff seated behind him, in addition to the regular courtroom bailiff, who evidently was seated or standing elsewhere, and not to be restrained by chains or handcuffs in the courtroom. He also moved to have his handcuffs removed in the hallway, where jurors or prospective jurors could not see the procedure. The court granted the motions. On one occasion, however, prospective jurors briefly may have seen him in handcuffs.

First, defendant contends that the court violated the federal Constitution by restraining him in chains while in court. The People respond that

the record shows he was not mechanically restrained. We agree: as we read the record, the court granted defendant's motion and he was specially secured only by the presence of the extra bailiff seated behind him, as he sought in his motion.

Without clearly articulating the legal basis for the claim, defendant also argues that even the presence of that bailiff constituted excessive security. But he invited any error—the court granted his proposal for security arrangements.

Defendant also contends that the court erred on state law and federal constitutional grounds in not investigating, on its own, the effect on prospective jurors of once briefly seeing him in handcuffs, and in not instructing them that they should not consider the presence of restraints an indication of guilt. It is unclear whether they did see him in restraints. However, any glimpse by prospective jurors of him in handcuffs could not have caused prejudice, whether under state law or federal constitutional standards, even if error occurred. (See *People* v. *Rich* (1988) 45 Cal.3d 1036, 1083-1085 [248 Cal.Rptr. 510, 755 P.2d 960].)

### C. *Denying Motion to Exclude Putrid Clothing.*

The prosecutor moved to introduce in evidence blood-saturated pantyhose and underwear taken from the Norma C. crime scene. He alerted the court that the two items had a foul odor attributable to the blood's putrefaction, and that the prosecution had been trying to air the garments that morning to reduce the odor, with partial success. Defendant objected, asserting that photographs of the exhibits should be introduced in place of the original items. The court ruled that the garments could be introduced, but that it would be done just before a recess with the side door open to allow more air circulation. The jurors were informed in advance of the garments' stench, and a witness showed them, pointing out a tear in each item. The garments were exhibited only briefly, and the court then immediately excused the jury for lunch. After the jurors left defense counsel asked the court to leave some doors open to air the room, and the court so ordered.

■■■ Defendant contends that the court erred under state law (Evid. Code, § 352) by permitting the prosecution to introduce evidence that was substantially more prejudicial, by reason of its odor, than it was probative. He also predicates claims of violations of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution on the asserted state law error.

We review a ruling on an objection of undue prejudice for an abuse of discretion. (*People* v. *Clair* (1992) 2 Cal.4th 629, 660 [7 Cal.Rptr.2d 564, 828 P.2d 705].) Under this deferential standard, we find no error.

As a rule, the prosecution in a criminal case involving charges of murder or other violent crimes is entitled to present evidence of the circumstances attending them even if it is grim. "Service on a murder trial jury is not entertainment; such duty is serious and onerous; by serving, the jurors are executing a primary and necessary duty as citizens. Often the details of evidence are unpleasant, but adult finders of fact must face this duty calmly and undismayed." (*People* v. *Campbell* (1965) 233 Cal.App.2d 38, 43 [43 Cal.Rptr. 237].)

The evidence was relevant to establish the charge of assault with intent to rape Norma C. The court did what it could to minimize the prejudicial impact of the odor. It did not abuse its discretion in admitting the evidence. Because there was no state law error, neither was there any predicate for a constitutional violation.

### D. *Failing to Ask Jurors What They Overheard in Hallway.*

 Counsel for defendant complained that two police officers were discussing material contained in their police reports, including the time of their arrival at the Norma C. crime scene, in the hallway where jurors could overhear them. The court ordered the prosecutor to make sure his witnesses stayed at the far end of the corridor, and when the jurors took their seats it admonished them, "You're not to consider anything that's said outside the courtroom. The only evidence that you are to consider is the evidence that comes from the witness stand . . . ."

At trial, defendant did not request a hearing on the matter. Nevertheless he contends that the court erred by not conducting a hearing on its own initiative to determine what the jurors might have overheard. He argues that they might have heard a discussion so prejudicial that no admonition could cure it. He claims generally that the failure to hold a hearing violated the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and implies that state law was also violated. He focuses, however, on perceived violations of the due process and confrontation clauses contained in the Fifth, Sixth, and Fourteenth Amendments.

"The decision whether to investigate the possibility of juror bias, incompetence, or misconduct—like the ultimate decision to retain or discharge a juror—rests within the sound discretion of the trial court. [Citation.] The court does not abuse its discretion simply because it fails to investigate any and all new information obtained about a juror during trial. [¶] As our cases make clear, a hearing is required only where the court possesses information which, if proven to be true, would constitute 'good cause' to doubt a juror's

ability to perform his duties and would justify his removal from the case." (*People* v. *Ray* (1996) 13 Cal.4th 313, 343 [52 Cal.Rptr.2d 296, 914 P.2d 846].) The record does not reveal that the court had any information of this type.

Moreover, if any violation of the law occurred when the jurors overheard statements extraneous to the record, any prejudice that may have arisen therefrom was cured by events immediately following defendant's complaint to the court, which strictly admonished the jurors not to consider anything they might hear beyond the witness stand. We presume that they followed the court's instructions and disregarded anything they may have overheard. (*People* v. *Green* (1965) 236 Cal.App.2d 1, 26 [45 Cal.Rptr. 744].)

Defendant also contends that counsel were ineffective for failing to seek a hearing on the matter. There is no reasonable probability that the outcome would have differed had they done so. In that case, the court in turn would have done what it in fact did: admonish the jury to disregard anything overheard in the hallway. Defendant argues, as stated, that the jurors might have overheard something so prejudicial no admonition could cure it. That speculation cannot give rise to a successful claim of ineffective assistance, however. He bears the burden of showing that such a remark was made. On this record he cannot do so.

E. *Admissibility of Photographic Evidence.*

Defendant contends that the court erred under state law by admitting into evidence photographs that were either cumulative or substantially more prejudicial than probative. He also claims that the rulings violated the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

1. *Photograph of Skuse While Alive.*

Dorothy Monahan testified that "Lois Skruse" was her neighbor. The prosecutor corrected her and she acknowledged that the name was Skuse. Monahan testified that she saw Skuse on the Friday before her killing. She identified her from a photograph—exhibit No. 48, which was subsequently lost and has not been replaced—taken on her birthday and also apparently showing Christmas presents. (Evidently Skuse's birthday occurred at Christmastime.) Skuse's daughter-in-law also identified her from the photograph. It appears that viewing it caused her eyes to well with tears, and the jury could see that reaction.

Defendant argued that he had offered to stipulate to Skuse's identity and that the photograph should be excluded. Nevertheless, the court

admitted it into evidence, finding that its "prejudicial effect, if any, would be far outweighed by the probative value . . . ."

As alluded to, we note that the photograph was lost after trial, could not be replaced, and is unavailable on appeal. We will therefore accept defendant's characterization of it as very likely to evoke feelings of sadness and sympathy for Skuse. Nonetheless, we find no abuse of discretion in ruling that it would be admitted.

"To be sure, we have repeatedly cautioned against the admission of photographs of murder victims while alive unless the prosecution can establish the relevance of such items. [Citations.] Otherwise, there is a risk that the photograph will merely generate sympathy for the victims." (*People* v. *DeSantis, supra*, 2 Cal.4th 1198, 1230.) In that case, we concluded that "our own inspection of the photograph in issue here suggests that it possibly did generate sympathy for the victims, a harmless- and congenial-appearing elderly couple." (*Ibid.*)

Nevertheless, in *DeSantis* we declined "to find error. The photograph, which was shown to three witnesses, was relevant to establish the witnesses' ability to identify the victims as the people about whom they were testifying. The possibility that it generated sympathy for the victims is not enough, by itself, to compel its exclusion if it was otherwise relevant." (2 Cal.4th at pp. 1230-1231.) That conclusion applies with equal force here. Indeed, Monahan's initial stumble, in which she gave the wrong last name for Skuse, shows the importance of using photographic evidence to ensure the accuracy of testimony. Even if defendant offered to stipulate to Skuse's identity, the photograph helped lay to rest a question the jury might otherwise have had about whether Monahan actually knew whom she saw on the Friday before Skuse died. We find no state law error, nor are we persuaded that any constitutional violation occurred.

2. *Admission of Photographs of Crime Scenes and of Victims.*

 Many photographs of the crime scenes and of Skuse and Norma C., showing them after defendant's attacks, were admitted. Defendant objected to the admission of certain of them as either unduly prejudicial or cumulative (Evid. Code, § 352); the court accordingly excluded a few of them, but most were admitted. To others he did not object.

Defendant contends that the court erred under state law and violated the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution by overruling various objections to the admission of some of

the photographs. He also contends that he was denied the effective assistance of counsel when his counsel failed to object to the admission of others.

We review a ruling denying a motion to exclude photographic evidence on grounds of undue prejudice or cumulativeness for an abuse of discretion. (*People* v. *Memro* (1995) 11 Cal.4th 786, 866 [47 Cal.Rptr.2d 219, 905 P.2d 1305].) There was no abuse of discretion: the court's rulings fell within the bounds of reason. We have reviewed the photographs and, although we believe an average member of the community would find some of them quite disturbing, they are neither unduly prejudicial nor cumulative. They tended to prove the mental-state and physical-act elements of the crimes charged (see *id.* at pp. 865-866), and in our view they did so without portraying the crime scenes or the victims in a gratuitously inflammatory manner.

Defendant further contends, most unpersuasively, that to the extent his counsel failed to object to the admission or use of each photograph, they rendered ineffective assistance. We disagree. It would have been pointless to object to the introduction or use of all of the photographs, or even many of them: their probative value was high and certainly was not substantially outweighed by prejudice. Counsel objected to the introduction of photographs into evidence when a plausible argument could be made that they should be barred under Evidence Code section 352. In particular, they objected to a particularly grim photograph (for which three replacements were furnished in the reconstructed record; the three are similar) showing the body of Skuse after the overlying debris had been removed. The court ruled that the photograph should be admitted—properly, in our view, for it did not abuse its discretion in implicitly concluding that the photograph was not substantially more prejudicial than probative. Counsel were not ineffective.

F. *Instructional Issues.*

1. *Reasonable Doubt Issues.*

 Defendant contends that the instructions given the jury removed the constitutional requirement that the prosecution prove every element of each crime charged beyond a reasonable doubt.

He bases his contention in part on the provision to the jury of CALJIC No. 2.90 (4th ed. 1979 bound vol.), defining reasonable doubt. That claim fails. (*People* v. *Freeman* (1994) 8 Cal.4th 450, 501-505 [34 Cal.Rptr.2d 558, 882 P.2d 249, 31 A.L.R.5th 888], explaining *Victor* v. *Nebraska, supra,* 511 U.S. 1 [127 L.Ed.2d 583].)

And otherwise he bases his contention on the provision to the jury of CALJIC Nos. 2.01, 2.02, 8.83, and 8.83.1 (identical in all material respects to those found in the 1979 bound volume edition of CALJIC).

"In these instructions, which pertained to the sufficiency of circumstantial evidence to prove (1) the charged offenses (CALJIC No. 2.01), (2) the required mental state [or specific intent] (CALJIC No. 2.02), (3) the special circumstance allegations (CALJIC No. 8.83), and (4) the required mental state as to the special circumstance allegations (CALJIC No. 8.83.1), the trial court informed the jury that, if one interpretation of the evidence 'appears to you to be reasonable and the other interpretation to be unreasonable, [it would be your duty to] accept the reasonable interpretation and [to] reject the unreasonable.'

"Specifically, defendant urges that, by informing the jurors of their duty to accept an interpretation of the evidence establishing defendant's guilt as long as that interpretation appears to be reasonable, the instructions (emphasized by the prosecutor's argument to the jury that the prosecution had presented a reasonable interpretation of the evidence) permitted the jury to determine guilt based upon a degree of proof less than that mandated by the reasonable doubt standard [citations]. Defendant urges that the instructions thus functioned to convey an unconstitutional, mandatory, conclusive presumption of guilt." (*People* v. *Crittenden* (1994) 9 Cal.4th 83, 144 [36 Cal.Rptr.2d 474, 885 P.2d 887].)

"When we consider a claim of this sort, the question we ask is whether there is a reasonable likelihood that the jury construed or applied the challenged instruction[s] in an objectionable fashion." (*People* v. *Berryman* (1993) 6 Cal.4th 1048, 1073, fn. 3 [25 Cal.Rptr.2d 867, 864 P.2d 40].) To do so, we examine all the instructions given (*People* v. *Davis* (1995) 10 Cal.4th 463, 521-522 [41 Cal.Rptr.2d 826, 896 P.2d 119]), noting that the jury was instructed "to consider all of the instructions as a whole and . . . to regard each in light of all the others." (CALJIC No. 1.01 (4th ed. 1979 bound vol.).)

Doing so, we find no reasonable likelihood that the jury was misled with regard to its obligation to find each element of each charged crime proven beyond a reasonable doubt. The jury was instructed that each inference or fact necessary to establish guilt must be proven beyond a reasonable doubt. (See also *People* v. *Crittenden, supra,* 9 Cal.4th at p. 144.) Defendant's contention is without merit.

### 2. *Failing to Instruct on Intent for Special Circumstance Findings.*

Defendant contends that the court erred by failing to instruct the jury that it must find he had the intent to kill before it could find true each felony-murder special-circumstance allegation. (See *People* v. *Johnson*

(1993) 6 Cal.4th 1, 44-45 [23 Cal.Rptr.2d 593, 859 P.2d 673].) The People agree.

The prosecution tried the case on the theory that defendant personally killed Skuse. It successfully urged the court to delete the requirement of intent to kill when instructing on the special circumstances. It also successfully argued to the jury that he was guilty of first degree murder for committing a felony murder or a premeditated and deliberate murder.

"In *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862], we held that intent to kill was a necessary element of the felony-murder special circumstance . . . . We overruled . . . *Carlos* . . . in *People* v. *Anderson* (1987) 43 Cal.3d 1104 [240 Cal.Rptr. 585, 742 P.2d 1306]. As to offenses committed after *Carlos* but before *Anderson*, however, due process and ex post facto principles demand that the intent-to-kill requirement apply to any felony-murder special circumstance charged in connection with such offenses." (*People* v. *Johnson, supra,* 6 Cal.4th at p. 44.) The murder of Skuse allegedly occurred on October 5, 1985, during the "window period" between *Carlos* and *Anderson.*

We filed *People* v. *Anderson* (1987) 43 Cal.3d 1104 [240 Cal.Rptr. 585, 742 P.2d 1306], on October 13. Trial in this case began the next day, and the parties proceeded under the erroneous assumption that because defendant was the actual perpetrator of Skuse's killing if he killed at all, *Anderson* applied and there was no need to instruct the jury that it must find he had the intent to kill to find true the special circumstances of felony murder. The court agreed.

The jury was instructed as follows on each special circumstance alleged (we quote from the written version furnished to the jury; see *post,* at p. 687): "To find that the special circumstance[] referred to in these instructions as murder in the commission of [the underlying crime] is true, it must be proved: [¶] 1. That the murder was committed while the defendant was engaged in the commission or attempted commission of [the underlying crime]; and [¶] 2. That the murder was committed in order to carry out or advance the commission of the [underlying] crime . . . or to facilitate the escape therefrom or to avoid detection. In other words, the special circumstance referred to in these instructions is not established if the [underlying crime] was merely incidental to the commission of the murder." (Cf. CALJIC No. 8.81.17 (4th ed. 1984 Supp.).) The standard jury instruction, if given in a manner adapted to the facts of this case, would also have told the jury that "it must be proved: [¶] . . . [¶] 2. That the defendant intended to kill a human being." (See *ibid.*)

Three felony-murder special circumstances were alleged, one each for the underlying crimes of burglary, robbery, and rape. No other special circumstance was alleged.

Failing to instruct the jury that it had to find intent to kill as an element of each of the felony-murder special circumstances was, of course, error under *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862] (*Carlos*). The question is whether the error was harmless. The determination depends on application of the harmless-beyond-a-reasonable-doubt standard of *Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065]. (*People* v. *Johnson, supra,* 6 Cal.4th at p. 45.)

In *People* v. *Whitt* (1984) 36 Cal.3d 724, 734 [205 Cal.Rptr. 810, 685 P.2d 1161], we stated that under the language of a felony-murder special-circumstance instruction similar to the ones provided here "[t]he jury was not instructed to find that [the defendant] intended to kill . . . ." (See also *id.* at p. 736.) The instruction in *Whitt* told the jury "to find the robbery-murder special circumstance allegation true if it found 'that the murder was committed during the immediate flight after the commission of a robbery by the defendant; and . . . that the murder was committed in order to carry out or advance the commission of the crime of robbery or to facilitate the escape therefrom or to avoid detection.' " (*Id.* at p. 734.)

We consider *Whitt* to be dispositive on this point. (Cf. conc. opn. of Mosk, J., *post,* at p. 738.) The error, however, does not require reversal, for in *People* v. *Johnson, supra,* 6 Cal.4th at pages 45-46, we held that error in failing to instruct that a special circumstance contains a requirement of the intent to kill is harmless when "the evidence of defendant's intent to kill . . . was overwhelming, and the jury could have had no reasonable doubt on that matter." We so conclude here.

To " '[i]ntend' means 'to have in mind as a purpose or goal . . . .' " (*People* v. *Balcom* (1994) 7 Cal.4th 414, 423, fn. 2 [27 Cal.Rptr.2d 666, 867 P.2d 777]; cf. *People* v. *Velasquez* (1980) 26 Cal.3d 425, 434 [162 Cal.Rptr. 306, 606 P.2d 341] (lead opn.), vacated and remanded *sub nom. California* v. *Velasquez* (1980) 448 U.S. 903 [65 L.Ed.2d 1132, 100 S.Ct. 3042], reiterated (1980) 28 Cal.3d 461 [171 Cal.Rptr. 507, 622 P.2d 952] [defining intent in terms of purpose or knowledge].) As in *People* v. *Johnson, supra,* 6 Cal.4th 1, and in *People* v. *Cudjo* (1993) 6 Cal.4th 585, 630 [25 Cal.Rptr.2d 390, 863 P.2d 635], we conclude that the method of killing "would preclude any inference [that it] was accidental or unintentional" (*Johnson, supra,* 6 Cal.4th at p. 47); rather, as we shall explain, "the only reasonable conclusion the jury could have drawn was that defendant" (*ibid.*) intended to kill.

The instructions and argument indicated that defendant could be found guilty of the first degree murder of Lois Minnie Skuse either because the killing was premeditated and intentional, or because it occurred during the commission of a burglary, robbery, and rape. The prosecutor argued, however, that whichever theory was credited by the jury, defendant's "intent to kill was obvious" based on the severity of the beating and the fatal knife wound to the carotid artery. The prosecutor theorized that defendant killed Skuse in order to "cover up" his other crimes. Against this backdrop, it is highly likely that the jury found an intentional homicide when it convicted him of first degree murder and found true the three felony-murder special circumstances.

We also conclude that no reasonable jury, properly instructed under *Carlos*, would have failed to find intent to kill based on the evidence in this case. The deep stab wound in the neck of Skuse, an elderly (*ante*, at p. 653), "tiny" (*post*, at p. 719), and osteoporotic (*ante*, at p. 655) woman (see *People v. Cudjo, supra*, 6 Cal.4th at p. 630 ["helpless victim"]) who was probably already disabled through defendant's beating of her, combined with evidence that he stabbed her twice or, if not twice, stabbed her once and twisted or let the knife twist in her neck, is inconsistent with unintentional homicide. The pathologist did not describe the wound as a laceration, as if Skuse had brushed or pushed against a knife blade held parallel to the skin, but as a "stab wound." His testimony also established that the knife was inserted with such force that the carotid artery "had almost been completely cut, severed." (See *People v. Johnson, supra*, 6 Cal.4th at p. 47, citing "*People v. Pride, supra*, 3 Cal.4th at p. 247 [multiple stab wounds consistent with finding of premeditated murder]"; cf. *People v. Balderas, supra*, 41 Cal.3d 144, 199 [gunshot wound "not in an area of vital organs," inter alia, defeats possibility of "an intent to kill as a matter of law"].)

Moreover, there was little doubt that the knife wound was administered while the victim was in the same defenseless position in which her body was found—lying facedown and battered on the bedroom floor. Descriptions of the crime scene established that blood drained from the stab wound in Skuse's neck and "saturated" a throw rug underneath her upper body. There was no evidence that Skuse was moved to this position after the fatal wound was inflicted. While we do not know when defendant obtained the murder weapon from the kitchen and carried it into the bedroom, the medical evidence establishes to a near certainty that he harbored lethal intent at the moment he used the knife.

The brutality of the assault, which involved force far in excess of that needed to complete any of the other crimes committed against Skuse, also

evinces an intent to kill. (See *People* v. *Cudjo, supra,* 6 Cal.4th at p. 630.) Defendant testified that he was of average strength and the jury could infer from the evidence presented that Skuse was frail. Her frailty was readily apparent because of her stooped or humpbacked condition. Together, these facts virtually eliminated the possibility that defendant inflicted the blunt trauma injuries and knife wound during a violent struggle or while the victim offered any meaningful resistance.

The condition in which defendant left the body further supports the view that he intended to kill. He "[d]raped" the purple robe across the victim's shoulder and back, stacked four dresser drawers on top of the robe, and then tossed items of clothing onto the pile. At some point, he also dumped the contents of the victim's purse on the bed and removed her television from the living room. The only reasonable inference is that defendant searched the apartment for valuables after attacking Skuse, safe in the knowledge that she would not interfere because she was either dead or dying.

Our conclusion is also supported by the manner in which the jury resolved the crimes defendant was charged with committing against the other victim, 51-year-old Norma C. In finding him guilty of attempted murder in this incident, the jury rejected his trial testimony and found that he intended to kill that victim, for the intent to kill is an element of the offense of attempted murder. (*People* v. *Visciotti* (1992) 2 Cal.4th 1, 56 [5 Cal.Rptr.2d 495, 825 P.2d 388].) The crimes against Norma C. occurred just two weeks after Skuse was murdered and were highly similar. In both incidents, an older female victim was severely beaten in the face and choked, was cut or stabbed at or near the carotid artery, was forced to lie facedown on the floor, and had her panties ripped or displaced; and in both, defendant raped or intended to rape, dumped the contents of the victim's purse, and stole her wallet or money. It seems improbable that the jury would have found that he intended to kill Norma C. but that he did not intend to kill Skuse, who was older and frail, even though Skuse died as a result of her injuries and defendant was found to have used a knife only against Skuse.

Citing and discussing *People* v. *Fuentes* (1985) 40 Cal.3d 629 [221 Cal.Rptr. 440, 710 P.2d 240], defendant asserts that the court's instructional error and the emphasis the prosecution placed on the felony-murder theory combined to cause him to abandon possible defenses that he was the killer but did not intend to kill, or that he was an accomplice to others who burglarized Skuse's apartment but that the others killed her.

We are unpersuaded. Leaving aside any question of invited error, the record makes plain that the prosecutor did not, as defendant implicitly

contends, emphasize felony murder to the virtual exclusion of the other theory available to him—namely, premeditated and deliberate murder. Hence "defendant had a dual incentive to present [evidence of a lack of intent to kill]. First, such evidence was *crucial* in the event the jury determined that defendant was [not guilty of felony murder] . . . . [¶] Second, lack of intent to kill would have been a strong mitigating factor at the penalty phase of the trial." (*People* v. *Fuentes, supra,* 40 Cal.3d at pp. 642-643 (conc. and dis. opn. of Lucas, J.); accord, *id.* at p. 643 (conc. and dis. opn. of Mosk, J.); see also *People* v. *Barbosa* (1991) 228 Cal.App.3d 1619, 1627-1628, fn. 12 [279 Cal.Rptr. 626].) The parties' and court's interpretation of the requisite mental state for the felony-murder special circumstances could not have had the effect that defendant suggests.

. As stated, the prosecution's theory of first degree intentional murder gave defendant every incentive to present evidence negating an intent to kill, notwithstanding the parties' mistaken assumption that *Carlos* did not apply. Yet "[r]elying on an alibi defense, defendant presented no evidence that the killing was other than intentional." (*People* v. *Cudjo, supra,* 6 Cal.4th at p. 630.) According to defendant's version of events, he did not see Skuse when he entered her apartment, and he did not rape or kill her or take any of her property. This version of events is fundamentally inconsistent with defendant's current claim that, absent *Carlos* error, he might have sought to persuade the jury that he was the killer but had no intent to kill. Given his trial testimony, we can only assume that no evidence "worthy of consideration" on intent to kill was available. (*People* v. *Garcia* (1984) 36 Cal.3d 539, 556 [205 Cal.Rptr. 265, 684 P.2d 826].)

For the foregoing reasons, defendant's claim of reversible *Carlos* error fails.

### 3. *Instruction Explaining Uses of Evidence to Show Intent.*

The jury was instructed that intent may be proven by direct or circumstantial evidence. The court modified CALJIC No. 3.34 (4th ed. 1979 bound vol.) so as to provide the jury this language: "The intent with which an act is done is shown as follows: (By a statement of his intent made by a defendant.) [¶] By the circumstances attending the act, the manner in which it is done, and the means used."

The jury was also instructed that for all the offenses charged except rape, battery, and battery with serious bodily injury, which were said to be general-intent crimes, "there must exist a union or joint operation of act or conduct and a certain specific intent and/or mental state in the mind of the

perpetrator and unless such specific intent and/or mental state exists the crime to which it relates is not committed. [¶] The specific intent and/or mental state required is included in the definition of the crimes charged."

The gravamen of defendant's claim is that "the instruction . . . mandatorily defined intent by action" by stating that intent "is shown" by certain acts amounting to direct or circumstantial evidence—hence the element of intent was taken from the jury, in asserted violation of several provisions of the federal Constitution.

Defendant is wrong. There is no reasonable likelihood that the jury would have understood that it must find intent established if it found certain acts to have been committed. Rather, it would have understood that intent is found, if at all, either by a defendant's own statements or by circumstantial evidence from which it can be inferred.

4. *Instructing on Rape in Terms of General Intent and Specific Intent.*

 The jury was given a version of CALJIC No. 3.30 (4th ed. 1979 bound vol.) adapted to the rape charge against defendant. The instruction informed them that rape was a general intent crime and explained: "To constitute general criminal intent, it is not necessary that there should exist an intent to violate the law. When a person intentionally does that which the law declares to be a crime, he is acting with general criminal intent, even though he may not know that his act or conduct is unlawful."

The jury was instructed, with regard to felony murder: "The unlawful killing of a human being . . . which occurs as a result of the commission or attempt to commit . . . rape . . . and where there was in the mind of the perpetrator the *specific intent* to commit such crime, is murder of the first degree." (Capitalization altered and italics added.) As stated above, the jury was also instructed that "[t]he specific intent and/or mental state required is included in the definition of the crimes charged."

Defendant contends that the instructions were contradictory, vague and confusing, requiring reversal under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. Specifically, he observes that the rape instruction required a finding of general intent, whereas the felony-murder-rape instruction required a finding of specific intent.

Rape is a general intent crime. (*People* v. *Hernandez* (1988) 46 Cal.3d 194, 209 [249 Cal.Rptr. 850, 757 P.2d 1013].) As the jury was informed in

the instruction defining rape, performing a proscribed act was enough to violate the law. To find that felony murder occurred, however, the jury was required also to find "specific intent." We discern no reasonable likelihood that the jury would understand the requirement of "specific intent" in the felony-murder charge to mean anything but the mental state of the purpose to achieve some goal—i.e., intent. There is no reasonable likelihood that the jury would understand that the term "specific intent" might mean something else (see *People* v. *Hood* (1969) 1 Cal.3d 444, 456-458 [82 Cal.Rptr. 618, 462 P.2d 370]; *Director of Public Prosecutions* v. *Beard* [1920] A.C. 479, 497-498 (per Lord Birkenhead)). Therefore defendant received more than he was entitled to when the jury was instructed on the "specific intent" to commit the underlying felony of rape. The reference inured to his benefit. If error occurred, it was harmless.

### 5. *Effect of Misreading Instructions.*

Defendant contends that the court prejudicially erred by misreading various instructions to the jury, and thereby violated rights he discerns in the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, requiring reversal of his convictions. This claim is without merit.

The court erroneously substituted "burglary" for "robbery" when reading the last sentence of the instruction on the felony-murder-robbery special circumstance.

The court stated, "In determining the believability of a witness, you may consider anything that has a tendency in reason to prove or disprove the truthfulness of the testimony *of the Defendant* . . ." (italics added), whereas the written instruction provided, ". . . of the witness . . . ."

Defining burglary, the court instructed: "Every person who enters any structure of the type shown by the evidence in this case, with the specific intent to steal . . . or with the specific intent to commit rape, a felony, is guilty of . . . burglary." Following other instructions on burglary, the jury was also given this written instruction, modifying CALJIC No. 14.59 (4th ed. 1979 bound vol.): "If you agree unanimously that defendant made an entry with the specific intent to steal or to commit rape, a felony, you should find the defendant guilty of burglary, and you are not required to agree on which particular crime the defendant intended to commit when he entered." The court's oral instruction did not include the words "of burglary"; it stated that if the jury found he entered with the intent to steal or rape it "should find the defendant guilty . . . ." Defendant contends that the oral form of

this instruction directed the jury to find him guilty of all crimes charged if it decided he entered the Skuse residence and the Norma C. classroom with the intent to steal or rape.

The court stated, according to defendant, that "[i]mplied malice aforethought is applicable to the crime of attempt to commit murder," whereas the written instruction contained the word "inapplicable." The corrected reporter's transcript shows that the court read that part of the instruction properly. But it did orally substitute "attempt" for "intent" in the ninth paragraph of that written instruction, misstating a clause instructing that "acts of a person who intends to kill another person will constitute an attempt where they themselves clearly indicate a certain, unambiguous *intent* to kill . . . ." (CALJIC No. 8.66 (4th ed. 1987 Supp.), italics added.)

The court omitted "discussed or" from the admonition of CALJIC No. 8.83.2 (4th ed. 1979 bound vol.): "In your deliberations the subject of penalty or punishment is not to be discussed or considered by you."

The court stated, "In this case there are . . . four possible verdicts as to Count Two, . . . [and] six possible verdicts and two findings as to Count Eight," omitting any mention of count seven, whereas the written instruction provided, "In this case there are . . . three possible verdicts as to Count Two, . . . six possible verdicts as to Count Seven, and four possible verdicts as to Count Eight."

Finally, the court stated, "[*a*]*ttempted* murder is the unlawful killing of a human being with express malice aforethought." (Italics added.) The written instruction also contained this obvious misstatement of law, which the court and parties agreed to during the instruction conference, evidently overlooking the flaw.

Regarding the instructions orally misstated but whose written form defendant does not contend to be erroneous: The jurors had before them six copies of the written version when they began to deliberate, and we presume that they were guided by those copies. (*People* v. *Crittenden, supra,* 9 Cal.4th 83, 138.) Although defendant insists that it is mere speculation to conclude that the jury even read the printed instructions, much less was guided by them, their primacy was reinforced by the court's admonition that "[y]ou are to be governed only by [each] instruction in its final wording whether printed, typed or handwritten." This direction reminded the jurors that it is difficult to recite complicated and lengthy written material verbatim and that the carefully prepared and reworked written text should guide them. The error committed in misstating the instructions was harmless. (*Id.* at p. 139.)

However, we emphasize the importance of trial judges reading jury instructions with care.

With regard to the instruction on attempted murder whose written form also misstated the law: The error was so obvious that we do not believe there is any reasonable likelihood that the jury, with its members deliberating the charges, would have understood that attempted murder is defined as an unlawful killing with malice aforethought. The same instruction explained that an element of attempted murder is "a direct but ineffectual act . . . done by one person towards killing another . . . ." Even if, as is most unlikely, the jury misunderstood the instruction, it could only have benefitted defendant. The misstatement of the law in the oral and written instruction was also harmless. There was no violation of any constitutional provision.

### 6. *Failing to Require Unanimity Regarding Murder Theory.*

The jury was instructed that it could find defendant guilty of first degree murder on a theory either of felony murder or of killing with malice aforethought, intent to kill, premeditation, and deliberation. The instructions did not require that the jury unanimously decide on one of these two bases for a conviction. Defendant contends that this procedure violated the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. He acknowledges that we have held otherwise. (*People* v. *McPeters* (1992) 2 Cal.4th 1148, 1185 [9 Cal.Rptr.2d 834, 832 P.2d 146].) We decline to reconsider our view.

### 7. *Cumulative Effect of Assertedly Erroneous Instructions.*

Defendant contends that the cumulative impact of giving the jury numerous instructions he finds defective—in sum, those reviewed in the instructional error part of this discussion—deprived him of rights he finds in the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

We disagree. We have concluded that some of the instructions about which he complains were in fact free of error, and that the errors in giving others were harmless. The cumulative effect of error did not deprive him of any constitutional right.

Defendant also maintains that the prosecutor committed misconduct by disparaging the instructions, calling them "legal jargon"—a term that defendant equates with "incomprehensible" speech or "gibberish"—and thereby undermining the jurors' understanding that they must follow them to return a lawful verdict.

When we review a claim of prosecutorial remarks constituting misconduct, we examine whether there is a reasonable likelihood that the jury would have understood the remark to cause the mischief complained of. (*People* v. *Clair, supra*, 2 Cal.4th 629, 663.)

In fact the prosecutor was speaking only of the complicated murder instructions, which do contain numerous terms of art. There is no reasonable likelihood that the jury would interpret his remarks as disparaging. No misconduct occurred.

### G. *Failing to Provide All Verdict Forms and to Read Them Correctly.*

As part of giving instructions, the court read the verdict forms to the jury. It failed to read any form returning a verdict of not guilty of first degree murder. And it also failed to read the form returning a verdict of not guilty for the rape of Skuse.

In addition, defendant contends that the court failed to provide the jury with a not guilty form for a first degree murder verdict and with any forms at all on a verdict for murder in the second degree, even though it promised that it would do so. The record supports his assertion. He did not, however, call these problems to the court's attention when they occurred.

He contends that by its errors the court directed the jury to return guilty verdicts on the first degree murder and rape charges, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution. He also urges that these constitutional provisions were violated by the court's failure to provide forms for second degree murder.

We do not decide whether the failure to notify the court of these problems prevents defendant from raising the issue on appeal. (Cf. § 1259 [claim of instructional error may be considered for first time on appeal if "the substantial rights of the defendant were affected" by the asserted error].) In any event, we have a different view from him of the merits of this issue. The jury was instructed that to find him guilty of first degree murder or rape it would have to decide that he committed these crimes beyond a reasonable doubt. Thus, just as was true of the error in misreading certain instructions to the jury (*ante*, at pp. 686-688), the errors in failing to properly read the verdict forms were harmless.

The parties do not raise, and we do not address, the question whether the court has any duty to provide the jury with verdict forms. But any failure to provide a form, if error it is, results in no prejudice when the jury has been

properly instructed on the legal issue the trial presented. When "the jury has been properly instructed as to the different degrees of the offense, it must be presumed that if [the jurors'] conclusion called for a form of verdict with which they were not furnished, they would either ask for it or write one for themselves. It certainly could have no necessary tendency to preclude them from finding such verdict. [¶] We discover no reversible error in the record . . . ." (*People* v. *Hill* (1897) 116 Cal. 562, 570 [48 P. 711]; accord, *People* v. *Elliott* (1953) 115 Cal.App.2d 410, 424 [252 P.2d 661]; see also *People* v. *Schindler* (1969) 273 Cal.App.2d 624, 642 [78 Cal.Rptr. 633] [dictum].)

H. *Sufficiency of Evidence for the Convictions and for the Crimes Supporting the Special Circumstance Findings.*

■■■ Defendant contends in substance that there is insufficient evidence that he committed any of the crimes charged in light of the requirements of the due process clause of the Fourteenth Amendment to the United States Constitution and its equivalent in the California Constitution (Cal. Const., art. I, § 15). He also urges that the evidence was insufficient to find true the special circumstance allegations.

We disagree: there was sufficient evidence in each instance.

■■■ "In reviewing [a claim regarding] the sufficiency of the evidence, we must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.] '[T]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] We ' "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." ' " (*People* v. *Davis, supra,* 10 Cal.4th 463, 509-510.) If we determine that a rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt, the due process clause of the United States Constitution is satisfied (*Jackson* v. *Virginia* (1979) 443 U.S. 307, 318-319 [61 L.Ed.2d 560, 573-574, 99 S.Ct. 2781]), as is the due process clause of article I, section 15, of the California Constitution (*People* v. *Berryman, supra,* 6 Cal.4th 1048, 1083).

1. *Crimes Against Skuse and Special Circumstances.*

■■■ Defendant claims that the evidence is insufficient to establish his guilt of first degree murder, rape, robbery, or burglary—the crimes for which

he was prosecuted in connection with the killing of Skuse—or to find true the special circumstance allegations. He contends that because the prosecution lacked sufficient evidence of the killer's identity, the evidence for felony murder was insufficient, and that because it lacked evidence of premeditation and deliberation, the evidence to convict him on that theory also was insufficient.

"Murder is the unlawful killing of a human being, or a fetus, with malice aforethought." (§ 187, subd. (a).) At the time of Skuse's killing, first degree murder could be accomplished by a "murder . . . committed in the perpetration of, or attempt to perpetrate, arson, rape, robbery, burglary, mayhem, or any act punishable under Section 288 . . . ." (Former § 189, added by Stats. 1982, ch. 950, § 1, p. 3440.) Rape was then defined in pertinent part as "an act of sexual intercourse accomplished with a person not the spouse of the perpetrator" "accomplished against a person's will by means of force or fear of immediate and unlawful bodily injury on the person or another." (Former § 261, subd. (2), added by Stats. 1984, ch. 1635, § 79.5, p. 5865.) Robbery is defined as "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211; see also § 212 [defining fear].) Burglary was defined, as relevant to this case, as an entry into any "room, apartment . . . or other building . . . with intent to commit grand or petit larceny or any felony . . . ." (Former § 459, added by Stats. 1984, ch. 854, § 2, p. 2896.) Burglary of an "inhabited dwelling house" was burglary of the first degree. (Former § 460, subd. 1, added by Stats. 1982, ch. 1297, § 1, p. 4786.)

In light of the evidence described *ante*, at pages 653-655 and 657-658, a rational trier of fact could surely have found beyond a reasonable doubt that defendant perpetrated felony murder and committed all three underlying felonies charged with respect to Skuse. The presence of defendant's palm, thumb, and fingerprint impressions at the scene; the shoe print impressions; the ripping of Skuse's underwear; the presence of semen; the severe beating that she endured; the postal authorities' return of her wallet and the disappearance of the television set and car keys; and defendant's own testimony regarding his visit to her apartment—these items of evidence permitted a rational trier of fact to find beyond a reasonable doubt that defendant committed felony murder, to find the offenses of rape, robbery, and burglary established beyond a reasonable doubt, and to find true each special circumstance alleged. Regarding the latter, defendant contends that even if the evidence sufficed to establish the underlying crimes, the special circumstance allegations may not be sustained, for the intent to kill was required at the time of the crimes and the jury never found such an intent. We have,

however, concluded that under the evidence presented the only reasonable conclusion the trier of fact could have reached was that defendant intended to kill Skuse. (*Ante*, at pp. 679-684.) There was sufficient evidence to permit us to sustain the allegations, and any error regarding a failure to find intent was harmless.

As stated, defendant also contends that there was insufficient evidence to find him guilty of first degree murder on a theory of premeditation and deliberation (former § 189, added by Stats. 1982, ch. 950, § 1, p. 3440). We need not address this point, however, because his conviction adequately rests on the first degree murder verdict and the three true felony-murder special-circumstance findings, "which, under the instructions actually given, necessarily entail a unanimous determination of felony . . . murder . . . beyond a reasonable doubt." (*People* v. *Berryman, supra,* 6 Cal.4th at p. 1086.)

### 2. *Crimes Against Norma C.*

 Defendant also contends that there was insufficient evidence to convict him of attempting to murder Norma C. He reasons that the prosecution's case lacked a sufficient showing of the element of intent to kill.

We have already explained the elements of murder. An attempt was defined, at the time defendant attacked Norma C., as an intent to commit a crime coupled with a direct but ineffectual act toward its commission. (*People* v. *Memro* (1985) 38 Cal.3d 658, 698 [214 Cal.Rptr. 832, 700 P.2d 446]; see also § 21a, added by Stats. 1986, ch. 519, § 1, p. 1859 [later codifying rule].)

With regard to the attack on Norma C., it is again necessary only to recall the evidence presented (*ante*, at pp. 655-658) to reject defendant's claims of insufficient evidence of the intent to kill. In addition to the nature of her injuries and other physical evidence, the brutality of the attack on her and the drawing of the curtains so that medical aid might not soon reach her all permitted a rational trier of fact to find beyond a reasonable doubt that he committed the crime.

Defendant also contends that there was insufficient evidence to convict him of robbery or of assault with intent to rape. Robbery we have already defined. With regard to the other charge, section 220 punishes "[e]very person who assaults another with intent to commit . . . rape . . . ."

But defendant's demand for money, his scouring of Norma C.'s purse and the disappearance of paper money from it, the rending of her underclothing

and pantyhose, and his own testimony at trial establish that there was sufficient evidence to convict him of these crimes. (See *ante,* at pp. 655-658.)

Finally, defendant contends that, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, he cannot present this issue adequately on appeal because the loss of certain photographic exhibits makes it impossible to review the record and marshal facts for an adequate argument. We do not agree. We have concluded on independent review that the record is adequate to allow the appeal to proceed in a meaningful fashion. That conclusion certainly applies here.

I. *Prosecutorial Misconduct.*

Defendant contends that the prosecutor committed misconduct at various stages of the guilt phase proceedings, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and evidently also in violation of state law.

1. *During the Taking of Evidence.*

With regard to some of the points raised in this section, defendant registered no objection to the purported acts of misconduct, and there is no reason to believe that any harm could not have been cured. Those points must therefore be rejected on procedural grounds. (*People* v. *Benson* (1990) 52 Cal.3d 754, 794 [276 Cal.Rptr. 827, 802 P.2d 330].) Defendant urges that if this is true, then counsel were ineffective for failing to timely object. In light of that argument, we will address each claim on the merits to the extent necessary to decide the ineffective assistance claim. (See *People* v. *Wader* (1993) 5 Cal.4th 610, 636 [20 Cal.Rptr.2d 788, 854 P.2d 80].) As will appear, most of his claims lack merit; we discern no prejudice from the one act of misconduct that occurred, and hence no denial of the effective assistance of counsel.

First, defendant contends that the prosecutor committed misconduct by showing putrid clothing to the jury. We have already explained the circumstances surrounding the presentation of this evidence. (*Ante,* at pp. 674-675.) There was no misconduct. As described, the prosecutor made every effort to minimize the effect of the blood's putrefaction on the jury.

Next, citing *Caldwell* v. *Mississippi* (1985) 472 U.S. 320 [86 L.Ed.2d 231, 105 S.Ct. 2633], defendant urges that by mentioning to prospective juror Catherine Trujillo, who was later seated on the jury, "in the last twenty years

no one has been executed in the State of California," the prosecutor improperly implied that the death penalty was a fiction and therefore she would not be fully responsible for whatever punishment she voted to mete out to him.

This claim fails to persuade. *Caldwell* error occurs when the jury has been "affirmatively misled . . . regarding its role in the sentencing process so as to diminish its sense of responsibility." (*Romano* v. *Oklahoma* (1994) 512 U.S. 1, __ [129 L.Ed.2d 1, 11, 114 S.Ct. 2004].) The prosecutor's innocuous comment, in response to Trujillo's observation that she did not recall the death penalty having been used in California, fell short of any such transgression. It did not affirmatively mislead her that the responsibility for the sentence rested elsewhere; indeed it did not hint at such a notion.

Next, defendant contends that when the prosecutor cross-examined him, he improperly questioned him regarding his denials to the police of having been present at the crime scenes, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. The authorities to which he refers us, however, discuss only the constitutional propriety of using an "arrested person's silence . . . to impeach an explanation subsequently offered at trial." (*Doyle* v. *Ohio* (1976) 426 U.S. 610, 618 [49 L.Ed.2d 91, 98, 96 S.Ct. 2240], fn. omitted; see *Brecht* v. *Abrahamson* (1993) 507 U.S. 619, 627-628 [123 L.Ed.2d 353, 366, 113 S.Ct. 1710].) By contrast, "*Doyle* does not apply to cross-examination that merely inquires into prior inconsistent statements. Such questioning makes no unfair use of silence, because a defendant who voluntarily speaks after receiving *Miranda* [v. *Arizona, supra,* 384 U.S. 436] warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all." (*Anderson* v. *Charles* (1980) 447 U.S. 404, 408 [65 L.Ed.2d 222, 226, 100 S.Ct. 2180].)

Such was the case here. As explained, evidently having waived his rights to silence and to counsel, defendant told a homicide detective that he had never visited the Skuse apartment. When told that his fingerprints had been found there, he could offer no explanation for their possible presence. He also denied ever having been inside St. Patrick's Elementary School and could not understand why his fingerprints might be found in a second grade classroom there. At trial, of course, he admitted that he was at both locations and committed crimes at each. The prosecutor committed no *Doyle* error by questioning him about his prior inconsistent statements.

█ Next, defendant contends that the prosecutor at times asked questions of him that were argumentative, improperly leading, or harassing, or that assumed facts not in evidence, all in violation of state law and the

federal Constitution. Having reviewed the record, we disagree that any misconduct occurred, with one exception. At one point this exchange regarding the beating of Norma C. occurred:

"Q. Did you take anything from her?

"A. No, I didn't.

"Q. Besides her dignity, I mean.

"MR. REESE: Objection, your Honor.

"THE COURT: Overruled.

"MR. REESE: It's not time for final argument at this time, your Honor."

Defendant calls the prosecutor's comment inflammatory. His remark was gratuitous, but his misconduct was also de minimis. The jury was well acquainted with defendant's crimes and their effect on Norma C. No prejudice appears as a matter of state law. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) Nor do we discern any violation of the federal Constitution. "A state-law violation is *not* automatically a violation[, e.g.,] of federal constitutional due process—and certainly, the violation here does not offend [any federal constitutional] guaranty." (*People* v. *Ashmus*, *supra*, 54 Cal.3d 932, 984, fn. 14.)

Next, defendant maintains that by asking Norma C. and a police officer whether they could recall her having told him at the hospital that she thought she had been raped, the prosecutor offered his own testimony and put before the jury inflammatory allegations not supported by evidence, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and also implicitly in violation of state law. Norma C. could not recall having made the statement. The police officer did recall her having made a statement, but defendant objected on grounds of hearsay, the prosecutor elected not to pursue the matter, and the statement's contents were never revealed.

No misconduct appears. "It is improper for a prosecutor to ask questions of a witness that suggest facts harmful to a defendant, absent a good faith belief that such facts exist." (*People* v. *Warren* (1988) 45 Cal.3d 471, 480 [247 Cal.Rptr. 172, 754 P.2d 218].) The record contains nothing that would suggest the absence of such a good faith belief. To contend the opposite is to speculate. Indeed, the police officer recalled that Norma C. did make a

statement regarding a sexual assault, and the prosecutor later made a point of putting on the record that he asked the question in good faith, but could not immediately think of how to overcome the hearsay objection. To be sure, misconduct may be found even when the prosecutor acts in good faith. (*People* v. *Price* (1991) 1 Cal.4th 324, 447 [3 Cal.Rptr.2d 106, 821 P.2d 610].) On this record, however, we find no misconduct and hence no violation of state or federal law.

### 2. *During Closing Arguments.*

■ Defendant further contends that the closing arguments were replete with misconduct, consisting of attempts to shift the burden of proof to him, misstate the law, rely on or assume facts not in evidence, and tar him with uncharged crimes or with acts for which there was insufficient evidence.

Defendant never assigned misconduct to any statement of the prosecutor at closing argument. He has failed to preserve for review any claim of misconduct. (*People* v. *Benson, supra,* 52 Cal.3d at p. 794.) He urges that his counsel's failure to assign misconduct to aspects of the arguments denied him the effective assistance of counsel. In light of that claim, we will address his contentions on the merits to the extent necessary. (*People* v. *Wader, supra,* 5 Cal.4th 610, 636.) As will appear, they are largely meritless, and in no case does he show prejudice. Therefore he was not denied the effective assistance of counsel.

### a. *Burden of Proof.*

First, defendant contends that the prosecutor attempted to shift the burden of proof to him when he asked the jury to consider what other explanation could account for the evidence at Skuse's apartment, including specifically the shoe print impressions.

There is no reasonable likelihood that the jury would have understood the remark to cause the mischief complained of. The prosecutor was suggesting that the most logical interpretation of the evidence was that defendant committed the crimes. It was "a fair comment on the state of the evidence . . . ." (*People* v. *Mayfield* (1993) 5 Cal.4th 142, 178 [19 Cal.Rptr.2d 836, 852 P.2d 331].) There was no misconduct, and no constitutional violation.

Defendant further urges that the prosecutor attempted to shift the burden of proof when he argued that if he "denies these things [i.e., having committed most of the crimes at the Skuse apartment], and if you conclude that—that he is not telling you the truth, I think it's a fair inference to

conclude the opposite must be true." We understand the prosecutor to have meant that if the jury did not believe defendant's statement that he did not commit the crimes, it would have to decide that he did commit them. There is no reasonable likelihood that the jury would understand the declaration to affect the burden of proof.

Defendant also urges that the prosecutor tried to shift the burden to him by arguing that his testimony was incredible. The prosecutor did indeed dwell on the implausibility of various aspects of defendant's testimony. In so doing, however, he nowhere suggested that defendant bore a burden to establish his lack of guilt, and there is no reasonable likelihood that the jury would have understood him to do so. Again, he fairly commented on the state of the evidence.

Defendant also asserts that the prosecutor tried to shift the burden of proof when he declared, "[i]f bacteria-type infection [i.e., contamination of forensic evidence] were such a big issue, there would be tests done on this type of evidence to discount it." The prosecutor was trying to emphasize the improbability that the evidence had been contaminated with fecal bacteria—he had just argued that there was evidence that "this type of result is very unusual." There was no attempt to shift the burden of proof to defendant, and no reasonable likelihood that the jury would have understood the remark as having that effect.

### b. *Misstating the Law.*

 Defendant maintains in essence that the prosecutor misstated the law of premeditation and deliberation when he argued that " '[p]remeditated' simply means considered beforehand." He also assigns misconduct to the arguments that the jury did not have to evaluate his reasoning process by a standard befitting Albert Einstein and that it need not, to establish premeditation and deliberation, find that he weighed the consequences as much or as long as might "regular, civilized people, who aren't criminals, who would never think of [doing] such a thing."

The prosecutor did not misstate the law of premeditation and deliberation. "We have defined 'deliberate' as ' "formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action." ' [Citation.] We have defined 'premeditated' as ' "considered beforehand." ' [Citation.] Premeditation and deliberation can occur in a brief interval. 'The test is not time, but reflection. "Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly." ' " (*People* v. *Memro, supra,* 11 Cal.4th 786, 862-863.) To the extent that the prosecutor asserted that defendant would not

take as long to decide to act as an individual whose moral compass would make it extremely difficult to contemplate killing another human being, he engaged in fair argument. We find no misconduct. We note, moreover, that the prosecutor argued that defendant "did think carefully. He had to walk into the kitchen and get that knife and walk back and plunge it into the neck of Mrs. Skuse."

### c. *Arguing Facts Not in Evidence.*

■ Defendant contends that the prosecutor argued facts not in evidence when he asserted that (1) defendant found money in Skuse's apartment, (2) Skuse did not die instantaneously, (3) defendant had to step on Skuse's body to reach the drawer on which fingerprints were found, (4) defendant had to have surveilled Skuse and to have known she had a car to steal, (5) Norma C. was elderly, (6) defendant used Norma C.'s money to divert himself with his friends, and (7) Norma C.'s "looking right at him, as he dragged her across the room" supported a motive for attempted murder.

The prosecutor should not, of course, argue facts not in evidence. (*People v. Benson, supra,* 52 Cal.3d at pp. 794-795.)

In each case cited, we conclude that the remarks were permissible inferences drawn from the testimony adduced (see *People v. Lewis* (1990) 50 Cal.3d 262, 283 [266 Cal.Rptr. 834, 786 P.2d 892]), or, in one case, inaccurate but not prejudicial.

Some $14,000 was found in envelopes secreted in Skuse's apartment after her death; other envelopes were scattered around the apartment, one of them bearing defendant's fingerprint impression. There was testimony that severing the carotid artery would result in a quick death but not necessarily an instant one. There was evidence that defendant's palm print was found on the topmost drawer lying on Skuse's body, and that the drawer was hard to reach without either stepping on Skuse's leg or stepping in a place that would make seeing her leg almost unavoidable. There was evidence that the padlock to Skuse's garage was unlocked, a condition in which she was unlikely to have left it, suggesting that defendant knew where her car was and tried to steal it but became frightened or otherwise deterred. Norma C. was 51 years old—not elderly, but not young either. Perhaps the prosecutor exaggerated, but as stated, any such inaccuracy was de minimis (see *People v. Bean* (1988) 46 Cal.3d 919, 951-952 [251 Cal.Rptr. 467, 760 P.2d 996]), and there is no reasonable likelihood that the jurors, seeing Norma C. in court for themselves, would have been misled by it. Defendant testified that he went with friends to drink beer, so to suggest that he used Norma C.'s

money for that purpose was a permissible inference. Finally, it was well within the scope of permissible argument to assert that defendant dragged Norma C. by her ankles or legs across the classroom, that he did not realize she was nearsighted, and that he decided to kill her so she could not later identify him. In sum, there is no reasonable likelihood the jury would have understood any of the prosecutor's remarks as having the mischievous effect claimed on appeal.

#### d. *Referring to Uncharged Crimes.*

In addition to arguing that defendant attempted to steal Skuse's car—a topic that we have already decided he could properly argue—the prosecutor argued that he stabbed Norma C. Defendant contends that he referred to an uncharged crime, and he notes that the court struck the knife-use allegations for want of sufficient evidence. But the prosecutor's remarks were permissible given the evidence—she had a laceration mark near the carotid artery and a swollen neck, suggesting internal bleeding. He did not argue that defendant stabbed her with a knife, merely that he "thrust something into [her] neck" or "stabbed" her.

In addition, the prosecutor stated, when discussing instructions that the jury would be given on assault with intent to rape, attempted rape, and simple battery, "[as] between attempted rape and assault with intent to commit rape, it's really a distinction without a difference. It just happens that he's charged with the assault—could as well be charged with attempted rape, and indeed, if you believe she was raped, you wouldn't be doing any injustice with this evidence. [¶] The only—remember Norma [C.] really can't tell us what happened to her after he was taking the money out of her purse. She draws a blank. [¶] Maybe she was unconscious—[the episode] may be too horrible for her to remember . . . . [¶] But he says no, he just tore her underpants, or pantyhose accidentally. He says—I think it wouldn't be too far away to say that—that Lance Osband committed rape here, but you're not permitted to find him guilty of rape because he's not charged with rape."

In the main, defendant contends that there was insufficient evidence of any rape and that the argument was calculated to persuade the jury that "the crime actually committed was more heinous than the one charged . . . [and] that only legal technicalities were preventing the jury from addressing the real crime." But he cites no authority holding this to be misconduct as a matter of law, nor are we aware of any. We find no reasonable likelihood that the jury understood the argument to mean that defendant should be convicted of one crime because he in fact committed another. And he was not charged with raping Norma C.

Defendant also contends that the prosecutor committed misconduct by suggesting he committed an act of sodomy on Skuse. There were, as stated, apparent fecal and semen stains on Skuse's robe. The prosecutor argued that defendant "raped and probably sodomized" her, suggesting that he wiped himself off on the robe after having committed sodomy. This was a fair inference to draw from the evidence. Although defendant contends that an allegation of sodomy is inflammatory and that the prosecutor made it to incite passion against him, we discern no reasonable likelihood that the jury would misapply the remark in reaching a verdict.

### e. Reference to Element of Murder.

Defendant again complains that the prosecutor committed misconduct by calling the murder instructions "legal jargon." As explained *ante*, at page 688, no misconduct occurred.

### 3. Cumulative Effect of Misconduct.

Defendant urges that the cumulative effect of the prosecutor's instances of misconduct resulted in violations of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, even if individually they did not. However, we have found either no misconduct at all or misconduct so trivial that no prejudice could have arisen from it. We reject the claim. In particular, any failure to assign misconduct to the prosecutor's actions on certain occasions did not result in the ineffective assistance of counsel. There is no reasonable probability that the outcome would have differed had counsel done so.

### J. Ineffective Assistance of Counsel.

Defendant contends on additional grounds that he received the ineffective assistance of counsel at the guilt phase, in essence in violation of the Sixth and Fourteenth Amendments to the United States Constitution and article I, section 15, of the California Constitution.

As stated, a defendant claiming ineffective assistance of counsel under the federal or state Constitutions must show both deficient performance under an objective standard of professional reasonableness and prejudice under a test of reasonable probability of a different outcome. "If the record contains an explanation for the challenged aspect of counsel's representation, the reviewing court must determine 'whether the explanation demonstrates that counsel was reasonably competent and acting as a conscientious, diligent advocate.' [Citation.] On the other hand, if the record contains no

explanation for the challenged behavior, an appellate court will reject the claim of ineffective assistance 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation . . . .' [Citation.]" (*People* v. *Cudjo, supra,* 6 Cal.4th 585, 623.)

On October 15, 1987, defendant filed a motion to compel discovery. The gist of the motion was to discover statistics that would show that the death penalty is discriminatorily imposed in California and in Sacramento County against Black defendants, and to set an evidentiary hearing on the question whether special circumstances are discriminatorily charged and the death penalty discriminatorily imposed.

Defendant withdrew the motion. Apparently one reason for his doing so was that the prosecutor persuaded him that he should. But counsel did not perform deficiently by withdrawing the motion on defendant's behalf. Indeed, it appears that it was without merit. (*People* v. *McPeters, supra,* 2 Cal.4th 1148, 1169-1171.)

Next, defendant contends that counsel were ineffective for failing to assign misconduct to the prosecutor's actions on certain occasions. As stated in our discussion of prosecutorial misconduct, however, counsel were not ineffective.

Next, defendant urges that counsel failed to adequately prepare him to testify, with the result that he admitted committing burglary and made it easier for the jury to find him guilty of that offense and of felony murder on the basis of that underlying offense. However, on this record we cannot ascertain that counsel knew or did not know what defendant might say on the witness stand. Under these circumstances, it cannot be said that there could be no satisfactory explanation for any tactic counsel might have chosen. Defendant has not shown that counsel were ineffective.

Next, defendant maintains that counsel were ineffective for failing to move the court to instruct the jury that the knife-use enhancement allegations in the charges related to the attack on Norma C. had been dismissed. We need not consider whether counsel were deficient for failing to seek such an instruction. As noted, the prosecutor did not argue that Norma C. was attacked or stabbed with a knife, and the jury was never asked to find true or false the knife-use allegations. There was no prejudice.

Defendant repeats his contention that counsel were ineffective for failing to object to prosecutorial argument that he stabbed Norma C. We have already rejected the claim that there was prosecutorial misconduct or ineffective assistance of counsel with regard to this episode. (*Ante,* at p. 699.)

Next, defendant contends that counsel failed to argue that, notwithstanding the filing of *People* v. *Anderson, supra,* 43 Cal.3d 1104, the felony-murder special-circumstance instructions should retain the intent-to-kill requirement because *Anderson* might not apply retroactively. But, as stated, we have concluded that under the evidence presented the only reasonable conclusion the trier of fact could have reached was that defendant intended to kill Skuse. (*Ante,* at pp. 679-684.) No prejudice resulted from any deficient representation.

Next, defendant contends that counsel failed to object when they should have done so at various points during the prosecution's cross-examination of him, that they changed their approach to his defense following that cross-examination, to the prosecution's benefit, and that they "thus generally failed to assert any control over the defense of [his] trial . . . ." Again, he cannot persuasively say that there could exist no satisfactory explanation for counsel's approach. On the basis of the record before us, the claim lacks merit.

Finally, defendant urges in essence that counsel's acts and omissions cumulatively resulted in prejudice, even if each such individual act or omission did not. On this record, we cannot agree.

### K. *Cumulative Effect of Guilt Phase Error.*

Defendant contends in essence that the due process clause of the Fourteenth Amendment to the United States Constitution was violated by the cumulative errors that occurred during the guilt phase. He further argues that the collective effect of these errors must be reviewed under the standard of *Chapman* v. *California, supra,* 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711]. (See *People* v. *Morris, supra,* 53 Cal.3d 152, 216.)

We find no due process violation. Defendant was " ' "entitled to a fair trial but not a perfect one." ' " (*People* v. *Miranda* (1987) 44 Cal.3d 57, 123 [241 Cal.Rptr. 594, 744 P.2d 1127].) The trial was fair.

### V. *Penalty Phase Issues.*

### A. *Validity of 1978 Death Penalty Statute Under the Eighth Amendment and Its California Constitutional Equivalent.*

Defendant filed a motion to "strike [the] special circumstance allegation[s]" "on the grounds that the imposition of the death penalty on the basis of such allegation[s] is arbitrary and capricious in violation of the Eight[h]

and Fourteenth Amendments to the United States Constitution and Article I, section 17 of the California Constitution." The court denied the application.

On appeal, defendant renews his challenge: the 1978 death penalty statute confers unconstitutionally wide discretion on the trier of fact and makes review of the verdict impossible, in violation of the Eighth and Fourteenth Amendments to the federal Constitution and their equivalent in article I, section 17, of the state Constitution.

We have repeatedly held to the contrary (*People* v. *Berryman, supra,* 6 Cal.4th 1048, 1109), and the United States Supreme Court has also rejected this contention insofar as it implicates the federal constitutional guaranties (*Tuilaepa* v. *California* (1994) 512 U.S. 967 [129 L.Ed.2d 750, 114 S.Ct. 2630]). We decline to reevaluate the question.

### B. *Instructing on Factor (a) of Section 190.3.*

 Defendant also contends in essence that the Eighth and Fourteenth Amendments to the United States Constitution and their California equivalent (Cal. Const., art. I, § 17) were violated by instructing the jurors that they could consider the circumstances of the crimes against Skuse. (See § 190.3, factor (a).) He maintains that neither the statute nor the instruction provided a standard to guide the jury's discretion, and that the prosecutor exploited this flaw by arguing that the gratuitousness, purposelessness, and incomprehensibility of the crimes should be considered in aggravation.

We reject this claim. (See *People* v. *Berryman, supra,* 6 Cal.4th at pp. 1096-1097 [referring to the Eighth Amendment's cruel and unusual punishments clause]; see also *Tuilaepa* v. *California, supra,* 512 U.S. 967, ___ [129 L.Ed.2d 750, 762, 114 S.Ct. 2630] [speaking of the Eighth Amendment].) As for the prosecutor's argument, defendant waived any claim of error by failing to assign misconduct to the statements. (*People* v. *Benson, supra,* 52 Cal.3d 754, 794.) In any event, we discern no impropriety: the prosecutor was asserting that the killing of Skuse was both savage and unnecessary. This declaration certainly fell within the wide range of permissible argument at the penalty phase. (See *People* v. *Thomas* (1992) 2 Cal.4th 489, 537 [7 Cal.Rptr.2d 199, 828 P.2d 101].)

### C. *Instructing on Factor (b) of Section 190.3.*

 Defendant further maintains that the Eighth and Fourteenth Amendments to the United States Constitution and their California equivalent (Cal. Const., art. I, § 17) were violated by instructing the jurors that they could

consider "[t]he presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence other than the [crimes against Skuse]." (See § 190.3, factor (b).) He asserts that the prosecutor exploited the opportunity created by statutory vagueness to make more of defendant's history of violent activity than was warranted. He urges that both the statute and the instruction violated the constitutional guaranties.

They did not. (*Tuilaepa* v. *California*, *supra*, 512 U.S. 967, __ [129 L.Ed.2d 750, 762, 114 S.Ct. 2630] [speaking of the Eighth Amendment]; see also *People* v. *Cain*, *supra*, 10 Cal.4th 1, 69.) Nor, contrary to defendant's argument, was there any obligation under state law or the federal or state Constitutions to instruct the jury sua sponte on the elements of the crimes suggested by evidence of prior violent activity. (*People* v. *Memro*, *supra*, 11 Cal.4th 786, 880-881.) As for the argument, there was no prosecutorial misconduct. It is conceivable that the prosecutor waxed hyperbolic when he argued that defendant nearly put Cossman "in the hospital, if not her grave" by attempting a purse-snatch from a fast-moving bicycle and striking her in the buttocks. But we do not know whether this argument was actually hyperbolic. Cossman was almost 70 years old when defendant committed his crime against her. She may have appeared feeble and frail on the witness stand—the record contains no explicit mention of the point, but it does suggest it: she implicitly described herself in her testimony as a member of the class of "old women[]," and as she completed her testimony the court warned her to "[b]e careful getting down those steps"—evidently the steps to the witness stand. On this record, therefore, we cannot find prosecutorial misconduct.

### D. *Failing to Delete Inapplicable Penalty Factors.*

Defendant contends that the court violated the Eighth and Fourteenth Amendments to the United States Constitution by failing to delete assertedly inapplicable mitigating factors from the instructions given the jury. We have rejected claims of this type (*People* v. *Memro*, *supra*, 11 Cal.4th at p. 880), and we continue to do so.

### E. *Failing to Specify Which Factors Aggravated and Which Mitigated.*

Defendant proposed an instruction that would have specified that only the circumstances of the crime, the presence or absence of prior violent criminal activity, and the presence or absence of a felony conviction could be considered in aggravation or mitigation. (§ 190.3, factors (a), (b), & (c).)

The proposed instruction would have instructed the jury that other factors—his age, his potential for rehabilitation, good behavior and a desire to learn in jail, whether the crime was aberrational, any lack of significant prior criminal conduct, any lingering doubt about his guilt or the truth of the special circumstance findings, whether the offense was committed under the influence of mental or emotional disturbance, whether a mental disease or defect or the effects of intoxication could account for the crime, and any other extenuating circumstance—must be considered, if applicable, only in mitigation. (See *id.*, factors (h), (i), & (k); *People* v. *Terry* (1964) 61 Cal.2d 137, 145-147 [37 Cal.Rptr. 605, 390 P.2d 381]; cf. § 190.3, factor (d).) The court rejected his proposal. However, it did give a very favorable special instruction, proposed by defendant, that told the jury it could consider in mitigation the absence of a prior felony conviction; his age at the time of the offense; his potential for rehabilitation, his past and present good behavior, and his desire to learn while in jail; whether the offense was aberrational; any lack of a record of significant prior criminal conduct; any intoxication by drugs at the time of the crimes against Skuse and Norma C.; the likely effect of a death sentence on his family, loved ones, and friends; whether a mental disease or defect or the effects of substance abuse could have caused what may be termed a form of diminished capacity at the time of the offense; and any other extenuating circumstance. We believe that the special instruction told the jury to consider in mitigation any evidence bearing on the factors described.

Defendant contends that the court violated the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution when it failed to instruct the jury which penalty factors were aggravating and which were mitigating, and by not defining for the trier of fact the meaning of aggravation in a manner that "might have served as a narrowing principle in the application of the factors . . . ."

We have regularly rejected the contention that the court must specify which factors of section 190.3 apply in mitigation and which in aggravation. (*People* v. *Espinoza* (1992) 3 Cal.4th 806, 827 [12 Cal.Rptr.2d 682, 838 P.2d 204].) In giving the special instruction on mitigation that defendant requested, the court granted him more than he was entitled to under our precedents. There was no error adverse to him. The contention that the concepts of aggravation and mitigation must be defined for the jury is also unavailing. (*People* v. *Hawkins* (1995) 10 Cal.4th 920, 965 [42 Cal.Rptr.2d 636, 897 P.2d 574].) In any event, the jury *was* given definitions of aggravation and mitigation. The jury was told that "[a]n aggravating circumstance is a circumstance attending the commission of a crime or the person who commits it that increases guilt or enormity or adds to the injurious consequences, but which is beyond the essential elements of the crime of murder

in the first degree itself." Mitigation was defined for the jury as follows: "A mitigating circumstance does not constitute a justification or excuse for the offense in question. A mitigating circumstance is a fact about the offense, or about the defendant, which in fairness, sympathy, or mercy, may be considered in extenuating or reducing the degree of moral culpability or which justifies a sentence of less than death, although it does not justify or excuse the offense. [¶] If a factor is not found to be a mitigating factor, that does not make that factor an aggravating factor."

### F. *Issues Regarding Specific Mitigating or Aggravating Factors.*

#### 1. *Intoxication.*

Defendant argues that the court erred in refusing to instruct that factor (h) of section 190.3—"[w]hether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect, or the [e]ffects of intoxication"—could only be considered in mitigation. He further argues that the error was exploited by the prosecutor, who, in his view, committed misconduct when he argued that his drug use should be considered in aggravation.

But the jury *was* told to consider in mitigation (1) the effects of mental disease or defect or of substance abuse at the time of the offense, and (2) any intoxication by drugs at the time of the crimes against Skuse and Norma C.

We turn to the claim of prosecutorial misconduct. Setting aside the fact that defendant failed to preserve the point for review when he failed to assign misconduct to the prosecutor's remarks (*People* v. *Benson, supra,* 52 Cal.3d 754, 794), it is evident that the prosecutor was not arguing that intoxication "at the time of the offense" (§ 190.3, factor (h)) was an aggravating factor. Quite the contrary.

Defendant presented evidence of increasing drug use as he progressed through his adolescence and offered that evidence in mitigation. At closing argument the prosecutor countered as follows:

"It appears to me that although not very forcefully, there has been kind of an eleventh hour attempt to blame responsibility for these crimes on drugs. That's questionable right off the top whether or not that should be a place where we, as a society, should put blame.

"But let's look at it a little more. What proof really is there that the defendant was under the influence of drugs?

"His own account of the events of October of 1985 do [*sic*] not include any mention of drugs, the account he gave you. His friends say he used drugs, but it's kind of a recreational use it sounds like.

"But are any of them intimate with the details of the crime? Were any of them with him when he murdered Lois Skuse? Were any of them with him when he assaulted Norma [C.]?

"What do they know of whether or not he was under the influence of drugs at the time of the crime?

"[The defense psychologist] alludes to the—presumably from his discussions with the defendant, but he really offers no proof in that regard, just kind of an offhanded conclusion that drugs were a problem in Lance Osband's life and now that we take them away, presumably, he won't have any problem acting out in the future.

"Norma [C.] at the time that she saw Lance Osband didn't notice him struggling around under the influence of drugs. She just saw a very determined person marching across that classroom—in a brief instant horribly changed her life.

"Can drugs be considered a mitigating factor in this case? I submit to you no because we haven't really established that drugs played any part in the actual murder, and too, I think it's up to you to decide whether or not drugs should at all be a mitigating circumstance.

"I submit to you that drug abuse could be an aggravating circumstance considered under the circumstances of the crime, and I think that when you examine drugs in society today, most people will say, 'Leave them alone. They're not good for you,' but there seems to be a tolerance of people who do use drugs.

"We seem to tolerate it, because it certainly flourishes in our society, but I think there's one thing at the bottom end [*sic*] we would all say, 'If you're going to ignore the advice, and as a consequence hurt somebody, that's it, you have no recourse to our sympathies if that's the course of life you want to adopt.'

"Drugs may provide some sense to all this. It may have been a motive for the crime—may have been a motive to break into Lois Skuse's house and steal from her, to acquire money to obtain drugs, so in that sense it may—it helps us to understand a little bit of why this happened, but does it really

explain—can [the defense psychologist] really explain, can you really rationalize, drugs as the cause of the gratuitous violence that was administered upon Lois Skuse, or Norma [C.] for that matter?

"Can drugs really be said to be responsible for the sexual assault? There's much more going on here in this young man than just a few marijuana joints or smoking some sherm. There's a callous criminal there.

"In short, the defendant is not a drug abuser who committed criminal acts. If anything, he's simply a criminal who happened to use drugs."

To be sure, as just quoted, the prosecutor declared, "I submit to you that drug abuse could be an aggravating circumstance considered under the circumstances of the crime . . . ." The question is whether there is a reasonable likelihood (*People* v. *Clair, supra,* 2 Cal.4th 629, 663) that the jury would have understood him to mean that intoxication "at the time of the offense" (§ 190.3, factor (h)) could be considered as a factor in aggravation. We think not. We have quoted the prosecutor's remarks at length to provide context. Again and again he questioned whether defendant was intoxicated at the time of the crimes. By the comment quoted in this paragraph we believe the prosecutor meant that if he stole from Skuse or Norma C. to obtain money for drugs or alcohol, that would be a particularly base motive that the jury could take into account in considering the circumstances of the crimes. (§ 190.3, factor (a).) That was permissible argument.

Moreover, not only did the prosecutor not state that intoxication "at the time of the offense" (§ 190.3, factor (h)) could be an aggravating factor, he told the jury that "[t]he law permits [only] three forms of aggravating factors. They include the circumstances of the crime, circumstances of the murder of Lois Skuse, other violent acts perpetrated by the defendant, and prior felony convictions. [¶] By 'prior felony convictions,' I mean convictions suffered by the date of the murder of Lois Skuse. There are none." This statement conceded to defendant more than he was entitled to (see the discussion in the next two paragraphs); it certainly did not misstate the law to his detriment. In sum, there was no misconduct.

### 2. *Age.*

As stated, defendant was 19 years old when he killed Skuse. The jury was instructed that it might consider "[t]he age of the defendant at the time of the crime." (§ 190.3, factor (i).)

Defendant contends that the court's refusal to instruct that his age could be considered only in mitigation allowed the prosecutor to commit misconduct by arguing that his maturity should be considered in aggravation. But

age may be considered either in aggravation or mitigation. (*People* v. *Freeman, supra*, 8 Cal.4th 450, 525.) Therefore, any such argument was not improper.

### 3. *Prior Felony Convictions.*

The jury was instructed that it could consider "[t]he presence or absence of any prior felony conviction other than the convictions you rendered with regard to Lois Skuse and Norma [C.]." (See § 190.3, factor (c).) The prosecutor conceded that defendant's lack of any such convictions operated in mitigation, and defendant's special instruction on mitigation reaffirmed this point. Defendant contends that the prosecutor committed misconduct by minimizing the importance of this factor, pointing out that his youth had left him little time to amass a felony record. He did not assign misconduct to this observation and has waived the claim. (*People* v. *Benson, supra*, 52 Cal.3d 754, 794.) In any event his argument is unpersuasive—the prosecutor's comments fell well within the wide latitude accorded him at argument.

### 4. *Mental Illness as Possible Penalty Factor.*

The court instructed the jury that it could consider "[w]hether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance" in deciding the penalty. (§ 190.3, factor (d).) It refused his requests to delete "extreme" from the instruction or to instruct that this factor could be considered only in mitigation. Defendant argues that these refusals violated the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. He is incorrect on both scores. (*People* v. *Espinoza, supra*, 3 Cal.4th 806, 827 [no error in refusing to instruct on which factors may aggravate and which may only mitigate]; *People* v. *Mayfield, supra*, 5 Cal.4th 142, 184-185 [no error in giving standard instruction on mental or emotional disturbance].)

Defendant also contends that the prosecutor committed misconduct by arguing that he was mentally impaired and that such an impairment could be considered in aggravation. The portion of the record to which he refers us contains no such argument. The prosecutor was asserting that defendant had a criminal mind, not a diseased one.

### G. *Other Claims of Instructional Error.*

Defendant also contends that the court violated the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution by failing to instruct that aggravating factors be proved beyond a reasonable doubt, that

the determination that aggravation outweighed mitigation be proved beyond a reasonable doubt, that death be proven the proper penalty beyond a reasonable doubt, that the death sentence be based on unanimous, written findings, and that the jury could exercise mercy on his behalf.

We need not review the law with regard to the final point—mercy—because the record simply belies defendant's contention: the jury was in fact instructed in writing, pursuant to an instruction that defendant sought, that it could consider "sympathy, pity, compassion, or mercy . . . in determining the appropriate punishment." (The oral instruction substituted "passion" for "pity.") Indeed, more than once the jury heard references to mercy in connection with mitigation. (*Ante*, at p. 706.)

And we have previously rejected defendant's other contentions. (*People* v. *Berryman*, *supra*, 6 Cal.4th 1048, 1100-1101.) We adhere to our prior conclusions. We also note that the jury was instructed that it had to find true beyond a reasonable doubt that defendant engaged in violent criminal activity against Norma C., Cossman and Angela M. (the crimes he committed against the latter two are chronicled *ante*, at pp. 659-660).

### H. *Claims of Constitutional Defects in the 1978 Death Penalty Law.*

Defendant contends that the 1978 death penalty statute is constitutionally flawed in various respects "and hence that the judgment of death entered pursuant thereto is unsupported as a matter of law. '[A]s a general matter at least, the 1978 death penalty law is facially valid under the federal and state charters. In his argument here, defendant raises certain specific constitutional challenges. But . . . in the . . . series of cases [beginning with *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 777-779 (230 Cal.Rptr. 667, 726 P.2d 113)], we have rejected each and every one. We see no need to rehearse or revisit our holdings or their underlying reasoning.' " (*People* v. *Berryman*, *supra*, 6 Cal.4th 1048, 1109.) (See also *ante*, at pp. 702-703.)

### I. *Allowing Evidence of Prior Violent Criminal Activity.*

Defendant moved to exclude evidence of the facts surrounding the prior crimes against Cossman and Angela M. at the penalty phase. He wanted to limit evidence regarding them to "a general statement of the nature of the crime . . . and the date that it occurred"—"in essence, an abstract of [the] judgment . . . ." The court denied the motion. It did, however, accede to his implicit request that the jury not be instructed on the elements of crimes that his prior violent activity might constitute.

Defendant contends that the court violated rights he discerns under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States

Constitution and under state law (§ 190.3) by allowing evidence to be introduced of the facts underlying his prior misdemeanor battery convictions, as opposed to evidence merely of the fact of the convictions. As he acknowledges, we have held otherwise. (*People* v. *Wader, supra,* 5 Cal.4th 610, 656.) In response to other contentions: even if the convictions were the result of a plea bargain, introducing evidence of them did not constitute error. (*People* v. *Garceau* (1993) 6 Cal.4th 140, 199 [24 Cal.Rptr.2d 664, 862 P.2d 664].) Neither was there any violation of the double jeopardy clause of the Fifth Amendment to the United States Constitution or article I, section 15, of the California Constitution. (See 6 Cal.4th at pp. 199-200.)

Likewise, as stated, failing to instruct the jury sua sponte on the elements of crimes the prior violent activity might constitute was not error. (*People* v. *Memro, supra,* 11 Cal.4th 786, 880-881.) Indeed, the court's decision not to do so came at defendant's behest. He contends that counsel rendered ineffective assistance by not moving to have the jury instructed on the elements of possible prior crimes. We do not agree: counsel stated that to do so would not "do anything other than confuse the jurors as to what the issue here is. [¶] The issue is life or death and not whether or not some particular aspect of or element of some crime has been committed or not committed." Counsel cannot be deemed ineffective when they elect to pursue a reasonable tactic at the penalty phase. (*People* v. *Gonzalez* (1990) 51 Cal.3d 1179, 1250-1251 [275 Cal.Rptr. 729, 800 P.2d 1159].) This was a reasonable tactical choice.

 Turning to a related issue: the prosecution gave the defense psychologist, Dr. Edward Grover, information about criminal activity that defendant had engaged in as a juvenile. Dr. Van Grover testified about it on cross-examination.

Defendant contends that the prosecutor committed misconduct by furnishing Dr. Van Grover with the information and then asking him about it on cross-examination, and that various rights he discerns in the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution were violated when the prosecutor cross-examined Dr. Van Grover regarding certain statements defendant had made to him. (See *ante,* at p. 661.) He is incorrect.

Defendant did not object contemporaneously to the cross-examination. He has failed to preserve the claim for review. In any event, we find it to be without merit.

An expert witness may be cross-examined about "the reasons for his opinion." (Evid. Code, § 721, subd. (a).) As will be recalled, Dr. Van Grover

testified that defendant would adjust well to life in prison. On cross-examination, the prosecutor asked him, in effect, how he could be sure that defendant would not "cook up mischief" in a prison yard or cafeteria, including coercing sex from other inmates. The prosecutor then asked Dr. Van Grover whether defendant was a mentally disordered sex offender. Dr. Van Grover was unsure. This exchange then occurred:

"Q. Are you familiar with the crimes he's perpetrated?

"A. Some of them, yes.

"Q. Which ones?

"A. Okay, let's see. Beginning at about age thirteen, there was burglary, auto . . . [and] a stealing of a bicycle from another juvenile. I think Mr. Osband was—must have been about thirteen or fourteen then; trespass and resisting arrest in '83, an arrest that started out with a charge of attempt to rape in '84, and then there was one where there was an apparent assault case against an elderly woman. I believe it was a Japanese woman. I'm not real clear on that one."

Dr. Van Grover then acknowledged the sexual nature of the crimes of which defendant was convicted in the present proceeding. The prosecutor proceeded. After more colloquy, he asked, "Don't we have a little more here ticking than just a person that got bombed on drugs and robbed people? Do we have somebody that's got some problems with sex?" Later—and following an unsuccessful objection under Evidence Code section 352 to continued questioning about defendant's criminal activity—the prosecutor pressed Dr. Van Grover further on this point, asking: "Don't you think there's some sort of unresolved conflict within Mr. Osband concerning sex?"

This line of questioning was permissible to cross-examine Dr. Van Grover about "the reasons for his opinion." (Evid. Code, § 721, subd. (a); *People* v. *Payton* (1992) 3 Cal.4th 1050, 1066-1067 [13 Cal.Rptr.2d 526, 839 P.2d 1035].) Having examined defendant's juvenile record of misconduct, he could be cross-examined on it, without offending any constitutional guaranty, to determine whether he took it into account in forming an opinion on his capacity to adjust to life in prison.

Defendant further contends that the prosecutor's failure to notify him that he would be using his record of juvenile misconduct violated section 190.3's provision generally requiring that the prosecution give notice of evidence in aggravation as a predicate to introducing it at the penalty phase. He did not

object to the questions on that basis, however, and may not complain now. In any event, because the questions were asked of his own witness on cross-examination, they amounted to rebuttal and no notice was required. (*Ibid.*; *People* v. *Clark* (1993) 5 Cal.4th 950, 1026-1027 [22 Cal.Rptr.2d 689, 857 P.2d 1099].)

Defendant also contends perfunctorily that counsel were ineffective for failing to have marked as an exhibit materials that Dr. Van Grover considered in forming opinions about him, because this omission deprived him of a reviewable record on appeal. Because he does not explain how the omission affects the reviewability of the judgment against him, we are unable to find prejudice, assuming that any deficient performance occurred.

### J. *Denying Motion for Jury View of Prison Facilities.*

Defendant moved to have the jury tour the gas chamber and the facilities for prisoners incarcerated for life without possibility of parole at San Quentin Prison, or to issue an order permitting him to prepare a videotape showing the same. The basis for the motion was that the jury would be unable to properly decide the issue of penalty without "direct knowledge of what a life without possibility of parole or [imposing the] death penalty entails . . . ." The court denied the motion.

Defendant contends that the ruling violated rights he discerns under the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, in essence because it refused him the opportunity to present evidence to enhance the jurors' understanding about the nature and gravity of the decision they must make. But we have, as he acknowledges, held to the contrary (*People* v. *Pride, supra,* 3 Cal.4th 195, 260-261), and we decline to reconsider our view.

### K. *Failing to Investigate Alternate Juror's Conduct.*

At the penalty phase there was evidence that defendant had received a new wristband in jail while awaiting trial. Apparently the deputies accepted his story that the band had simply fallen off; he was not charged with violating jail rules. The prosecutor adduced evidence, however, that if a wristband were deliberately switched, an inmate could be erroneously released.

This evidence apparently piqued the interest of an alternate juror who, the court reported on the record, asked a bailiff in another courtroom whether jail wristbands are prone to falling off. Defendant asked whether the alternate had "contaminated" the seated jurors with his question. The court

replied that no one except the bailiff was present. But it acknowledged that it had not asked the alternate juror about the incident. Defendant agreed that if the alternate juror should need to be seated, the bailiff should be called to testify and the alternate juror excused, depending on the bailiff's testimony. But he again indicated his concern that the offending alternate juror might be contaminating the seated jurors. The court replied, "I don't see any of the other jurors talking to him. I think that's why he has to go to the other areas to find someone to talk to . . . ." Defendant did not pursue the matter.

He now contends that the court had a duty to investigate, on its own initiative, whether the alternate juror contaminated members of the seated panel. By not doing so, he claims, the court violated rights he locates in the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

As stated, further inquiry "is required only where the court possesses information which, if proven to be true, would constitute 'good cause' to doubt a juror's ability to perform his duties and would justify his removal from the case." (*People* v. *Ray*, *supra*, 13 Cal.4th 313, 343.) The court stated that it had no such information—to the contrary, the other jurors appeared to be avoiding the offending alternate juror.

Defendant further claims that he was denied the effective assistance of counsel when they failed to seek a hearing. We cannot agree. Even if they were deficient for not doing so, there is no reasonable probability that the jury was swayed in favor of death thereby. In our view, the testimony on jailhouse conduct was brief and of little moment. And, in response to the incidents involving the alternate juror, the jurors received a special instruction just before beginning deliberations. That instruction admonished them that they "must decide all questions of fact in this case from the evidence received in this trial and not from any other source. You must not discuss this case with any other person except a fellow juror and you must not discuss the case with a fellow juror until the case is finally submitted to you for your decision and only when all jurors are present in the jury room. You must not make any independent investigation of the facts or the law or consider or discuss facts as to which there is no evidence. . . ." We presume that they followed the instruction. (*People* v. *Mickey* (1991) 54 Cal.3d 612, 689, fn. 17 [286 Cal.Rptr. 801, 818 P.2d 84].)

L. *Instruction on Weighing Aggravating and Mitigating Circumstances.*

The court's written instruction informed the jury that in determining the penalty, "you shall consider, take into account and be guided by the applicable factors of aggravating and mitigating circumstances upon which you

have been instructed. [¶] The weighing of aggravating and mitigating circumstances does not mean a mere mechanical counting of factors on each side of an imaginary scale, or the arbitrary assignment *of weights* to any of them. You are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider. In weighing the various circumstances you simply determine under the relevant evidence which penalty is justified and appropriate by considering the totality of the aggravating circumstances with the totality of the mitigating circumstances. To return a judgment of death, each of you must *be persuaded* that the aggravating evidence is so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole." (Italics added.)

In the oral instruction, the record indicates that the court stated "or weights" rather than "of weights," and "he persuaded" rather than "be persuaded."

Defendant contends that giving this instruction violated state law (§ 190.3) and the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution. We disagree: the instruction was proper and did not violate any constitutional provision or other legal principle. (*People* v. *Berryman, supra*, 6 Cal.4th 1048, 1099.) Defendant also complains of the court's substitution of "or" for "of" when referring to weights. The point is addressed *post*, at page 717.

M. *Refusing to Instruct on the Meaning of Possible Sentences.*

The court denied defendant's request to instruct the jury that "[a] sentence of life without possibility of parole means that Lance Ian Osband will remain in state prison for the rest of his life and will not be paroled at any time. A sentence of death means that Lance Ian Osband will be executed." (Capitalization altered.) He contends that the failure to do so violated rights he finds in the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

We disagree. As regards life imprisonment without possibility of parole, the proposed instruction has been held not to be completely accurate. (*People* v. *Gordon* (1990) 50 Cal.3d 1223, 1277 [270 Cal.Rptr. 451, 792 P.2d 251].) As regards a sentence of death, it would also be inaccurate. There was no violation of the federal Constitution.

In his reply brief, defendant nonetheless contends that failing to give the instruction constituted constitutional error under *Simmons* v. *South Carolina*

(1994) 512 U.S. 154 [129 L.Ed.2d 133, 114 S.Ct. 2187]. We have recently rejected this contention. (*People* v. *Arias*, *supra*, 13 Cal.4th 92, 172-173.) There was no constitutional violation under the authority of *Simmons*; as stated, there was no constitutional violation of any sort.

### N. *Refusing to Instruct on Lingering Doubt.*

 Defendant maintains that the court's refusal to instruct the jury that it could consider lingering doubt about his guilt in determining the penalty violated state decisional law (*People* v. *Terry*, *supra*, 61 Cal.2d 137, 145-147), state statutes (§§ 190.3, 1093, subd. (f), 1127), and the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution. He is incorrect. The jury was instructed that it could consider in mitigation "any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime[,] and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death . . . ." Giving this instruction, which was derived from factor (k) of section 190.3, adequately alerted the jury that it could consider lingering doubt in reaching its decision. (*People* v. *Memro*, *supra*, 11 Cal.4th 786, 881, 883.) The jury was also instructed to consider the "circumstances of the murder, burglary, robbery, and rape [of Skuse or her apartment] of which the defendant was convicted in the present proceeding . . . ." (Cf. § 190.3, factor (a).) This instruction also was broad enough to alert the jury that it could consider lingering doubt. (See *People* v. *Berryman*, *supra*, 6 Cal.4th 1048, 1104.) There was no violation of state law or the federal Constitution. (See *ibid.* [no right to a lingering doubt instruction under the state or federal Constitutions].)

### O. *Considering Skuse Murder as Incident of Prior Violent Activity.*

 At closing argument the prosecutor referred to four incidents of prior violent conduct and then proceeded to discuss defendant's attacks on Angela M., Cossman, and Norma C., and "the circumstances of the murder of Lois Skuse . . . ." Defendant contends that this was misconduct because it told the jury that it should consider Skuse's murder under both factors (a) and (b) of section 190.3. He contends that the misconduct violated rights he finds in the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution.

"Factor (b) [of section 190.3] only pertains to criminal activity other than the crimes for which defendant is convicted in the present proceeding." (*People* v. *Hernandez* (1988) 47 Cal.3d 315, 358 [253 Cal.Rptr. 199, 763 P.2d 1289], italics deleted.)

Defendant made no contemporaneous assignment of misconduct and has waived the claim. (*People* v. *Benson, supra,* 52 Cal.3d 754, 794.) In any event, even if the prosecutor failed to sever his discussion of the Skuse murder from the other incidents with sufficient precision, and thus created a reasonable likelihood (*People* v. *Clair, supra,* 2 Cal.4th 629, 663) that jurors would think they could consider Skuse's murder under section 190.3, factor (b), any harm was cured by the instructions, which explicitly informed the jury that it could not consider the crimes against Skuse under factor (b). When argument runs counter to instructions given a jury, we will ordinarily conclude that the jury followed the latter and disregarded the former, for "[w]e presume that jurors treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade." (*People* v. *Clair, supra,* 2 Cal.4th at p. 663, fn. 8.) We so conclude here. There was no constitutional violation.

P. *Misreading Penalty Phase Instructions.*

 As at the guilt phase (see *ante,* at pp. 686-688), the court's oral rendering of the instructions varied from the text of the written versions. The court deleted "if applicable" from the phrase "You shall consider, take into account and be guided by the following factors, if applicable [in determining penalty]." In listing those factors, the court inserted "any" between "of" and "criminal" in the phrase "[t]he presence or absence of criminal activity by the defendant"—i.e., his prior violent criminal activity. The court substituted "may" for "should" in instructing the jury that "[i]n determining the weight to be given to an opinion expressed by any witness[] who did not testify as an expert witness, you should consider his credibility, the extent of his opportunity to perceive the matters upon which his opinion is based[,] and the reasons, if any, given for it." As noted *ante,* at page 710, the court substituted "passion" for "pity" in an instruction (proposed by defendant) that it agreed to give. There were other misstatements, each of a minor character (see, e.g., *ante,* at pp. 714-715).

Defendant contends that these misstatements violated the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

But as long as the court provides the jury with the written instructions to take into the deliberation room, they govern in any conflict with those delivered orally. (See *People* v. *Crittenden, supra,* 9 Cal.4th 83, 138.) As it did at the guilt phase, the court gave the jurors six copies of the written instructions. There was no violation of any federal constitutional provision.

### Q. *Displaying, at Argument, Photograph of Skuse While Alive*

■ Defendant contends, in essence, that the prosecutor committed misconduct when, at closing argument, he displayed a photograph to the jury of Skuse while alive.

In response to a display of photographic exhibits of defendant when he was a child, the prosecutor displayed the photograph of Skuse while alive (see *ante*, at p. 676) and said, "What about this picture, while we're at it? That's in evidence, too. Since we're talking about pictures, here's where the truth lies. These are the pictures you have to look at to decide what to do with Lance Osband."

We have already accepted defendant's characterization of this photograph, which was lost and could not be replaced, as very likely to evoke feelings of sadness and sympathy for Skuse. He contends that the prosecutor improperly invoked a nonstatutory aggravating factor when he appealed to the jury to have him put to death on the basis of the photograph's representation of the victim, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

Defendant acknowledges that in *People* v. *Edwards* (1991) 54 Cal.3d 787, 832-836, 839 [1 Cal.Rptr.2d 696, 819 P.2d 436], we held that evidence and argument about the harm caused by a death-eligible defendant's crimes are generally admissible at the penalty phase as a matter of state law. We implicitly also held that ordinarily to introduce such evidence or argue on its basis violates no constitutional provision. He maintains, however, that to apply the holding to him would result in a violation of the federal Constitution's ex post facto clause (U.S. Const., art. I, § 10, cl. 1) and its equivalent in the California Constitution (Cal. Const., art. I, § 9), because, in his view, we held in *People* v. *Gordon, supra*, 50 Cal.3d at pages 1266-1267, that factor (a) of section 190.3 did not permit consideration of evidence of the effect of the crime on the victim's family or of sympathy for the victim at the penalty phase. In response, the People contend that the law in 1985, when defendant committed his crimes, permitted the use of such evidence.

Defendant failed to assign misconduct to the prosecutor's remark and thus failed to preserve the claim for review. (*People* v. *Benson, supra*, 52 Cal.3d at p. 794.) He argues that in this case the harm done by the prosecutor's action could not be cured by an admonition and therefore the rule does not apply to this claim. (*Ibid.*) That contention, however, is questionable: as with any other instance of misconduct, we presume that the jury would have followed the court's direction to disregard the offending action. (See *People*

v. *Fosselman* (1983) 33 Cal.3d 572, 580-581 [189 Cal.Rptr. 855, 659 P.2d 1144].)

In any event, defendant misunderstands the discussion in *People* v. *Gordon, supra*, 50 Cal.3d at pages 1266-1267. There we explained that "the only circumstances material to the determination of penalty are those defined in Penal Code section 190.3 . . . . In the general case—and certainly here—the effect of the crime on the victim's family is not relevant to any material circumstance. Nor is sympathy for the victim." This conclusion came in response to an assertion that there was impropriety in "the following comment by the prosecutor: 'Not only did the defendant take William Wiley's life and his entire future and destroy his family, he now wants to take sympathy away from him too. The sympathy that is rightfully due William Wiley.' " (*Id.* at p. 1266.)

Nothing in the foregoing quotation forbids the prosecution from discussing guilt phase evidence that relates to the "nature and circumstances of the present offense" (§ 190.3)—and indeed, the prosecution may do so (see *People* v. *Clair, supra*, 2 Cal.4th 629, 681-682 [photographs introduced at the guilt phase bear on the circumstances of the crime]; see also *People* v. *Edwards, supra*, 54 Cal.3d at p. 832 [photographs introduced at penalty phase "properly aided the jury in judging the size, age and vulnerability of the victims"]). That is all that occurred here.

Defendant also contends that if we conclude that he failed to preserve the claim for review, counsel were ineffective for failing to assign misconduct. We are of a different view. To our minds, even if counsel were deficient, there is no reasonable probability that the outcome would have differed had the prosecutor not made his remarks and invoked the photograph. The crimes against Skuse were heinous and the jury was already well aware of her vulnerability from evidence it received at the guilt phase. In that proceeding the jurors saw the photograph of Skuse while alive, and her daughter-in-law testified that "[s]he was very tiny. She was maybe five-foot-one or -two, and she had some serious illnesses, and her bones were deteriorating. She had shrunk a lot. She was just a little tiny lady."

### R. *Other Instances of Alleged Prosecutorial Misconduct.*

We have already reviewed and for the most part found meritless numerous assertions of prosecutorial misconduct at the penalty phase. Defendant finds additional instances of what he views as misconduct, and claims that they violated rights he discerns in the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

### 1. *While Examining Witnesses.*

■ First, he urges that the prosecutor committed misconduct by asking Angela M. to "speak up so your father can hear you in the back" of the courtroom. He asserts that this request "served to link the witness in the jury's mind with her father and the image of his over-seeing [*sic*], protective presence in the courtroom as his daughter testified to being the subject of the misdemeanor battery." In his view, the prosecutor's inflammatory design was unmasked when he called her a "father's daughter" in his summation.

This claim is unpersuasive. There was no constitutional violation in asking a witness to speak clearly so that she could be heard. It appears that the witness, an 18-year-old, was nervous. No doubt the prosecutor was trying to persuade her to speak up so that the jury could hear her. To assert that he invoked her father during the examination so that he could refer to him in argument is to speculate. Moreover, defendant did not lodge a contemporaneous objection to the prosecutor's request to Angela M. to speak louder, so he waived the claim.

Next, defendant finds misconduct in the prosecutor's asking Angela M. whether she was afraid as defendant was fondling her. At the time, he objected that the question called for speculation, but the court ruled that the witness had already answered. The prosecutor then asked whether she was afraid for her physical safety, and she replied in effect that she could not be that specific. He contends: "The prosecutor sought to have each juror imagine the worst possible ensuing event in his or her mind . . . rather than the event that actually occurred." We discern no reasonable likelihood that the jury would interpret his questions in that fashion.

Next, defendant contends that the prosecutor generally harassed and was sarcastic toward Dr. Van Grover, the psychologist who testified in his behalf. We discern no misconduct.

Lynox Dixon, a family friend, had testified that defendant was "a nice person, I still say." On cross-examination the prosecutor elicited testimony that Dixon was unfamiliar with defendant's crimes. Even after the prosecutor described the crimes against Norma C., Dixon adhered to his view of defendant's character. Dr. Van Grover testified that he relied on comments by Dixon in formulating his opinion regarding defendant's capacity to adjust to life in prison. The prosecutor then said to Dr. Van Grover: "Do you know that he still thinks Mr. Osband is a nice guy even though he's beaten up two women and killed one of them? I withdraw that question." Defendant contends that this question was designed to be withdrawn after inflaming the

jury—i.e., it was asked in bad faith. We discern no bad faith. Moreover, the jury already knew about the crimes and about Dixon's adherence to his perception of defendant despite them.

Nor, contrary to defendant's argument, did the prosecutor commit misconduct by asking Dr. Van Grover whether he had seen certain photographic exhibits or by taking back documents he had previously furnished him and then asking questions about their contents. There is nothing untoward about a witness and counsel handing back and forth documents that are the subject of the examination, and it appears that such an exchange was occurring here.

### 2. At Closing Argument.

Defendant contends that the prosecutor also engaged in acts of misconduct at closing argument. Some of these we have already described. We note preliminarily that he failed to assign misconduct to any of the remarks to which he refers us. Accordingly, he has not preserved the claims for appeal. Nevertheless, in response to his claim that he was denied the effective assistance of counsel when they failed to contemporaneously assign misconduct, we will address the assertions on the merits to the extent necessary to decide the ineffective assistance claim. (See *People* v. *Wader*, *supra*, 5 Cal.4th 610, 636.)

Defendant contends that the prosecutor showed disdain and a lack of respect for Dr. Van Grover by referring to him as "Mr. Groves." This claim, however, is speculative: the record does not reveal whether he was being disdainful or whether he suffered a lapse of memory. It bears noting that on one occasion the prosecutor addressed Dr. Gary Stuart, a prosecution witness and the pathologist who examined Skuse, as "Mr. Stuart."

Defendant further contends that the prosecutor repeatedly called into question a right he claims to an individualized assessment of the propriety of the penalty. The prosecutor did argue that the evidence in mitigation was weak if not nonexistent and that the jury should focus on what punishment he deserved, not what was best for him. We cannot find any infringement of the claimed right in such argument.

Before the presentation of guilt phase evidence the prosecutor stated, evidently outside the presence of any prospective juror, that "the horrible type of crime is not involved in this case." At the penalty phase, by contrast, he argued that Skuse's murder was "a horrible, atrocious, crime." Defendant asserts that this "complete reversal of position was both deceptive and reprehensible . . . ." On this record, however, we cannot find misconduct:

as stated, the prosecutor is allowed wide latitude to present an argument at the penalty phase, and his characterization of the crime was permissible.

Turning to defendant's next point: the prosecutor argued, ". . . ask yourselves how much sympathy—really, is sympathy and mercy and forgiveness yours to give in this case? How much is really yours to extend? Aren't you just really a surrogate of Lois Skuse? What is the wellspring of any sympathy you might have in this case? Is it really yours to give?"

Defendant contends that this argument effectively told the jury that he was not entitled to the benefits of factor (k) of section 190.3. We disagree. To be sure, although " '[s]ympathy is not itself a mitigating "factor" or "circumstance[,]" ' . . . [t]he jury is permitted to consider mitigating evidence relating to the defendant's character and background precisely because that evidence may arouse "sympathy" or "compassion" for the defendant.' " (*People* v. *Wright* (1990) 52 Cal.3d 367, 442 [276 Cal.Rptr. 731, 802 P.2d 221].) In other words, the jury may consider sympathy grounded in the evidence. But in our view the prosecutor was not arguing to the contrary. In fact, he told the jury that "you may act upon . . . sympathy in arriving at a verdict." Rather, he was arguing that defendant was unworthy of it given the facts of the case. The jury was instructed that it could consider sympathy in mitigation. (*Ante*, at p. 710.) It must have concluded that defendant did not deserve enough sympathy, if any at all, to avoid the more severe verdict.

Defendant also contends that the prosecutor committed misconduct by referring to his age at the time of argument—the prosecutor declared that "[d]efendant is twenty-two years old at this time"—rather than his age at the time of the crime (§ 190.3, factor (i)). No misconduct occurred, although it would have been more precise and therefore better to refer to his age when he committed the crime. Defendant does not argue that the statement was factually incorrect. And when the jurors heard the instructions, which told them that they might consider defendant's age at the time of the crime (*ante*, at p. 708), they would have understood that they must subtract the interval between his age at the time of trial and at the time of the crime.

Defendant argues that when the prosecutor said "I think" preceding the argument that he should "have no recourse to our sympathies" he improperly injected his personal beliefs into the argument.

We discern no impropriety. (Cf. *People* v. *Fosselman, supra,* 33 Cal.3d 572, 580 [criticizing a prosecutor's "statements of personal belief, based on purported facts not in evidence, that defendant planned to rape"].) The use of "I think" appears to be a purely rhetorical device. And as such, it had the effect of weakening, not strengthening, the prosecutor's argument.

Defendant also contends generally that the prosecutor tried to convert mitigating factors into aggravating factors. In particular, he asserts that the prosecutor improperly argued that with the personal and economic resources defendant disposed of—"[i]t appears to me that Lance Osband didn't have it that bad when he was growing up"—he had no excuse to have committed the crimes. We discern no misconduct. The prosecutor's comments fell within the range of permissible argument. Nor do we agree that the prosecutor's characterization of defendant as a "criminal" was improper in any respect, given the evidence adduced of his criminal history.

Defendant further contends that the prosecutor argued facts not in evidence when he stated that he "dragged" Angela M. into a bedroom. That comment was a permissible inference from the evidence adduced through her testimony. Similarly, his comments that Norma C. was "sexually assaulted, stabbed in the neck," were supported inferentially by the evidence: defendant was convicted of assault with intent to rape, and there was evidence that made it permissible to argue that she was stabbed (see *ante*, at p. 699).

 Next, defendant contends that the prosecutor implied during closing argument that Angela M. was the victim of an attempted rape or another undefined crime—in effect, that he exaggerated the nature of her victimization. He maintains that this conduct amounted to an argument in aggravation not based on any statutory factor.

The prosecutor did imply that something very serious might have happened to Angela M. had someone else not entered the house as defendant was molesting her and interrupted him. This was a permissible inference to draw from her testimony (*ante*, at p. 660).

Defendant next asserts that the prosecutor committed misconduct by arguing that he would be dangerous in prison. He characterizes this argument as not properly based on a statutory aggravating factor. But since defendant presented evidence of his capacity to adjust to life in prison, it was permissible for the prosecutor to argue that the evidence was unpersuasive (*People* v. *Davis*, *supra*, 10 Cal.4th 463, 537), and that is what he did.

Defendant next maintains in effect that the prosecutor improperly argued that putting him to death was a community obligation or a duty of citizenship. That is incorrect. The prosecutor argued that deciding the proper penalty was an important duty of citizenship. There was no misconduct.

 We turn to defendant's next point. The prosecutor argued: "You were summoned to the courthouse. . . . [K]eep in mind also that you did

not set in motion the course of events that ends here in this courtroom today, and in the next few days that you have to make your decision. [¶] You're not responsible for having made this decision. He is. It's his conduct that brings us here, that brings us to have to make this awful decision. How do you go about doing your task?" Defendant contends that the prosecutor improperly informed the jury that responsibility for imposing the penalty lay elsewhere. (See *People* v. *Memro, supra,* 11 Cal.4th 786, 878-879.)

We believe that the prosecutor was suggesting that the jury was not responsible for having been summoned to the courthouse to try the case, or for the fact that defendant had been charged with such serious crimes. To tell the jurors that defendant was responsible for their presence in the courtroom was not to commit misconduct. Nothing in these comments can reasonably be interpreted as an attempt to weaken the jury's sense of its ultimate responsibility for the sentencing determination.

Next, defendant urges that the prosecutor improperly argued that his lack of remorse was an aggravating factor. The prosecutor argued, "[w]hen he got up here [i.e., testified at the guilt phase] and told you about that crime [against Norma C.], told you that he was just having a frustrating day, and he took it out on Norma [C.], did you get any sense at all that he was sorry for his conduct? Is there anything that he said or anything in his demeanor that indicated to you that he felt compassion and remorse for his victim, Norma [C.]? No. [¶] He's an individual, [calloused] and indifferent to other people."

We have held, however, that when "a prosecutor does not suggest that a defendant's lack of remorse should be considered a factor in aggravation, he or she properly may comment on the lack of remorse." (*People* v. *Proctor* (1992) 4 Cal.4th 499, 545 [15 Cal.Rptr.2d 340, 842 P.2d 1100].) The prosecutor did no more than he was entitled to do.

In sum, there was no prosecutorial misconduct that resulted in prejudice to defendant. As no prejudicial misconduct occurred, neither, in our view, was there any violation of the Fifth, Sixth, Eighth, or Fourteenth Amendments to the United States Constitution.

S. *Denying Application to Modify Verdict.*

 Defendant contends that the court violated state law and the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution in denying his application to modify the verdict of death in favor of life imprisonment without possibility of parole. (§ 190.4, subd. (e).)

The court first declared that its role was to "review the evidence, consider and take into account and be guided by the aggravating and mitigating

circumstances and . . . make a determination as to whether the jury's finding and the verdicts; that is, the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented. [¶] . . . The Court having reviewed the evidence presented in this case makes its independent determination as to whether the jury's verdict is contrary to the law or the evidence presented."

The court then found true the following items beyond a reasonable doubt: that defendant murdered Skuse with malice aforethought, premeditation, deliberation, and the intent to kill, that he murdered her while committing burglary, rape, and robbery, and that he used a knife. It then discussed each statutory factor in aggravation and mitigation and announced that, having "considered all of the evidence, . . . taken into account and . . . been guided by the aforesaid factors [and] having heard and considered any arguments of counsel," "the aggravating circumstances far outweigh any of the mitigating circumstances. Therefore, it is the court's conclusion and opinion that the jury finding and verdict are not only supported by the weight of the evidence, but the court finds and in his independent review of all the received letters, finds that the jury verdict and findings are not contrary to the law or evidence." (Capitalization altered.)

The letters to which the court referred evidently are two whose receipt was noted in the record. One, from Norma C. and read aloud by her in court, described the consequences of defendant's attack on her and contained her prayer that the court would "lock him up permanently." The other, from a Sacramento County jail cellmate of defendant's and offered in mitigation of penalty, explained that defendant had told the inmate "in June of 1987" that he was searching for property to steal in another room when a fellow burglar killed Skuse. It also conveyed his remorse for the crimes and offered the writer's opinion that he "is a good person that was just misled down the wrong road in life."

The court explained that it was considering Norma C.'s letter only in meting out the determinate sentence for his crimes other than the capital offense. It also stated that it had "considered" the inmate's letter, without specifying the purpose for which it considered it.

When the court read the inmate's letter into the record, it noted that defendant "hereinafter . . . was sworn to tell the truth . . . and [the letter does not contain] the same story that he testified [to] here in Court." Defendant testified on December 4, 1987.

Subdivision (e) of section 190.4 provides: "In every case in which the trier of fact has returned a verdict or finding imposing the death penalty, the

defendant shall be deemed to have made an application for modification of such verdict or finding pursuant to Subdivision 7 of Section [1181]. In ruling on the application, the judge shall review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances referred to in Section 190.3, and shall make a determination as to whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented. The judge shall state on the record the reasons for his findings."

 "Pursuant to section 190.4, in ruling upon an application for modification of a verdict imposing the death penalty, the trial court must reweigh independently the evidence of aggravating and mitigating circumstances and then determine whether, in its independent judgment, the weight of the evidence supports the jury's verdict." (*People* v. *Crittenden, supra,* 9 Cal.4th 83, 150.)

" 'On appeal, we subject [the] ruling . . . to independent review.' [Citation.] 'Of course, when we conduct such scrutiny, we simply review the trial court's determination after independently considering the record; we do not make a de novo determination of penalty.' " (*People* v. *Berryman, supra,* 6 Cal.4th 1048, 1106.)

 The court followed the statutory and decisional requirements in deciding the motion. Defendant disagrees, raising several contentions, each of which is without merit.

First, he contends that the court erred when it read and considered the probation report in deciding the section 190.4, subdivision (e), application. (See, e.g., *People* v. *Memro, supra,* 11 Cal.4th at p. 886.) Preliminarily, we note that the record leaves us unsure whether the court had the probation report in mind when deciding the motion to modify the verdict. It mentioned having considered it at a time that it was preparing to discuss the determinate sentence. However, even if it did err by considering it in setting penalty, no prejudice appears, for " 'it is apparent from the record that [the report] played no role whatsoever in the court's decision' [citation]—' "we must assume that the court was not improperly influenced" thereby' [citation]." (*Ibid.*) Rather, the court considered the statutory factors in aggravation and mitigation and made its decision on the basis of them (see the discussion of its reference to the letters in the following paragraphs). No prejudicial error appears, if error occurred at all.

Next, defendant contends that the court erred when it considered the two letters it received. The court specified that it was not taking into account the

letter from Norma C. in setting penalty, however. Its "fleeting reference" (*People* v. *Douglas* (1990) 50 Cal.3d 468, 540 [268 Cal.Rptr. 126, 788 P.2d 640]) to "letters" at the end of its discussion of the motion does not persuade us that it considered Norma C.'s statement in reviewing the verdict.

It is more difficult to determine whether the court considered the inmate's letter in reviewing the motion. It appears that it did not—again, its brief references to it are far outweighed by its statement of the law that would guide it and its review of each statutory factor thereafter. But even if it did, it could only have done so in mitigation. The inmate was essentially pleading for the court to spare defendant's life, on the basis of his background and character and the circumstances of the crime as he understood them.

Defendant disagrees, asserting that the court's comment about the inconsistent accounts of the crime's circumstances showed that the court regarded either his testimony as perjurious or his statement to the inmate as false. We do not read as much into the court's statement as does he. In our view, the court was stating that after defendant told the inmate his story in June he "hereinafter" (i.e., in December) testified under oath, and was declaring that it would only consider the sworn testimony. Reading the record as a whole, we doubt that the court considered the inmate's letter at all, notwithstanding its brief reference to "letters." It certainly did not consider it in aggravation as showing a willingness to give false accounts.

Next, defendant asserts that the court's review of the penalty factors shows that it ignored facts in mitigation. The record shows, rather, that it carefully considered each factor. Even if it did not discuss each possible evidentiary fact that might apply in mitigation, it was not required to engage in a rote recitation of each single one (see *People* v. *Berryman, supra,* 6 Cal.4th at p. 1107)—absent an indication that it " 'ignored or overlooked' " (*ibid.*) the mitigating evidence, we will not find error, and there is no such indication of such an omission here.

Finally, defendant urges that the court went beyond the jury's findings when it decided that the circumstances of the crimes were aggravating and that one of them was his intentional killing of Skuse. We agree that the court implicitly did reach that conclusion. In defendant's view, the jury never decided that he intended to kill. We have, however, concluded that under the evidence presented the only reasonable conclusion the trier of fact could have reached was that defendant intended to kill Skuse. (*Ante,* at pp. 679-684.) Any error that occurred was harmless.

In sum, we conclude that no error occurred in ruling on the motion to modify the verdict. As there was no state law error, there is no predicate on

which to establish a claim of a constitutional violation. We reject defendant's claims.

## T. *Determinate Sentencing Issues.*

Defendant raises several claims regarding the discretion the court exercised in imposing sentence for his noncapital convictions. It sentenced him to 26 years and 4 months for the noncapital crimes, staying all of the determinate sentences until his execution, and in addition staying some of them with a stay to become permanent on successful completion of the unstayed determinate term. Defendant raised no claims of error at trial, but, because the proceedings predate *People* v. *Scott* (1994) 9 Cal.4th 331 [36 Cal.Rptr.2d 627, 885 P.2d 1040], we will consider them on appeal. (*People* v. *Davis*, *supra*, 10 Cal.4th 463, 552.)

### 1. *Sentence for Rape of Skuse.*

■ The court imposed a full consecutive sentence under section 667.6, subdivision (c), for the rape of Skuse because it "was such a vicious crime and the victim was beaten and murdered . . . ." It also imposed the upper term for the offense because "[t]he factors in aggravation heretofore stated are found to preponderate . . . ." These factors were the crime's violence and cruelty (Cal. Rules of Court, former rule 421(a)(1)), the victim's vulnerability (*id.*, former rule 421(a)(3)), and defendant's dangerousness, criminal record and probationary status (*id.*, former rule 421(b)(1), (2), & (4)).

Defendant contends that the court violated former rule 441(c) of the California Rules of Court, which provided that "[a] fact used to enhance the defendant's prison sentence may not be used to impose the upper term," by relying on the same fact to impose the full consecutive sentence under section 667.6 and to impose the upper term under the Rules of Court. He is correct. The court relied on the violent nature of the rape to impose a consecutive sentence and the upper term. This was error. (*People* v. *Coleman* (1989) 48 Cal.3d 112, 164 [255 Cal.Rptr. 813, 768 P.2d 32].)

But no prejudice appears. "Improper dual use of the same fact for imposition of both an upper term and a consecutive term or other enhancement does not necessitate resentencing if '[i]t is not reasonably probable that a more favorable sentence would have been imposed in the absence of the error.'" (*People* v. *Coleman*, *supra*, 48 Cal.3d at p. 166.) Only a single aggravating factor is required to impose the upper term (*People* v. *Castellano* (1983) 140 Cal.App.3d 608, 614-615 [189 Cal.Rptr. 692]), and the same is

true of the choice to impose a consecutive sentence (*People* v. *Coulter* (1989) 209 Cal.App.3d 506, 516 [257 Cal.Rptr. 391]). In this case, the court could have selected disparate facts from among those it recited to justify the imposition of both a consecutive sentence and the upper term, and on this record we discern no reasonable probability that it would not have done so. Resentencing is not required.

Defendant also contends that the court erred by failing to state adequate reasons on the record for its decision to impose a full consecutive sentence. Again, his point is persuasive. "It is well settled that in making sentencing choices pursuant to section 667.6, subdivision (c), sexual assault offenses, the trial court must state a reason for imposing a consecutive sentence and a separate reason for imposing a full consecutive sentence as opposed to one-third the middle term as provided in section 1170.1." (*People* v. *Pock* (1993) 19 Cal.App.4th 1263, 1277 [23 Cal.Rptr.2d 900].) Under the court rules in their present form, however, the court may "repeat the same reasons." (Cal. Rules of Court, rule 426(b).)

In this case the court referred to the violence of the crimes against Skuse as reason to impose a consecutive sentence, and to defendant's criminal record and Skuse's vulnerability as reasons for the upper term. It did not give separate reasons for its decision to impose a *full* consecutive sentence. Nevertheless, the error was harmless. It could have referred to the aggravating circumstances contained in the California Rules of Court that it found true other than the crimes' violence and cruelty as reasons to impose a full consecutive sentence, while imposing a consecutive sentence for the separate reason of the crimes' violence and cruelty. (*People* v. *Pock, supra,* 19 Cal.App.4th at pp. 1277-1278.) We discern no reasonable probability that it would not have chosen to do so. Resentencing is not required.

### 2. *Sentence for Attempted Murder of Norma C.*

The court imposed the upper term for the attempted murder of Norma C. It did so "because . . . the factors . . . in aggravation [listed *ante*, at page 728] clearly preponderate." It immediately added, "It is clear from the evidence . . . that this defendant had the intent to kill Norma C., the victim."

Defendant contends that the court's statement of reasons showed that it improperly relied on a fact constituting an element of attempted murder—the intent to kill—to impose the upper term. To be sure, as stated, the intent to kill is an element of the offense of attempted murder. (*People* v. *Visciotti, supra,* 2 Cal.4th 1, 56.) And former rule 441(d) of the California Rules of

Court forbade relying on a fact that constitutes an element of a crime to impose an upper term. (See now *id.*, rule 420(d).) But it is difficult to discern from the record whether the court was relying on defendant's mental state in imposing the upper term or whether its comment was a mere aside. In any event, even if error occurred, there is no reasonable probability that a more favorable sentence would have been imposed in the absence of the error. As stated, a single factor in aggravation suffices to support an upper term. (*People* v. *Castellano, supra,* 140 Cal.App.3d at pp. 614-615.) The court therefore could still have relied on the aggravating factors it listed to impose such a term. (Former § 1170, subd. (b), added by Stats. 1984, ch. 1432, § 9, p. 5028 [court shall impose middle term "unless there are circumstances in aggravation or mitigation of the crime"]; Cal. Rules of Court, rule 405(d).)

### 3. *Failing to Stay Sentences for Rape and Robbery of Skuse.*

■ The court imposed consecutive sentences for the rape and robbery of Skuse. Defendant claims that the court erred under state law (§ 654) and violated the United States Constitution, Fifth Amendment's double jeopardy clause in failing to stay them. He maintains that the jury may have found him guilty of felony murder on the basis of the underlying crimes of rape or robbery, or both, and therefore the court violated the Fifth Amendment's double jeopardy clause and section 654 to prejudicial effect when it sentenced him to terms of imprisonment for rape and robbery. (See *People* v. *Wader, supra,* 5 Cal.4th 610, 670 [discussing the double jeopardy clause]; *People* v. *Mulqueen* (1970) 9 Cal.App.3d 532, 547 [88 Cal.Rptr. 235] [discussing section 654].) He also maintains that the crimes were committed for a single objective, and therefore section 654 requires that the rape and robbery sentences be stayed. (*People* v. *Latimer* (1993) 5 Cal.4th 1203, 1208, 1216 [23 Cal.Rptr.2d 144, 858 P.2d 611].)

In response, the People contend that because it is unknown whether he was found guilty of first degree murder on a theory of felony murder or premeditation and deliberation, there is no double jeopardy problem or violation of section 654. Nor, they contend, is there any question of a single objective: when the court sentenced him on the rape and robbery counts it implicitly found that the crimes against Skuse involved more than one objective, a factual determination that must be sustained on appeal if supported by substantial evidence (*People* v. *Saffle* (1992) 4 Cal.App.4th 434, 438 [5 Cal.Rptr.2d 648]). In response to the latter point, defendant replies that there was no substantial evidence that the crimes were committed for more than one objective.

We agree with the People that the standard of review articulated in *Saffle* is correct, and disagree with defendant that no substantial evidence sustains

the court's implicit determination that he held more than one objective when he committed the crimes against Skuse. Therefore we decline to stay any sentence on the ground of section 654. And we need not decide whether, because the jury *may* have found him guilty on a theory of felony murder, the sentences imposed for the rape and robbery of Skuse must be stayed lest a violation of the Fifth Amendment's double jeopardy clause or any principle of state constitutional, statutory or decisional law occur. (Cf. *People* v. *Wader, supra*, 5 Cal.4th at p. 670 [concluding that the defendant there "was sentenced for robbery . . . and robbery-felony-murder" and that the Fifth Amendment's double jeopardy clause prohibits multiple punishments for the felony murder and the underlying crime of robbery].) The court did stay all of the determinate sentences pending execution of the sentence for murder: death. There is no risk of multiple punishments, because when the sentence for murder is carried out there will be no further punishment. (See *ibid.*)

Defendant also contends in passing that because the sentence for the burglary of Skuse's apartment was premised on underlying felonies of rape and robbery, the rape and robbery sentences must be stayed lest multiple punishments be imposed, evidently in violation of section 654 or the Fifth Amendment's double jeopardy clause. But the burglary sentence was stayed with a stay to be made permanent on successful completion of the determinate term. Hence, even if defendant's argument would have merit absent a stay of the burglary sentence—a question we need not address—it has no merit here, for the burglary sentence was stayed.

4. *Failing to Stay Sentence for Assault With Intent to Rape.*

Defendant next contends in essence that because he had only one intent in attacking Norma C.—we believe that he must mean to murder her—his sentence for assault with intent to rape (§ 220) should have been stayed, and the court committed error by failing to do so. We disagree: substantial evidence supports the implicit determination that he held the dual objectives of rape and murder during his attack on her.

5. *Number of Prior Convictions or Adjudications Needed to Find Aggravating Factor.*

Former rule 421(b)(2) of the California Rules of Court allowed the court to consider in aggravation defendant's "prior convictions as an adult or adjudications of commission of crimes as a juvenile" if they were "numerous or of increasing seriousness." The court found that this factor applied in aggravation, because he had been convicted of two batteries as an adult and had been adjudicated to have committed petty theft as a juvenile. He

contends that as a matter of law two convictions cannot be "numerous" (*People* v. *Berry* (1981) 117 Cal.App.3d 184, 191 [172 Cal.Rptr. 756]) and that the holding of *Berry* should be extended to three convictions or adjudications. We need not address that question, however. The court listed three circumstances in aggravation in discussing whether to impose more severe sentences on him. As stated, one sufficed for each purpose. (Cal. Rules of Court, rule 405(d); *id.,* former rule 425 ["Criteria affecting the decision to impose consecutive rather than concurrent sentences include: [¶] . . . [¶] (b) Any circumstances in aggravation or mitigation."]; *People* v. *Coulter, supra,* 209 Cal.App.3d at p. 516 [one aggravating factor suffices to impose consecutive sentences]; *People* v. *Castellano, supra,* 140 Cal.App.3d at pp. 614-615 [one aggravating factor suffices to impose upper term]; cf. Cal. Rules of Court, rule 425(b) [same fact may not be used to impose both consecutive sentence and upper term]; *People* v. *Coleman, supra,* 48 Cal.3d at p. 164 [citing former rule 441(c) to same effect].) Hence, even if we were to accept the argument that three instances of prior conviction or adjudication of crime cannot be "numerous," and that the court therefore erred in finding the factor in aggravation, it would not be required to alter its decision on remand and we perceive no reasonable probability that it would do so. We will not remand this aspect of the case for resentencing.

### 6. *Intent to Kill.*

Finally, defendant contends that because the jury did not find an intent to kill, his sentence is constitutionally infirm and also was imposed in violation of state law. Essentially he reasons that the court could not consider him to have had a separate objective of killing when he committed the Skuse crimes, and therefore section 654 prohibited the sentence he received on conviction of them. (See *People* v. *Latimer, supra,* 5 Cal.4th 1203, 1208, 1216.) But we reiterate that under the evidence presented the only reasonable conclusion the trier of fact could have reached was that defendant intended to kill Skuse. (*Ante,* at pp. 679-684.) Substantial evidence supports the ruling on sentence. (*People* v. *Macias* (1982) 137 Cal.App.3d 465, 470 [187 Cal.Rptr. 100] [referring to "implied jury finding" on intent].)

In sum, no prejudicial error occurred in fixing defendant's determinate term of imprisonment. We note that he further contends that the proceedings violated not only state law and the Fifth Amendment's double jeopardy clause in various respects, as outlined above, but also other provisions of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. We discern no violation of any federal constitutional guaranty in the setting of his determinate term.

### U. *Ineffective Assistance of Counsel at the Penalty Phase.*

Defendant lodges numerous claims that he received the ineffective assistance of counsel at the penalty phase, in violation of the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution. Many of the claims have been discussed elsewhere in our review of the penalty trial. We consider the rest here. As we will explain, they do not withstand scrutiny.

#### 1. *Failure to Object or to Assign Misconduct.*

Defendant reiterates his prior claims of ineffective assistance for failing to object or assign misconduct to the prosecutor's examinations and argument. We have already explained that no ineffective assistance occurred. We add that as a general matter, our review of the record establishes that the prosecutor conducted himself in a professional and unobjectionable manner.

#### 2. *Failing to Impeach Angela M. Following Statutory Rape Remark.*

Defense counsel asked Angela M. on cross-examination whether she was in the courtroom when defendant entered a plea on the battery charge involving her. This colloquy occurred:

"A. . . . I just sat back there, and he pleaded no contest, and that was about it.

"Q. Do you know what he pleaded to?

"A. No.

"Q. Do you know if it was battery?

"A. Oh, I believe it was statutory rape.

"Q. That's what your recollection was?

"A. (nodded head in affirmative)[.]"

On re-cross-examination, counsel took up this theme again:

"Q. When you were present when Mr. Osband entered a no contest plea, do you recall hearing him enter a plea to a battery?

"A. No, I don't recall. In fact, I don't even know what that is."

Defendant argues in essence that counsel were unprepared to impeach Angela M. with the record of his battery conviction and left the jury with the impression that he had done something much worse to her but escaped conviction therefor as the result of a plea bargain.

Any deficiency in counsel's performance, however, did not result in prejudice. "Statutory rape" is commonly understood to be the offense of unlawful sexual intercourse with a minor (§ 261.5), and we believe that the jury would so understand the term. Angela M. did not testify that she had sexual relations with defendant, consensual or otherwise—rather, he was molesting her and was interrupted by the sound of the front door being unlocked and opened, at which point she fled. The only article of clothing he removed or tried to remove was her belt. Moreover, she demonstrated on the witness stand that she did not understand what a "battery" was. The parties stipulated that defendant pleaded no contest to a misdemeanor charge of battery. It is very unlikely that the jury understood him to have committed "statutory rape" against Angela M., and there is no reasonable probability that the outcome of the penalty phase would have differed had counsel impeached Angela M. immediately with the record of his conviction rather than stipulating to it later.

### 3. *Failing to Object to Items Considered at Sentencing.*

 Defendant urges that counsel were ineffective for failing to object to the court's consideration of the probation officer's report and the letters from Norma C. and the Sacramento County jail cellmate, and at the court's mention of a purse-snatching from Cossman, given that she testified that she clutched her purse and kept it.

We have already explained that the court considered Norma C.'s letter only in deciding the determinate term. It was entitled to do so. (Former § 1170, subd. (b), added by Stats. 1984, ch. 1432, § 9, p. 5028 [court permitted to consider "any further evidence introduced at the sentencing hearing" in setting prison terms].) We have also explained that the court did not consider the inmate's letter in aggravation even if, as we doubt, it considered it at all. Defendant is correct, however, that the court erroneously stated, in the course of explaining why it was rejecting his motion to modify the verdict under section 190.4, subdivision (e), that he had seized Cossman's purse, when in fact she kept it. Counsel did not point out the error. However, there is no reasonable probability that if they had done so the court would have changed its mind and granted the motion. It stated that "the aggravating circumstances far outweigh any of the mitigating circumstances." Defendant was not denied the effective assistance of counsel.

Defendant also asserts in passing that counsel were ineffective for failing to argue all the mitigating evidence before the court. We have already stated, however, that there is no indication that the court ignored or overlooked the mitigating evidence.

### 4. *Failing to Prepare Witnesses and Present a Stronger Defense.*

Defendant argues that the witnesses called on his behalf at the penalty phase did little or nothing to bolster his case for life: either they offered insufficient mitigating evidence or they revealed unsavory aspects of their own background and character that, by association, tainted the jury's perception of those aspects of him.

On this record we cannot agree. It is true that, with the exception of testimony that at about age 17 defendant took it on himself to care for a sick individual, the witnesses on his behalf gave undramatic testimony that did not portray him as exceptionally virtuous, and some of them had adult or juvenile criminal records. Two of them testified in jail clothes. However, the witnesses may have been the best that he had available to him, and they did present mitigating evidence. We find no ineffective assistance of counsel on this record.

### 5. *Offering Misdemeanor Convictions in Aggravation.*

Defendant proposed the following instruction: "Evidence has been introduced that Lance Osband has been convicted of the crime of misdemeanor battery prior to the offense of murder in the first degree of which he has been found guilty in this case. [¶] Before you may consider such alleged crime as an aggravating circumstance in his case, you must first be satisfied beyond a reasonable doubt that Lance Osband was in fact convicted of such prior crime." (Capitalization altered.) The instruction was refused, the prosecutor correctly observing (§ 190.3, factor (c)) that a misdemeanor conviction may not be introduced in aggravation.

Elsewhere the record of the instructions conference shows a discussion of CALJIC No. 1.00 (4th ed. 1979 bound vol.). The standard instruction would have admonished the jury "not [to] be swayed by mere . . . sympathy . . . ." Counsel stated, "I remember there was some problem with 1.00 in conjunction with any capital case. It's either 1.00 or 1.01, and I can't remember the specific problem with it." The prosecutor replied, "1.00, I think, is the one that has the language that, 'You shall not consider sympathy,' but that's been removed from that." The prosecutor was wise to request modification of the instruction, and the court was wise to grant the request,

to forestall any possibility that the jury would be misled not to consider sympathy in reaching a verdict. (See *People* v. *Mayfield, supra,* 5 Cal.4th 142, 181-183; *People* v. *Wright, supra,* 52 Cal.3d 367, 442.)

Defendant contends that these exchanges reveal that counsel did not understand the law, a deficiency that resulted in the "withdrawal of defenses" because counsel did not know the law well enough to raise them, with resulting inadequacies in the instructions and in the closing argument. We do not discern the withdrawal of any defense, however. Moreover, counsel succeeded in persuading the court to offer special instructions favorable to him. (*Ante,* at pp. 705, 709-710.)

### 6. *Failing to Argue Factors in Mitigation.*

As previously mentioned, defendant persuaded the court to instruct the jury that it could consider in mitigation the absence of a prior felony conviction, his age at the time of the offense, his potential for rehabilitation, good behavior and a desire to learn in jail, whether the crime was aberrational, any lack of a record of significant prior criminal conduct, any intoxication by drugs at the time of the crimes against Skuse and Norma C., the likely effect of a death sentence on his family and friends, whether a mental disease or defect or the effects of substance abuse could account for the crime, and any other extenuating circumstance. (*Ante,* at p. 705.) He contends that counsel were ineffective for failing to argue all of these factors. In particular, he stresses that because some of the witnesses called on his behalf described his abuse of drugs, counsel needed to emphasize that actual intoxication or intoxication-induced diminished capacity at the time of the crimes were factors to be considered only in mitigation. In his view, they did not do so, an omission that allowed the prosecutor to argue without contradiction that if he stole from Skuse or Norma C. to obtain money for drugs or alcohol, that would be a particularly base motive that the jury could take into account in considering the circumstances of the crimes. (*Ante,* at pp. 706-708.) We stated that the prosecutor's argument was permissible. (*Ante,* at p. 708.)

During closing argument counsel treated rather sparely specific facts that the jury could entertain in mitigation. Instead, the argument contained a general plea to show mercy to defendant and compassion to his relatives, a description of the grim nature of imprisonment, an assertion that defendant was not so devoid of humanity that he should be executed, and a further implicit assertion that human life is worth preserving.

We have explained that counsel cannot be deemed ineffective when they elect to pursue a reasonable tactic at the penalty phase. (*People* v. *Gonzalez,*

*supra*, 51 Cal.3d 1179, 1250-1251.) This appears to have been a reasonable tactical choice. The testimony in defendant's favor was meager. There was little or nothing about the circumstances of the crimes that could be argued in mitigation, although counsel made an effort to do so. For all we know, jurors may have displayed distaste when they heard testimony about defendant's drug abuse. On this record we cannot find ineffective assistance of counsel for failing to pursue another strategy in closing argument.

In sum, defendant has failed to demonstrate that he received the ineffective assistance of counsel at the penalty phase.

### VI. *Cumulative Effect on Penalty of Errors Throughout the Trial.*

The jury was instructed to consider "all of the evidence . . . received during any part of the trial . . . ." Defendant contends that an accumulation of errors, both evidentiary and instructional, throughout the guilt and penalty phases "sufficiently undermines the confidence in the integrity of the penalty phase proceedings . . . that reversal is required" to remedy violations he discerns of state law and of the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution. He further argues that the significance of each error was magnified by the inadequacy of the record on appeal. We cannot agree. The trial was adequate under state law and the federal Constitution, and we have found the record adequate to enable us to determine his appeal.

### CONCLUSION

The judgment is affirmed.

**MOSK, J.**—I concur in the judgment.

The majority find harmless the error in omitting an explicit reference to the intent to kill from the felony-murder special-circumstance instructions because, in their view, overwhelming evidence leads to the conclusion that defendant did intend to kill. (Maj. opn., *ante*, at pp. 679-684.) I have explained that this type of harmless-error analysis is improper because the question "is *not* what a reviewing court might itself decide if it looked to the entire record," for "the reviewing court is not the proper decisionmaker." (*People* v. *Johnson* (1993) 6 Cal.4th 1, 56 [23 Cal.Rptr.2d 593, 859 P.2d 673] (conc. and dis. opn. of Mosk, J.).) Neither is the question "what a reviewing court might conjecture the jury would have decided in the absence of the error." (*Id.* at p. 57.) Rather, it is "what the jury actually decided and whether the error may have tainted its decision." (*Id.* at p. 56.)

Nevertheless, I agree with the majority that the error was harmless. Under the instructions given, the jury necessarily found an intent to kill.

As the People concede, failing to instruct the jury that it had to find intent to kill as an element of each of the felony-murder special circumstances was error under *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862]. We have held that whether the error was harmless is determined under the harmless-beyond-a-reasonable-doubt standard of *Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824]. (*People* v. *Johnson, supra,* 6 Cal.4th at p. 45.) The *Chapman* test is satisfied when the jury necessarily makes a finding adverse to the defendant on the issue erroneously omitted from the instructions. (See *Carella* v. *California* (1989) 491 U.S. 263, 270-271 [105 L.Ed.2d 218, 224-226, 109 S.Ct. 2419] (conc. opn. of Scalia, J.).)

Such is the case here. In finding each of the felony-murder special-circumstance allegations to be true, and also finding defendant guilty of burglary, robbery, and rape in the attack on Lois Minnie Skuse, the jury necessarily found as follows: defendant committed the murder, i.e., an unlawful killing with malice aforethought, while committing the indicated felony, and he did so for the purpose of committing the felony or avoiding the legal consequences thereof. The jury thereby necessarily found that, in committing the felony, he had the intent to kill. To kill for the purpose of achieving success or at least avoiding punishment with regard to a felony entails an intent to kill.

At pages 691-692, 702, 727, and 732 of the majority opinion, *ante,* the majority resolve claims raised on the basis of defendant's contention that the jury did not find an intent to kill. I would reject each of those claims for the reasons I have set forth above.

I recognize that in *People* v. *Whitt* (1984) 36 Cal.3d 724 [205 Cal.Rptr. 810, 685 P.2d 1161], we concluded rather summarily that under the language of a felony-murder special-circumstance instruction similar to those given here, "[t]he jury was not instructed to find that [the defendant] intended to kill . . . ." (*Id.* at p. 734.) We reasoned that "[n]o instruction *squarely posed* the question of an intent to kill." (*Id.* at p. 736, italics added.) Although that is true, the relevant point is that under the instructions given here the jury necessarily found such an intent.

I also recognize that, in finding each of the felony-murder special-circumstance allegations to be true, the jury necessarily found that the indicated felony "was [not] merely incidental to the commission of the murder." But

there is no basis to conclude that such a finding displaces those described above. As noted by the majority, the instructions stated: "To find that the special circumstance[] referred to in these instructions as murder in the commission of [the underlying crime] is true, it must be proved: [¶] 1. That the murder was committed while the defendant was engaged in the commission or attempted commission of [the underlying crime]; and [¶] 2. That the murder was committed in order to carry out or advance the commission of the [underlying] crime . . . or to facilitate the escape therefrom or to avoid detection. *In other words, the special circumstance referred to in these instructions is not established if the [underlying crime] was merely incidental to the commission of the murder.*" (Italics added.) The italicized words define a necessary condition—a not-merely-incidental felony is required—but not a sufficient condition—a not-merely-incidental felony is enough.

**KENNARD, J., Concurring and Dissenting.**—I concur in the judgment affirming defendant's death sentence for the first degree murder of Lois Minnie Skuse, and upholding his convictions for the attempted murder of Norma C., and for the other offenses committed during those two incidents. With one exception, I also agree with the reasoning of the majority. In particular, I agree that the trial court erred in failing to instruct the jury that it could find the felony-murder special-circumstance allegations to be true only if it determined that defendant intended to kill Skuse, and I agree that this error did not prejudice defendant. My disagreement is with the reasoning the majority uses to reach the conclusion that this error was nonprejudicial.

The majority reasons that the error was nonprejudicial because " 'the evidence of defendant's intent to kill . . . was overwhelming' " (maj. opn., *ante*, at p. 681), and therefore the majority is satisfied beyond a reasonable doubt that defendant would not receive a more favorable verdict if the matter were to be retried in a proceeding in which the error did not occur. The difficulty with this reasoning is that the majority is substituting its own judgment of what a hypothetical jury *would find* in an error-free proceeding for the jury's *actual findings* in this case, thereby denying defendant his federal constitutional right to a jury determination of the special circumstance charge.

In my view, the correct approach, as explained by recent decisions of the United States Supreme Court, is to closely examine the verdict, the instructions, and the evidence at defendant's actual trial to determine whether the jury actually found either intent to kill or some other fact that is its "functional equivalent." (See *Sullivan* v. *Louisiana* (1993) 508 U.S. 275, 280-281 [124 L.Ed.2d 182, 189-191, 113 S.Ct. 2078]; *Carella* v. *California* (1989) 491 U.S. 263, 271 [105 L.Ed.2d 218, 225-226, 109 S.Ct. 2419] (conc.

opn. of Scalia, J.).) As I explain here, the error in the instructions was harmless because, given the undisputed evidence establishing the manner of the killing in this case, the jury's finding that defendant killed Skuse was functionally the equivalent of finding that he did so with intent to kill.

Admittedly, the difference between the two approaches is subtle. But it is a difference upon which the United States Supreme Court has insisted as essential to the preservation and enforcement of criminal defendants' Sixth Amendment right to jury trial.

I

Penal Code section 190.2[1] provides that a defendant found guilty of first degree murder is subject to either a sentence of death or life imprisonment without possibility of parole if the trier of fact finds the existence of one or more special circumstances as defined in the statute. Among the special circumstances set forth are the "felony murder" special circumstances, which require a finding that the murder was perpetrated during the commission or attempted commission of certain enumerated felonies. (*Id.*, subd. (a)(17).) In *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131, 135 [197 Cal.Rptr. 79, 672 P.2d 862], this court construed section 190.2 as requiring "an intent to kill or to aid in a killing as an element of the felony murder special circumstance." Four years later, in *People* v. *Anderson* (1987) 43 Cal.3d 1104, 1147 [240 Cal.Rptr. 585, 742 P.2d 1306], this court overruled *Carlos*, concluding: "[I]ntent to kill is not an element of the felony-murder special circumstance; but when the defendant is an aider and abetter rather than the actual killer, intent must be proved." *Anderson* does not apply, however, to cases in which the murder was committed during the "window period" after *Carlos* but before *Anderson* (that is, between December 12, 1983, and October 13, 1987); in these cases, intent to kill is a necessary element of the felony-murder special circumstances. (*In re Baert* (1988) 205 Cal.App.3d 514, 521-522 [252 Cal.Rptr. 418]; accord, *People* v. *Johnson* (1993) 6 Cal.4th 1, 44-45 [23 Cal.Rptr.2d 593, 859 P.2d 673]; *People* v. *Fierro* (1991) 1 Cal.4th 173, 227 [3 Cal.Rptr.2d 426, 821 P.2d 1302].)

Here, the prosecution charged defendant with a murder that occurred on October 5, 1985, during the so-called window period, and alleged three felony-murder special circumstances, on the theory that the murder was perpetrated during the commission of the offenses of robbery, rape, and burglary. (Former § 190.2, subd. (a)(17)(i), (iii), and (vii).) When the trial court instructed the jury on the special circumstance allegations, it failed to instruct that as to each felony-murder special circumstance the prosecution

---

[1]Further undesignated statutory references are to the Penal Code.

had to prove defendant's intent to kill. This was error, and the majority so holds.

The majority further holds that the error was not prejudicial because " 'the evidence of defendant's intent to kill . . . was overwhelming, and the jury could have had no reasonable doubt on the matter.' " (Maj. opn., *ante*, at p. 681.) I too am of the view that the error was not prejudicial, but for reasons different from those articulated by the majority.

## II

This court has consistently held that when a trial court fails to instruct the jury on an element of a special circumstance allegation, the error violates the federal Constitution, and the prejudicial effect of that error must be measured by the test the high court set forth in *Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824]. (*People* v. *Garcia* (1984) 36 Cal.3d 539, 550-552 [205 Cal.Rptr. 265, 684 P.2d 826]; *People* v. *Odle* (1988) 45 Cal.3d 386, 414-415 [247 Cal.Rptr. 137, 754 P.2d 184]; accord, *People* v. *Johnson*, *supra*, 6 Cal.4th 1, 45.) Under that test, an error implicating the federal Constitution may be found harmless only when, beyond a reasonable doubt, the error did not contribute to the verdict. (*Chapman*, *supra*, at p. 24 [17 L.Ed.2d at pp. 710-711].) *Garcia* and *Odle* relied on the due process clause of the Fourteenth Amendment to support their conclusion that a trial court's failure to instruct on an element of the special circumstance allegation violates the federal Constitution. (*Garcia*, *supra*, at p. 552; *Odle*, *supra*, at p. 412.) In my view, the error also violates the federal Constitution's Sixth Amendment, which "gives a criminal defendant the right to have a jury determine, beyond a reasonable doubt, his guilt of every *element of the crime* with which he is charged." (*United States* v. *Gaudin* (1995) 515 U.S. __, __ [132 L.Ed.2d 444, 458, 115 S.Ct. 2310, 2320], italics added.)

Generally, the definition of crimes and their elements is a legislative prerogative. (*McMillan* v. *Pennsylvania* (1986) 477 U.S. 79 [91 L.Ed.2d 67, 106 S.Ct. 2411].) Under California's death penalty law, which defines the crime of capital murder, the special circumstances are tried at the guilt phase of the trial together with a charge of first degree murder. (§§ 190.1, 190.4, subd. (a).) If, after finding the defendant guilty of first degree murder, the jury also finds the existence of at least one special circumstance, the defendant is eligible for the death penalty or for life imprisonment without possibility of parole. (*Ibid.*) The case then proceeds to the penalty phase, at which the jury decides whether to impose a sentence of death or of life imprisonment without possibility of parole based on the presence or absence of certain statutory factors in aggravation and mitigation. (§ 190.3.)

If the legislative intent was that the special circumstances in California's capital scheme be treated as the equivalent of or integral to criminal offenses, then the Sixth Amendment of the federal Constitution comes into play, giving defendants the right to have a jury decide the truth or falsity of such allegations. A trial court's failure to instruct the jury on an element of a special circumstance allegation removes the issue from the jury's consideration, thus violating the Sixth Amendment. If, on the other hand, the legislative intent was that the special circumstances be treated simply as sentencing factors, the Sixth Amendment would not apply, for "there is no Sixth Amendment right to jury sentencing, even where the sentence turns on specific findings of fact." (*McMillan* v. *Pennsylvania, supra*, at p. 93 [91 L.Ed.2d at p. 81]; accord, *People* v. *Bacigalupo* (1991) 1 Cal.4th 103, 147 [2 Cal.Rptr.2d 335, 820 P.2d 559] [no Sixth Amendment right to jury trial at the penalty phase, and thus no right to a unanimous jury finding on aggravating and mitigating factors].)

Under the due process clause of the Fourteenth Amendment, the analysis is the same. "[I]n determining what facts must be proved beyond a reasonable doubt the state legislature's definition of the elements of the offense is usually dispositive: '[T]he Due Process Clause requires the prosecution to prove beyond a reasonable doubt all of the elements *included in the definition of the offense* of which the defendant is charged.' " (*McMillan* v. *Pennsylvania, supra*, 477 U.S. at p. 85 [91 L.Ed.2d at p. 75], original italics.) As a general rule, however, the Fourteenth Amendment does not require that factors to be used only in determining a defendant's sentence be proven beyond a reasonable doubt. (*McMillan, supra*, at pp. 86-92 [91 L.Ed.2d at pp. 76-80].)

Special circumstances, to some extent, defy classification. As this court observed in *People* v. *Garcia, supra*, 36 Cal.3d at page 552, "special circumstances are *sui generis*—neither a crime, an enhancement, nor a sentencing factor." This court has, however, noted the "resemblance between a special circumstance proceeding and a trial to determine guilt." (*Ibid.*) For example, the statutory procedures governing the pleading and proof of a special circumstance allegation are identical to those applicable to criminal offenses: The trier of fact must determine the truth or falsity of special circumstance allegations at the guilt phase of trial (§ 190.1, subd. (a)); that determination is based "on the evidence presented at the trial," (§ 190.4, subd. (a)).[2] In addition, at the preliminary hearing on a charge of capital murder, the prosecution must offer evidence supporting each special circumstance allegation (just as it must for the murder charge); if the prosecution

---

[2]One special circumstance, the prior-murder special circumstance, is different. When the prosecution alleges a prior-murder special circumstance, the truth or falsity of this special

fails to do so, the defendant may move to dismiss the special circumstance allegation for insufficiency of evidence. (*Ramos* v. *Superior Court* (1982) 32 Cal.3d 26, 34 [184 Cal.Rptr. 622, 648 P.2d 589].) A special circumstance allegation likewise is an "offense" within the meaning of section 1387, which bars "any other prosecution for the same offense" when a felony action has twice been terminated. (*Ramos*, *supra*, at p. 36.) In short, as we explained in *Garcia*: " 'In the California scheme the special circumstance is not just an aggravating factor: it is a fact or set of facts, found beyond reasonable doubt by a unanimous verdict (Pen. Code, § 190.4), which changes the crime from one punishable by imprisonment of 25 years to life to one which must be punished either by death or life imprisonment without possibility of parole.' " (*People* v. *Garcia*, *supra*, 36 Cal.3d at p. 552, quoting *People* v. *Superior Court* (*Engert*) (1992) 31 Cal.3d 797, 803 [183 Cal.Rptr. 800, 647 P.2d 76].)

Because of the similarities between a special circumstance proceeding and a trial to determine guilt or innocence, this court has held that a trial court's failure to instruct the jury on an element of a special circumstance *is a denial of federal due process*. (*People* v. *Garcia*, *supra*, 36 Cal.3d at p. 552; *People* v. *Odle*, *supra*, 45 Cal.3d at p. 412.) As explained above, the same method of analysis is used to determine the applicability of the Sixth Amendment right to jury trial; it therefore follows that if failure to instruct on an element of a special circumstance allegation violates the due process clause of the Fourteenth Amendment, it also violates the Sixth Amendment right to jury trial.

I now turn to the question of how to evaluate the prejudicial effect of the trial court's failure to instruct the jury on intent to kill as an element of the felony-murder special circumstances.

### III

In deciding that the trial court's instructional error was harmless beyond a reasonable doubt, the majority relies on this court's decision in *People* v. *Johnson*, *supra*, 6 Cal.4th 1, 46, which concluded that a trial court's failure to instruct on intent to kill as an element of a special circumstance allegation is not prejudicial if *"the evidence before the jury was so overwhelming as to leave it beyond a reasonable doubt the verdict would have been the same had the jury been instructed regarding the necessity of finding an intent to kill."* (Italics added.) Applying the *Johnson* test here, the majority holds that defendant was not prejudiced by the instructional error because " 'the evidence of defendant's intent to kill . . . was overwhelming, and the jury

---

circumstance is determined at neither the guilt nor the penalty phase, but at a separate stage of trial. (§§ 190.1, subd. (b), 190.4, subd. (a).)

could have had no reasonable doubt on that matter.' " (Maj. opn., *ante*, at p. 681, quoting *People* v. *Johnson*, *supra*, at pp. 45-46.)

I concurred in *People* v. *Johnson*, *supra*, 6 Cal.4th 1, which was decided in 1993. Since then, however, I have reconsidered the issue and have concluded that to the extent the harmless error analysis used in *Johnson* relies on overwhelming evidence, that analysis does not conform to federal constitutional law as enunciated by the United States Supreme Court.

In 1994, the year after *People* v. *Johnson*, *supra*, 6 Cal.4th 1, was decided, this court was again called upon to apply federal harmless error standards to instructional error. In *People* v. *Harris* (1994) 9 Cal.4th 407 [37 Cal.Rptr.2d 200, 886 P.2d 1193], the jury instructions had incorrectly defined an element of robbery. As it had done in *Johnson*, the court in *Harris* determined the prejudicial effect of the instructional error by reasoning that instructional error in incorrectly defining an element was not prejudicial if the evidence of guilt was so overwhelming as to establish guilt as a matter of law. (*Id.* at p. 431.) I disagreed with the majority's harmless error analysis in *Harris*. Setting forth my understanding of the pertinent decisions of the United States Supreme Court on the issue of harmless error when a jury instruction misdescribes an element of an offense, I observed:

"When a trial court, in instructions to the jury, incorrectly defines one of the elements of the crime with which the defendant is charged, the defendant's conviction of that crime can be affirmed on appeal only if the reviewing court is persuaded beyond a reasonable doubt that the error did not 'contribute to' the verdict. (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065]; see also *Pope* v. *Illinois* (1987) 481 U.S. 497, 502 [95 L.Ed.2d 439, 446, 107 S.Ct. 1918]; *People* v. *Hayes* [1990] 52 Cal.3d 577, 628 [276 Cal.Rptr. 874, 802 P.2d 376].) To determine whether an error 'contributed to' a verdict, a reviewing court does not ask whether a hypothetical jury in a hypothetical trial in which the error did not occur would surely have reached the same verdict. (*Sullivan* v. *Louisiana* (1993) 508 U.S. [275, 277-280] [124 L.Ed.2d 182, 188-189, 113 S.Ct. 2078, 2081].) Rather, the reviewing court must ask whether the guilty verdict actually rendered in this trial was 'surely unattributable to the error.' (*Ibid.*) This is because the Sixth Amendment right to jury trial means that the jury, and not a reviewing court, must find beyond a reasonable doubt every fact needed to convict.

" . . . . . . . . . . . . . . . . . . . . . . .

"Under the United State's Supreme Court's decisions in *Yates* v. *Evatt* [1991] 500 U.S. 391 [114 L.Ed.2d 432, 111 S.Ct. 1884], and *Sullivan* v.

*Louisiana, supra*, 508 U.S. [275] [124 L.Ed.2d 182, 113 S.Ct. 2078], the focus of the harmless error analysis is upon the verdict actually rendered in [a particular] case, not the verdict that would have been rendered in a hypothetical trial free of instructional error. Thus, if an instructional error prevents the jury from making a necessary factual finding, it is generally irrelevant that the evidence supporting that finding was overwhelming. In the words of Justice Scalia, 'misdescription of an element of the offense . . . deprives the jury of its factfinding role' and thus is 'not curable by over-whelming record evidence of guilt.' (*Carella v. California* (1989) 491 U.S. 263, 270 [105 L.Ed.2d 218, 225, 109 S.Ct. 2419] (conc. opn. of Scalia, J.).)" (*People v. Harris, supra*, 9 Cal.4th at pp. 455-457 (conc. and dis. opn. of Kennard, J.).)[3]

I then concluded in *Harris* that when a trial court, in instructions to the jury, incorrectly defines one of the elements of the crime with which the defendant is charged, the jury is deprived of its fact-finding role. I further concluded, however, that the instructional error in *Harris* was harmless beyond a reasonable doubt (*Chapman v. California, supra*, 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711]) because it had not "contributed to" the verdict. As I pointed out, the facts underlying the incorrectly defined element were conclusively established by the evidence at Harris's trial; thus, the jury was not called upon to make a finding on that element. (*People v. Harris, supra*, 9 Cal.4th at pp. 458-459 (conc. and dis. opn. of Kennard, J.).)

The instructional error in *Harris* pertained to the *incorrect definition* of an element of robbery. Here, the trial court failed to instruct the jury that intent to kill was an element of the felony-murder special circumstances alleged. Thus, this case involves the *complete failure to instruct on an element* of the special circumstance allegations. In either situation, the instructional error's effect upon a jury is the same: it prevents the jury from making a necessary factual finding. In *Harris*, the trial court's misdescription of an element was, in my view, " 'not curable by overwhelming record evidence of guilt.' " (*People v. Harris, supra*, 9 Cal.4th at p. 457 (conc. and dis. opn. of Kennard, J.), quoting *Carella v. California, supra*, 491 U.S. 263, 270 [105 L.Ed.2d 218, 224-225] (conc. opn. of Scalia, J.).) So too here, the trial court's error in failing to instruct the jury on an element of the felony-murder special-circumstance allegations cannot be cured by considering the weight of the evidence, as the majority does.

---

[3]I have twice urged the high court to provide clarification of its harmless error analysis, in my concurring and dissenting opinion in *People v. Harris, supra*, 9 Cal.4th 407, 460-461, and more recently in my concurring and dissenting opinion in *People v. Wims* (1995) 10 Cal.4th 293, 328, footnote 10 [41 Cal.Rptr.2d 241, 895 P.2d 77], stressing that "the United States Supreme Court has not clearly described how a reviewing court should conduct a harmless error evaluation when the trial court has inaccurately defined, or failed to define, the elements of a criminal offense to the jury." I again urge the high court to clarify this issue.

Nonetheless, I conclude that the instructional error was harmless under *Chapman* v. *California*, *supra*, 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711]. In reaching this conclusion, I rely on the reasoning of Justice Scalia in his concurring opinion in *Carella* v. *California*, *supra*, 491 U.S. 263, 271 [105 L.Ed.2d 218, 224-225]. In that case, a jury instruction on an element of an offense contained a mandatory conclusive presumption. The instruction told the jurors that if they found the existence of certain facts (the predicate facts), they were required to conclusively presume another fact (the ultimate fact). Justice Scalia explained one situation in which this instructional error might be deemed not to have "contributed to" the verdict within the meaning of *Chapman*, and thus to be harmless.

Justice Scalia put it this way: "When the predicate facts relied upon in the instruction, or other facts necessarily found by the jury, are so closely related to the ultimate fact to be presumed that no rational jury could find those facts without also finding that ultimate fact, making those findings is functionally equivalent to finding the element required to be presumed. The error is harmless because it is 'beyond a reasonable doubt' *Chapman* v. *California*, 368 U.S. 18, 24 [17 L.Ed.2d 710-711] (1967) that the jury found the facts necessary to support the conviction." (*Carella* v. *California*, *supra*, 491 U.S. 263, 271 [105 L.Ed.2d 218, 225-226] (conc. opn. of Scalia, J.); accord, *Sullivan* v. *Louisiana*, *supra*, 508 U.S. 275, 280-281 [124 L.Ed.2d 182, 189-191].)

As an illustration of this mode of harmless error analysis, Justice Scalia quoted the following passage from *Rose* v. *Clark* (1986) 478 U.S. 570, 580-581 [92 L.Ed.2d 460, 472, 106 S.Ct. 3101]: "In many cases, the predicate facts conclusively establish intent, so that no rational jury could find that the defendant committed the relevant criminal act but did not *intend* to cause injury." (Original italics.)

Adapting this analysis to the situation in this case, the trial court's error in failing to instruct on the need to find intent to kill may be deemed harmless if the jury, untainted by the error, necessarily found that defendant committed certain criminal acts and no rational jury could find that defendant committed those acts without intent to kill. In other words, the error may be deemed harmless if "[t]he method of execution itself precludes any inference the murder was accidental or unintentional." (*People* v. *Johnson*, *supra*, 6 Cal.4th 1, 47.) This is such a case.

The question to be answered is whether in this case the jury necessarily found that defendant had the intent to kill Lois Minnie Skuse. At trial, undisputed evidence conclusively established that Skuse was a tiny, frail,

66-year-old woman with osteoporosis ("brittle bones"); that she died from a one-and-three-quarter-inch-deep V-shaped stab wound to her neck that partially severed her carotid artery; and that the fatal wound was inflicted after Skuse had suffered a broken rib and a broken jaw as the result of a severe beating. In convicting defendant of murdering Skuse, the jury necessarily found that he inflicted a deep, V-shaped stab wound in an obviously vital area of an elderly victim who, given her generally frail physical condition and the beating administered to her, could have offered no resistance at all. Because this method of killing is irreconcilable with any intent on the part of the perpetrator other than an intent to kill, the jury's finding, untainted by instructional error, that defendant committed this criminal act was the "functional equivalent" of a finding that defendant had the intent to kill Lois Minnie Skuse when he inflicted the fatal injury. For this reason, I conclude that the instructional error did not contribute to the special circumstance finding and is therefore harmless beyond a reasonable doubt under *Chapman* v. *California, supra,* 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711].

There is an important distinction between the harmless error analysis I have engaged in, which is premised on the test articulated in Justice Scalia's concurring opinion in *Carella* v. *California, supra,* 491 U.S. 263, 271 [105 L.Ed.2d 218, 225-226], and the overwhelming evidence test set forth by this court in *People* v. *Johnson, supra,* 6 Cal.4th 1, 46, relied on by the majority. I evaluate the evidence to decide what the jury in this case necessarily found, whereas the majority decides what a hypothetical jury considering the evidence presented at trial would have found. Although this distinction does not affect the outcome here, it may well do so in other cases.

Appellant's petition for a rehearing was denied October 17, 1996, and the opinion was modified to read as printed above.